# ORDER OF PROOF

| Action/Element | Fact | Evidence |
|---|---|---|
| **Defamation** | | |
| 1. Defendant published statement of fact; | Magedson published statements and comments regarding GW Equity on the Websites. | *See* Exhibits 3-7 to the Affidavit of Ryan Binkley, Apx. at 000058-000076; Deposition Transcript of Dickson Earl Woodward at Vol. I. 183:6-8, 237:18-238:11, Apx. at 000106-000117 |
| 2. Statement referred to plaintiff; | The statements and comments on the Websites clearly referred to GW Equity's business practices and reputation. | *See* Exhibits 3-7 to the Affidavit of Ryan Binkley, Apx. at 000058-000076 |
| 3. Statement was defamatory to plaintiff, in that it damaged the plaintiff's reputation, exposing him to financial injury; and | The statements and comments on the Websites regarding GW Equity damaged its reputation and have caused it to lose existing and potential clients. | Affidavit of Ryan Binkley ¶¶ 15-19 (discussing loss of existing and potential clients), Apx. at 000051-000054; Supplemental Affidavit of Ryan Binkley ¶¶ 4-6, Apx. at 000128-000129 (discussing recent loss of potential clients) |
| 4. False. | The statements and comments on the Websites are false and misleading. | Affidavit of Ryan Binkley ¶ 5, Apx. at 000050 (denying any relationship between GW Equity and Geneva Enterprises and Citigroup); Deposition of Dickson Earl Woodward, Vol. II, 414:1-18, 480:15-481:2, Apx. at 000116-000124 |

GW Equity LLC v. Xcentric Ventures LLC et al

Dockets.Justia.com

Doc. 6 Att. 7

APX 000103

# ORDER OF PROOF

| Business Disparagement | | |
|---|---|---|
| 1. The defendant published disparaging words about the plaintiff's economic interests; | Magedson published statements and comments regarding the character of GW Equity's business on the Websites. | *See* Exhibits 3-7 to the Affidavit of Ryan Binkley, Apx. at 000058-000076; Deposition Transcript of Dickson Earl Woodward at Vol. I. 183:6-8, 237:18-238:11, Apx. at 000106-000117 |
| 2. The words were false; | The statements and comments on the Websites are false and misleading. | Affidavit of Ryan Binkley ¶ 5, Apx. at 000050 (denying any relationship between GW Equity and Geneva Enterprises and Citigroup); Deposition of Dickson Earl Woodward, Vol. II, 414:1-18, 480:15-481:2, Apx. at 000116-000124 |
| 3. The defendant published the words with malice; | Defendants published the statements and comments on the Websites with full knowledge that they were false. After GW Equity requested that Defendants remove these statements, Defendants refused to do so unless GW Equity agreed to enter into the remediation program for a considerable sum of money. | Affidavit of Ryan Binkley ¶ 14, Apx. at 000052 (explaining how Defendants offered to remedy the false and misleading statements only if GW Equity entered into a program they offered for a fee) |
| 4. The defendant published the words without privilege; and | Defendants cannot assert protection under the CDA for the false and misleading statements because it created and developed the original information on the Websites by | *MCW, Inc. v. Badbusinessbureau.com*, No. 3:02-CV-2727-G, 2004 WL 833595, at *9-10 (N.D. Tex. Apr. 19, 2004) (finding no immunity under the |

| | | |
|---|---|---|
| | altering report content and titles.<br><br>Defendants cannot find protection under the First Amendment for the false and misleading statements because this is not a protected form of speech. | CDA for defendants who went beyond the publisher's role and developed some of the defamatory information on the websites)<br><br>False or misleading commercial speech may be prohibited in its entirety because it does not receive the same heightened protection under the First Amendment. *Ibanez Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 142 (1994); *Proctor & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 557 (5th Cir. 2001), *cert. denied*, 534 U.S. 945 (2001). |
| 5. The publication caused special damages. | The statements and comments on the Websites regarding GW Equity damaged its reputation and have caused it to lose existing and potential clients. | Affidavit of Ryan Binkley, ¶¶ 15-19, Apx. at 000051-000054 (discussing loss of existing and potential clients); Supplemental Affidavit of Ryan Binkley ¶¶ 4-7, Apx. at 000128-000130 (discussing recent loss of existing and potential clients) |

APX 000105

CAUSE NO. 06-12231

| | | |
|---|---|---|
| GW EQUITY, L.L.C., | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | DALLAS COUNTY, TEXAS |
| | ) | |
| DIXON WOODARD, et al., | ) | |
| | ) | |
| Defendants. | ) | 116TH JUDICIAL DISTRICT |

-----------------------------------------------------------

ORAL DEPOSITION OF

DICKSON EARL WOODARD

VOLUME 1 OF 2

MAY 3, 2007

-----------------------------------------------------------

ORAL DEPOSITION OF DICKSON EARL WOODARD, produced as

a witness at the instance of the plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on the 3rd of May, 2007, from 10:03 a.m. to 5:22 p.m.,

before Julia E. Whaley, CSR, CRR, RMR, and Notary Public

in and for the State of Texas, reported by machine

shorthand, at the law offices of McCreary & Stockford,

L.L.P., 18333 Preston Road, Suite 150, Dallas, Texas,

pursuant to the Texas Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

00851e06-ad9e-461c-9be0-b7fb4604017d

Page 283

CAUSE NO. 06-12231

| | |
|---|---|
| GW EQUITY, L.L.C., | ) IN THE DISTRICT COURT |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) DALLAS COUNTY, TEXAS |
| | ) |
| DIXON WOODARD, et al., | ) |
| | ) |
| Defendants. | ) 116TH JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION

ORAL DEPOSITION OF DICKSON EARL WOODARD, VOLUME 1

MAY 3, 2007

I, Julia E. Whaley, CSR, CRR, RMR, and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, DICKSON EARL WOODARD, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition transcript was submitted on the _____ day of May, 2007, to the witness for examination, signature, and return to the court reporter by June _____, 2007;

That the amount of time used by each party at the deposition is as follows:

Ms. Pannell - 4 hours, 55 minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the

00851e06-ad9e-461c-9be0-b7fb4604017d

1 | following includes all parties of record:

2 | FOR THE PLAINTIFF:

3 |       MS. KRISTEN M. PANNELL
        and MR. BRAD E. STOCKFORD
4 | McCreary & Stockford, L.P.
        18333 Preston Road
5 | Suite 150
        Dallas, Texas  75252

6 | APPEARING PRO SE:

7 |
        MR. DICKSON EARL WOODARD
8 | 5317 Anchor Bay Drive
        Garland, Texas  75043

9 |

10 |      I further certify that I am neither counsel for,

11 | related to, nor employed by any of the parties in the

12 | action in which this proceeding was taken, and, further,

13 | that I am not financially or otherwise interested in the

14 | outcome of the action.

15 |      Further certification requirements pursuant to Rule

16 | 203 of TRCP will be certified to after they have

17 | occurred.

18 |      Sworn and certified to by me this _____ day of May,

19 | 2007.

20 |
                        Julia E. Whaley, CSR NO. 2961
21 |                     LONE STAR REPORTING
                        723 Woodlake Drive
22 |                     Coppell, Texas  75019
                        (972) 402-9885  Fax (972) 393-3611
23 |                     Firm registration number 379
                        Certification Expires 12-31-07
24 |                     Notary Comm. Expires 11-20-09

25 |

1           FURTHER CERTIFICATION UNDER RULE 203 TRCP

2        The original deposition was/was not returned to the

3    deposition officer on                          ;

4        If returned, the attached changes and signature page

5    contains any changes and the reasons therefor.

6        If returned, the original deposition was delivered

7    to Ms. Kristen M. Pannell, Custodial Attorney.

8        That $_____ is the deposition officer's

9    charges for preparing the original deposition transcript

10   and any copies of exhibits, charged to Ms. Kristen M.

11   Pannell, Attorney for Plaintiff.

12       That the deposition was delivered in accordance with

13   Rule 203.3 and that a copy of this certificate was served

14   on all parties shown herein and filed with the Clerk.

15       Certified to by me this     day of          ,

16   2007.

17

18
                        Julia E. Whaley, CSR NO. 2961
19                      LONE STAR REPORTING
                        723 Woodlake Drive
20                      Coppell, Texas  75019
                        (972) 402-9885  Fax (972) 393-3611
21                      Firm registration number 379
                        Certification Expires 12-31-07
22                      Notary Comm. Expires 11-20-09

23

24

25

1 | people off and not --

2 |     A.   Oh, absolutely.  I mean the complaints filed

3 | just with the Better Business Bureau, which was something

4 | I should have looked at to begin with, is that -- there's

5 | a little clause in there that will guarantee they will

6 | get you a job in 90 days.

7 |          But after the first nine days after the work

8 | has been done on the resumes, it's kind of a sliding

9 | scale toward that 90 days.  If you're still there after

10 | 90 days, they don't owe you any money because, you know,

11 | they're already doing work for you at the end of 90 days.

12 |          What they'll do is redo your resume for you for

13 | another 90 days.  But I mean as far as the money-back

14 | guarantee for you being employed in 90 days, it's

15 | complete bullshit.

16 |     Q.   So did Ed believe --

17 |     A.   That was his problem.

18 |     Q.   Did Ed believe that McKenzie Scott was also

19 | ripping people off?

20 |     A.   He knew -- he knew way before -- I mean he's

21 | the one that explained to me in detail I mean how this

22 | was being done.  And when I researched into it, he

23 | couldn't have been any more accurate.

24 |     Q.   So it was Ed who told you they were ripping

25 | people off, McKenzie Scott was ripping people off?

1     A.   He said, I don't know what you're so mad at me

2  for.  These guys are ripping people off.

3     Q.   Do you realize that if you go onto Rip Off

4  Report today and you look up McKenzie Scott, there's a

5  banner from Ed saying that he has looked into this and

6  researched this matter and that McKenzie Scott's actually

7  a great company?

8     A.   They paid him off, then.

9     Q.   Okay.  So Ed's willing to write that if you pay

10  him enough money?

11     A.   Yeah.  Absolutely.  He takes it off.  And not

12  only does he take off the negative report.  He replaced

13  them with positive reports.  He's writing them, himself.

14  So everything that's in the negative, he will spin it and

15  say the company feels terrible about this situation

16  happening and we -- we rectify it the best we possibly

17  can, and it looks like you're -- you're timely in your --

18  in your response to the general public.

19        So he takes you from zero to hero.  And now if

20  they pull up Rip Off Reports, you're one of the few

21  positive things on there.  These other people have got

22  negative reports.  Man, this company is -- I mean he has

23  got nothing bad to say about them at all.  He makes his

24  money off --

25     Q.   Ed will actually write the reports, though?

1      A.    Yes.

2      Q.    He'll write the reports, and he'll write the

3  headings on the report?

4      A.    Yeah.  I mean that's part of what he does, is

5  the background and the due diligence, and probably more

6  than highly likely hacking into the networks that would

7  afford him the necessary data to produce details or --

8  and/or he does have some complaints that he can -- he can

9  kind of combine or make -- make with the data that he

10  does have and what he -- the result is a very readable,

11  believable sounding, heart-wrenching story about

12  somebody's getting shafted.

13          But he only needs, like, two complaints or just

14  to get into their net -- somebody's network, and he's

15  got, you know, all of their clients.  And if there's any

16  kind of Better Business Bureau, he's checking courthouse

17  records, anything he can compile that will even remotely

18  look like it could possibly be based on fact.

19          I think you said there's a Bill or somebody in

20  Wisconsin or something.  I'm sure there's a Bill in

21  Wisconsin, you know.  It -- typically more a -- a little

22  bit more detailed than that as far as how it fits into

23  whatever the person that's looking for the due diligence

24  that it's going to make sense to them.

25          He's got to know enough about their business,

00851e06-ad9e-461c-9be0-b7fb4604017d

1    what they do, to undermine the confidence the person has

2    in them.  And that's how he puts these people out of

3    business.

4         Q.    So why would Ed do this?

5         A.    He actually has completely -- I mean -- and I

6    believe this honestly.  He actually believes that he is

7    conducting a -- a -- an endeavor that's helping the

8    general public.  And his rationalization for this

9    thinking is if it wasn't so insane, it would be

10   brilliant.

11        But he -- and he's had a hard life.  He got

12   screwed over early at 17 by some major corporation, and

13   somebody stole his bicycle or something.  And he changed

14   his name to Ed Magedson when he was 17, and he's been Ed

15   ever since.  And he just -- some people do look at him as

16   the quickest way for consumer protection out there and --

17        Q.    That's interesting that you say that, Dickson,

18   because just five minutes ago, we were talking about how

19   even though he believed McKenzie Scott was this big

20   fraud, he was willing to change his opinion and write

21   good things about them to the detriment of consumers if

22   they paid him money.

23        A.    And I have a perfect explanation for that, too.

24   You're exactly right.  I mean I'm not saying the man is

25   not an extortionist, but he does have the Robin Hood

00851e06-ad9e-461c-9be0-b7fb4604017d

Page 183

1   maintains that he has never posted anything either.  So

2   gnomes are putting it on there.

3       Q.   What?

4       A.   Gnomes like cobblers.  He maintains that he's

5   never written one before in his life, but there's --

6       Q.   You already testified that he told you that he

7   wrote some of those reports?

8       A.   Exactly.

9       Q.   Okay.  So that was --

10      A.   It's a completely different conversation, I

11  mean.

12      Q.   But I'm asking you, when you get onto the web

13  site, ripoffreport.com, do you have to sign in and, like,

14  write your user name, or can you sign in as an

15  unregistered guest, or how does that work?

16      A.   I don't know.  It's a public web site.  It's

17  like Better Business Bureau.  You don't have to sign in

18  to anything.

19      Q.   So I can just get on there and post whatever I

20  want?  I don't have to provide an e-mail address --

21      A.   I don't --

22      Q.   -- or -- I don't have to provide an e-mail

23  address or anything?

24      A.   I don't know about posting.  I just know if you

25  want to search via his little Google thing in there for

1    Q.   I don't care how many days later it was,

2   Dickson.  Did you, in fact, go and look into filing class

3   action lawsuits after you got the idea from Jeff Robinson

4   that it was a lucrative industry?

5    A.   Yes.  That would be -- that would be -- that

6   would be good.

7    Q.   Thank you.

8    A.   I mean that's a good question to ask me if it

9   wasn't tripping over itself with inconsistencies.

10               MR. STOCKFORD:  Objection; nonresponsive.

11               THE WITNESS:  You can object your ass off.

12               MR. STOCKFORD:  Objection; nonresponsive.

13    Q.   (By Ms. Pannell)  Okay.  I'm going to hand you

14   now, Dickson, what has been marked Plaintiff's Exhibit

15   No. 2.  This is a printout of a posting that has been

16   made on www.ripoffreport.com.  Do you see at the top of

17   this posting, Dickson, where it says, "Submitted on

18   11/2/2006 at 5:14 a.m."?

19               At the very top of your page there, the top

20   right-hand corner, do you see where it says submitted?

21    A.   Yeah, I do.

22    Q.   Okay.  Did you, in fact, author or post or

23   write any part of this report?

24    A.   Absolutely not.  Let me read it first.  I

25   mean -- I mean this is the same one you put in the

Page 237

1    complaint.  This is something that 200 -- numbers -- $120

2    million -- I think we've already established that it's

3    not --

4         Q.   Okay.  Did you write this?

5         A.   I did not write this.

6         Q.   Okay.

7                   MR. STOCKFORD:  Do you know who did?

8                   THE WITNESS:  I'm positive I know who did.

9                   MR. STOCKFORD:  Who did it?

10        Q.   (By Ms. Pannell)  Who did?

11        A.   I mean --

12                  MR. STOCKFORD:  Who did it?

13                  THE WITNESS:  Of course Ed did it.

14                  MR. STOCKFORD:   Thank you.

15        Q.   (By Ms. Pannell)  Ed Magedson made this post?

16        A.   Yeah.  He's the -- this is his -- this is his

17   gift.

18        Q.   How do you know Ed Magedson did this post?

19        A.   Because I'm pretty sure he's one of the only

20   people that posts on his own web site.  I mean there may

21   be some people that complain, but not to the quantity

22   he's talking about.

23        Q.   How are you -- how do you get this information?

24        A.   As far as him doing the postings?

25        Q.   Yeah, as far as him posting.

00851e06-ad9e-461c-9be0-b7fb4604017d

Page 238

1        A.    Just the adamancy to which he -- he objects

2   to -- objects to posting of himself.  I mean he just --

3   you know, I think he does protest too much.  You know, he

4   told me a hundred thousand times, I don't do any of the

5   postings.

6            So many times, and the fact that -- coupled

7   with his -- his ability to access sensitive databases of

8   large corporations, it's just -- it's a hybrid of

9   complaints, stuff found in public -- in the public

10  sector, and then stuff that he hacks into on his -- on

11  his own.

12           I mean together, the three make -- with his

13  creative ability can -- can weave a pretty hideous --

14  some of this stuff about McKenzie Scott was like -- I was

15  mad knowing it was a lie.  I was like, Dang, did we do

16  that?  No, that was me.

17      Q.    Okay.  So it's your testimony today that you

18  did not author this, that Ed Magedson authored this post?

19      A.    I'm telling you that anything that's on his web

20  site regarding GW Equity is a combination of exactly the

21  things I -- that I just explained to you, it's got

22  nothing to do with me.

23      Q.    Okay.  Let's go through this post, then,

24  Dickson.  If you look at the very beginning, it says, "GW

25  Equity is actually a $120 billion enterprise called

00851e06-ad9e-461c-9be0-b7fb4604017d

CAUSE NO. 06-12231

| | |
|---|---|
| GW EQUITY, LLC, | ) IN THE DISTRICT COURT |
| Plaintiff, | ) |
| | ) |
| VS. | ) 116TH JUDICIAL DISTRICT |
| | ) |
| DIXON WOODARD, et al., | ) |
| Defendants. | ) DALLAS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED ORAL DEPOSITION OF
DICKSON EARL WOODARD
VOLUME 2
MAY 8, 2007

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF DICKSON EARL WOODARD,

produced as a witness duly sworn by me at the

instance of the Plaintiff, taken in the above-styled

and -numbered cause on the 8th day of May, A.D.,

2007, from 9:11 a.m. to 2:43 p.m., before Carla J.

Shanks, Certified Shorthand Reporter No. 5054 in and

for the State of Texas, at the offices of McCreary &

Stockford, located at 18333 Preston Road, Suite 150,

in the City of Dallas, County of Dallas and State of

Texas, in accordance with the Texas Rules of Civil

Procedure and the provisions stated on the record.

89d3063b-adb1-482c-93d4-4e7df2ccc845

Page 504

1                    CAUSE NO. 06-12231

2   GW EQUITY, LLC,              ) IN THE DISTRICT COURT
        Plaintiff,              )
3                                )
    VS.                          ) DALLAS COUNTY, TEXAS
4                                )
    DIXON WOODARD, et al.,       )
5       Defendants.             ) 116TH JUDICIAL DISTRICT

6

                    REPORTER'S CERTIFICATION
7

         ORAL DEPOSITION OF DICKSON EARL WOODARD
8

                    TAKEN ON MAY 8, 2007
9

                    I, Carla J. Shanks, Certified Shorthand
10   Reporter in and for the State of Texas, hereby
     certify to the following:
11                    That the witness, DICKSON EARL WOODARD,
     was duly sworn by the officer and that the transcript
12   of the oral deposition is a true record of the
     testimony given by the witness;
13                    That the deposition transcript was
     submitted on    5/17/07    to the witness or to the
14   attorney for the witness for examination, signature,
     and return to LONE STAR REPORTING by   6/7/07   ;
15                    That the amount of time used by each party
     at the deposition is as follows:
16
     MS. PANNELL:    3 hrs. 47 mins.
17

18                    That pursuant to information given to the
     deposition officer at the time said testimony was
19   taken, the following includes all parties of record:

20   Ms. Kristen Pannell and Mr. Brad Stockford, Attorneys
     for Plaintiff,
21   Mr. Dickson Earl Woodard, Pro Se.

22                    I further certify that I am neither
     counsel for, related to, nor employed by any of the
23   parties in the action in which this proceeding was
     taken, and further that I am not financially or
24   otherwise interested in the outcome of the action.
                    Further certification requirements
25   pursuant to Rules 205 and 206 of TRCP will be
     certified to after they have occurred.

Page 505

1

    Sworn to by me on this the   16th    day of
2   May     , 2007.

3

4                     Carla J. Shanks, Texas CSR 5054
                      Certification expires 12/31/08
5                     LONE STAR REPORTING
                      723 Woodlake Drive
6                     Coppell, Texas  75019
                      Firm Registration No. 379
7                     (972) 402-9885  fax (972) 393-3611
                      Date Reported:   5/8/07
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 506

1  CERTIFICATION UNDER RULES 205 AND 206 TRCP

2              The original deposition was/was not

3  returned to the deposition officer on              ;

4              If returned, the attached Changes and

5  Signature page contains any changes and the reasons

6  therefor;

7              If returned, the original deposition was

8  delivered to Ms. Kristen Pannell, Custodial Attorney;

9              That $   1159.70   is the deposition

10  officer's charges to Ms. Kristen Pannell for

11  preparing the original deposition transcript and any

12  copies of exhibits;

13              That the deposition was delivered in

14  accordance with Rule 203.3, and that a copy of this

15  certificate was served on all parties shown herein

16  and filed with the Clerk.

17              Witness my hand this        day of

18              , 2007.

19

20

21

22       Carla J. Shanks, Texas CSR No. 5054
         Expiration Date:  12/31/08
23       LONE STAR REPORTING
         723 Woodlake Drive
         Coppell, Texas  75019
24       Firm Registration No. 379
         Expiration Date:  12/31/07
25       (972) 402-9885    fax (972) 393-3611

Page 293

1      A.    I mean, submitted by the original author,

2  you're saying Jim was one and Greg was another

3  version?

4      Q.    Right.

5      A.    It doesn't match.

6      Q.    It doesn't match, you're right.  Did you

7  author this post?

8      A.    No.

9      Q.    Did you direct Ed to author this post?

10     A.    No, not at all.

11     Q.    Okay.  Do you know who made this post?

12     A.    No, I couldn't, I couldn't, I couldn't

13 honestly give you an answer.  I mean, I've got my

14 suspicions, but it's -- I don't have any --

15     Q.    What are your suspicions?

16     A.    -- direct evidence.  I mean, it's just --

17 it just looks like the same guy that wrote all of

18 them.

19     Q.    And who would that be?

20     A.    It's -- in my opinion, it's Ed.

21     Q.    Is Ed familiar with where you live?

22     A.    He's familiar with where my parents used

23 to live.

24     Q.    Which is where?

25     A.    They used to live in Rockwall.

Page 300

1    the search engines.

2        Q.    So Ed has told you that he needs to have

3    four or five posts before he can manipulate search

4    engines?

5        A.    Yeah, I think so.

6        Q.    Is that something he told you?

7        A.    I think it's on his website.

8        Q.    What website, the Rip-Off Report?

9        A.    That wouldn't be on the website.  That

10   would not make any sense.

11       Q.    No.

12       A.    He's alleging that he's doing this for

13   free.  It would have had to have been in a

14   conversation that I had with him.

15       Q.    Okay.  Well, look at the headings on

16   these, on these two.  Do you see the headings are

17   different?

18       A.    It looks like this one is an absolute

19   duplication of the same thing.

20       Q.    The same post, but look at the headings,

21   the big bold print at the top.

22       A.    GW Equity, Citibank, CitiGroup, Citi -- I

23   don't -- GW.

24       Q.    I mean, do you see that the headings are

25   different?  There are two different headings.

Page 414

1     Q.    Okay.  Is GW Equity the same as Geneva

2  Business Research?

3     A.    No.

4     Q.    Okay.

5     A.    To the best of my knowledge, I've never --

6     Q.    Okay.  So GW Equity and Geneva Business

7  Research are two separate companies?

8     A.    As far as I know and as far as Brian

9  Binkley's response to your original deal, he's

10  adamant about it, so --

11     Q.    I believe you --

12     A.    -- Brian is one of those people that I

13  think he's telling the truth when he talks.

14     Q.    And you testified last time that you spoke

15  to the attorney that represented Geneva and he

16  assured you that they were not the same company;

17  isn't that true?

18     A.    I never had any reason to believe that.

19     Q.    Okay.

20     A.    Somebody pointed me in that direction, and

21  it turned out to be ridiculous.

22     Q.    So if somebody were to say that GW Equity

23  and Geneva Business are the same, that would be a

24  lie, correct?

25     A.    I don't know what you'd call that.  I

Page 480

1    himself, because he has nowhere else to put it, and

2    the admission to this little program was that -- I

3    was surprised to see that last night.  That was the

4    first time I had seen anything that he admitted to

5    becoming part of some kind of a plan.  I mean, he

6    denied that even to me, you know, until I read that.

7    He always denied taking money for, for -- I mean,

8    taking money for taking the reports off his site.

9            But I mean, there was just too many people

10   out there complaining about him about the same thing,

11   just enough to know that he's -- it's got to come up

12   as extortion.  I mean, he's got some kind of legal

13   defense against it, but to me it's just -- it's

14   extortion.  There is no way out of it.

15       Q.   So what I've gathered from all of your

16   testimony, Dickson, is that Ed Magedson has

17   indirectly told you that he is responsible for making

18   posts about companies.  He will make these posts.

19       A.   Yes.

20       Q.   And then he will manipulate the search

21   engines; is that true?

22       A.   No question about the search engines.

23   That's where the money is made.

24       Q.   Okay.  So --

25       A.   Because he doesn't take anything off his

Page 481

1  website, but whoever -- whatever they're paying for

2  is the search-engine-related agreement deal.

3      Q.    Okay.

4      A.    That part.

5      Q.    So he will manipulate search engines after

6  he may make some of these posts himself about these

7  companies?

8      A.    There is no question he's doing it.

9      Q.    So he's -- no question Ed is making these

10 posts about these companies, and then he's

11 manipulating them in the search engines, and then

12 he'll go and try to get money from these companies --

13     A.    I don't --

14     Q.    -- to remove them or to manipulate the

15 search back into their favor?  Is that kind of how he

16 operates?

17     A.    I don't believe that he ever approaches --

18 that I know of.

19     Q.    Okay.

20     A.    That he ever approaches the victims.  I

21 think he just waits until they come to him.  I don't

22 know that for sure.

23     Q.    What do you mean by victims?  What are

24 you, what are you talking about?

25     A.    I'm saying the big victims like McKenzie

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GW EQUITY, LLC, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | No. 3-07-CV-0976-K |
| XCENTRIC VENTURES, LLC, | § | |
| WWW.RIPOFFREPORT.COM, | § | |
| WWW.BADBUSINESSBUREAU.COM, | § | |
| and EDWARD MAGEDSON, | § | |
| | § | |
| DEFENDANTS. | § | |

### SUPPLEMENTAL AFFIDAVIT OF RYAN BINKLEY

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

On this day, before the undersigned authority, personally appeared Ryan Binkley, known to me to be the person whose name is subscribed hereto and under oath states:

1.      My name is Ryan Binkley.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am, in all ways, capable of making this Affidavit.  The facts stated in this Affidavit are within my personal knowledge and are true and correct.

2.      I am currently employed as President of GW Equity, LLC ("GW Equity").  Based on my service in this capacity, I am personally familiar with the facts stated in this affidavit.  All of the information contained in this Supplemental Affidavit serves to supplement the facts previously stated in my Original Affidavit filed in support of GW Equity's Original Complaint for Damages and Emergency Application for Injunctive Relief.

3.      In my original affidavit, I explained in detail the losses that GW Equity has suffered due to the false, misleading, disparaging and defamatory statements about GW Equity

APX 000127

on Defendants' websites, www.ripoffreport.com and www.badbusinessbureau.com (collectively, the "Websites").  Nevertheless, the financial injury GW Equity has suffered has not ended. Since filing my original affidavit approximately one week ago, GW Equity has continued to suffer severe business losses and other consequences due to the statements on Defendants' Websites.

4.    When existing or potential clients discover the false postings about GW Equity on the Websites, they ultimately decide not to attend our educational seminars or to terminate their contracts with GW Equity.  The following non-exhaustive list represents more potential clients who have decided not to pursue a business relationship with GW Equity *in the last week* due to the false and misleading information on the Websites:

- On June 5, 2007, Paul Roesel of The Sack Company informed GW Equity that it was not interested in pursuing a business relationship with GW Equity after reading the statements on Defendants' Websites.  GW Equity would have received $29,975.00 from this potential client.

- On June 6, 2007, David McDonald of DMC, Inc. informed GW Equity that it was not interested in pursuing a business relationship with GW Equity after reading the statements on Defendants' Websites.  GW Equity would have received $29,975.00 from this potential client.

- On June 6, 2007, Echo Magazine informed GW Equity that it was not interested in pursuing a business relationship with GW Equity after reading the statements on Defendants' Websites.  GW Equity would have received $29,975.00 from this potential client.

- On June 7, 2007, Bob Gard of Georgian Plantation Shutter Company informed GW Equity that it was not interested in pursuing a business relationship with GW Equity after reading the statements on Defendants' Websites.  GW Equity would have received $29,975.00 from this potential client

- On June 7, 2007, Keith White of Parkerwhite informed GW Equity that it was not interested in pursuing a business relationship with GW Equity after reading the statements on Defendants' Websites.  GW Equity would have received $29,975.00 from this potential client.

APX 000128

- On June 7, 2007, Tony Cobb of All Gutter Systems, Inc. informed GW Equity that it was not interested in pursuing a business relationship with GW Equity after reading the statements on Defendants' Websites. GW Equity would have received $29,975.00 from this potential client.

- On June 7, 2007, Don McGilvray of Olympia, Inc. informed GW Equity that it was not interested in pursuing a business relationship with GW Equity after reading the statements on Defendants' Websites. GW Equity would have received $29,975.00 from this potential client.

- On June 7, 2007, Scott Cafner of Angel Appliances Sales Services informed GW Equity that it was not interested in pursuing a business relationship with GW Equity after reading the statements on Defendants' Websites. GW Equity would have received $29,975.00 from this potential client.

- On June 7, 2007, Wayne Huber of Huber General Contracting LLC informed GW Equity that it was not interested in pursuing a business relationship with GW Equity after reading the statements on Defendants' Websites. GW Equity would have received $29,975.00 from this potential client.

5.      The false and misleading postings by Defendants on the Websites have clearly disrupted GW Equity's ability to conduct business. The damages I have identified above are just the losses we actually have knowledge about. Because the majority of GW Equity's client base uses the Internet to learn more about information about our company, there are certainly more unidentified potential clients who have read the false postings on the Websites and have then decided not to do business with us. It is thus virtually impossible for us to know how many clients we are losing on a weekly and monthly basis.

6.      Furthermore, it is incredibly difficult for GW Equity to neutralize the force of the false and misleading statements on the Websites. Because we do not know the identity of every single person who visits the Websites, we cannot try to explain to these potential clients that the statements are false and misleading. As a result, Defendants' actions have caused us to lose

APX 000129

customers at an increasing rate per month and have severely damaged our business and reputation.

7.      GW Equity does not have an adequate remedy at law for money damages in the event that the defamatory "Rip-off Reports" regarding GW Equity remain on the Defendants' Websites.  GW Equity cannot in any way estimate the precise losses we are experiencing due to the statements on the Websites.

8.      Defendants will not be prejudiced at all by taking down the false and misleading postings on the Websites because there is no evidence that they will suffer any damages.  Indeed, Defendants do not experience a profit by maintaining the false and misleading statements regarding GW Equity on the Websites.

9.      Unless this Court grants the requested relief, GW Equity will be irreparably harmed because the loss of existing and potential clients would cause GW Equity to suffer irreparable economic harm in that GW Equity may never be able to get those relationships back. Furthermore, the goodwill and reputation GW Equity has worked so hard to establish with its customer base will be lost.

10.      I affirm under penalty of perjury that, to the best of my knowledge and belief, the above is true and correct.

AFFIANT SAYETH NOTHING FURTHER.

_____
RYAN BINKLEY

Subscribed and sworn to before me, this 11th day of June, 2007.

_____
Notary Public in and for the State of Texas

My Commission Expires: 3/2/08

SEAL:



JERRY G. HILL
MY COMMISSION EXPIRES
MARCH 2, 2008

---

APX 000131