UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


GW EQUITY, LLC,                              )
                                            )
                        Plaintiff,           )  CIVIL ACTION NO.
                                            )  3-07 CV 0976-K
v.                                           )
                                            )
XCENTRIC VENTURES, LLC, *ET AL.*,           )
                                            )
                        Defendants.          )



**DEFENDANT XCENTRIC VENTURES, L.L.C.'S
OPPOSITION TO PLAINTIFF'S APPLICATION FOR INJUNCTIVE RELIEF**

Dockets.Justia.com

## <u>TABLE OF CONTENTS</u>

I.    THE COURT LACKS JURISDICTION OVER DEFENDANTS............2

II.   INTRODUCTION..................................................................3

III.  BACKGROUND.....................................................................4

IV.   COMMUNICATIONS DECENCY ACT......................................7

V.    PRELIMINARY INJUNCTION ARGUMENT................................9

     A.    Status Quo.....................................................................10
     B.    No Likelihood of Success on the Merits.....................................11
     C.    No Threat of Irreparable Harm...............................................18
     D.    The Possibility of Injury to GW Equity Does Not Outweigh The Harm to Defendants....................................................................20
     E.    The Injunction Will Undermine the Public Interest.........................21

     V.    CONCLUSION......................................................................22

10297-1/MCS/MCS/591990_v1

## I.    THIS COURT LACKS JURISDICTION OVER DEFENDANTS

Defendants, by appearing to defend the application for a preliminary injunction, do not waive, and specifically reserve their defense of lack of jurisdiction.    While Defendants will separately file a motion to dismiss for lack of personal jurisdiction over Defendants, Defendants will briefly raise this issue herein.    Defendants are an Arizona resident and an Arizona company who conduct business entirely within the state of Arizona.    Plaintiff alleges that Defendants "transact business in this district through the internet..." and "conduct and direct the unlawful and tortious conduct described herein within the jurisdiction of this Court."    Neither is true.    Defendants conduct no business in Texas.    The fact that the website can be viewed in Texas can not, alone, be the basis for exercise of personal jurisdiction in Texas for statements posted by others on the website. *Revell v. Lidov*, 2001 WL 285253 (N.D. Texas 2001).

## II.    INTRODUCTION

Plaintiff GW Equity, LLC ("GW Equity") has engaged in a shocking manipulation of the facts to circumvent the law and attempt to obtain a preliminary injunction. Utilizing two different law firms, GW Equity has filed two different cases, asserting completely opposite factual allegations, to attempt to obtain the same result.

On or about December 4, 2006, GW Equity initiated legal proceedings against Dickson Woodard (the "First Lawsuit").    (Ex. H.; Def. Appx. 0045–56)    Similar to the present action, GW Equity requested injunctive relief from the Defendant.    There,

2

however, the defendant apparently agreed to enter into a stipulated injunction whereby he, among other things, agreed to "demand" that Ed Magedson remove any and all "publications made by Defendant Woodard" or "published at Defendant Woodard's direction" from the website located at www.ripoffreport.com ("ROR").   GW Equity clearly took the position in the First Lawsuit that the purportedly defamatory statements at issue were authored by Woodard and only published by Magedson and ROR.

After it obtained the stipulated injunctive relief in the First Lawsuit, counsel for GW Equity asserted to Ed Magedson that the "Agreed Order Granting Plaintiff's Petition for Preliminary Injunction" required the removal of all reports pertaining to GW Equity. In January, 2007, counsel for Defendants informed counsel for GW Equity that, among other things, absent any showing that Magedson or Xcentric Ventures personally created or authored the allegedly false and/or defamatory material, no liability can possibly be asserted against Defendants pursuant to the Communications Decency Act ("CDA"). (Ex. K.; Def. Appx. 0070–75)  GW Equity was also informed specifically that the CDA prohibits the imposition of injunctive relief against Defendants.  (Def. Appx. 0073; ¶ 2)

GW Equity then filed the within action, suddenly alleging that it was Magedson and/or Xcentric who authored the defamatory material, rather than Woodard.   The assertions in the present action include language alleging that Defendants "edit", "publish", "author", "alter", "change", "create", and/or "develop" reports posted on ROR. (Complaint, ¶¶ 14, 16, 17, 18, 19, 20, 21)   These assertions directly contradict the position taken by GW Equity in the First Lawsuit that the reports at issue were made by or on behalf of Dickson Woodard. (Ex. H.; Def. Appx. 0045–56).

3

GW Equity has manufactured evidence to fit into the law. Knowing that it could not bring an action alleging that Defendants should be liable merely for publishing statements authored by third parties, GW Equity has alleged facts that they know to be untrue – i.e., that Defendants have created defamatory content.

## III.    FACTUAL BACKGROUND

Ed Magedson ("Magedson") is the Manager of Xcentric Ventures, LLC ("Xcentric"). Xcentric operates a website known as Rip-off Report ("ROR") located at www.ripoffreport.com. It is an extremely popular website where users of the website can both post complaints about businesses and look up a business' track record. In fact, ROR is used by law enforcement, including the FBI, governmental agencies, and the media to gather information about patterns of wrongful business practices. (Def. Appx. 0001)

ROR is a free service. The reports are posted for free, can be viewed and searched for free and can be replied to or "rebutted" for free. The website currently has more than 250,000 original reports, over 1,000,000 unique entries including rebuttals to reports, and an average of 500-800 new incoming submissions each day. (Def. Appx. 0002)

Magedson and the agents of Xcentric do not author complaints about companies posted on ROR. (Def. Appx. 0002) Specifically, neither Magedson, nor any other agent of Xcentric authored the reports posted on ROR regarding GW Equity. (Def. Appx. 0004–5)

4

The evidence is that the reports at issue were actually created by a former employee of GW Equity named DICKSON WOODARD ("Mr. Woodard") who GW Equity sued for posting the reports. (Ex. H.; Def. Appx. 0045–56). According to ¶ 8 of GW Equity's Complaint against Mr. Woodard, GW Equity alleged: "On or about November 2, 2006, Defendant Woodard, writing under the name 'Jim from St. Paul, Minnesota," published a statement on the website www.ripoffreport.com regarding the Plaintiff and the Plaintiff's business practices." (Def. Appx. 0047; ¶ 8). This allegation refers to Report #218734 discussed above and is also the same report which GW Equity has alleged that Magedson wrote in ¶ 20 of the Complaint filed in this case.

Attached as Exhibit 1 to GW Equity's complaint in the First Lawsuit is an affidavit of Jim Willingham. (Def. Appx. 0057–59). According to this affidavit, Mr. Willingham is a private investigator hired by GW Equity to investigate the conduct of Mr. Woodard. Paragraph 7 of Mr. Willingham's affidavit indicates that Mr. Woodard confirmed that he was "hired ... to kill Ed Magedson ... ." (Def. Appx. 0057; ¶ 7). Also attached to the complaint against Woodard is an affidavit of Ryan Binkley, President of GW Equity. (Def. Appx. 0060–61). In ¶ 1 of his affidavit, Mr. Binkley states that "no 'Jim from St. Paul Minnesota,' has ever attended a GW Equity seminar. However, this was the name and location of the last potential client that Dickson Woodard spoke to before being terminated from his employment with GW Equity."

On January 5, 2007, Magedson received an email from an attorney for GW Equity named Kristen Pannell. (Def. Appx. 0066). Attached to Ms. Pannell's email was a copy of an "AGREED ORDER GRANTING PLAINTIFF'S PETITION FOR TEMPORARY

INJUNCTION." (Def. Appx. 0068–69). This order indicates that, "IT IS ORDERED THAT Defendant Woodard shall send to Ed Magedson, owner of www.ripoffreport.com, a written demand that any and all publications made by Defendant Woodard or published at Defendant Woodard's direction be removed from www.ripoffreport.com within 5 days of the signing of this order." (Def. Appx. 0068).

Upon receiving Ms. Pannell's email and the enclosed order, Defendants' attorneys sent a response letter to Ms. Pannell. (Def. Appx. 0071–73). In this letter, Defendants' counsel explained to Ms. Pannell that the operator of Rip-Off Report, Xcentric Ventures, is generally subject to immunity from civil liability pursuant to the Communications Decency Act, 47 U.S.C. § 230 (the "CDA") absent affirmative proof that defamatory material was actually created by Magedson or by Xcentric.

After this letter was sent to Ms. Pannell, Ms. Pannell thereafter took the deposition of Dickson Woodard and elicited testimony to the effect that Mr. Woodard "knew" that Magedson had created the reports concerning GW Equity on Rip-Off Report, including the reports listed above. (Ex. 2 to Plaintiff's Complaint).

Magedson recently called Mr. Woodard by telephone and confronted him with the deposition testimony filed by GW Equity in support of its request for a preliminary injunction in this case. (Def. Appx. 0006). During a telephone conversation which took place June 11, 2007, Mr. Woodard admitted to Magedson that he had actually wrote the reports which GW Equity now claims were authored by Magedson. (Def. Appx. 0006).

6

## IV.    COMMUNICATIONS DECENCY ACT—SHORT HISTORY

It is well-established law that under certain circumstances, those who "publish" or "distribute" defamatory statements via traditional methods (i.e., a newspaper or magazine) can be liable for false statements authored by a third party:

> At common law, "primary publishers," such as book, newspaper, or magazine publishers, are liable for defamation on the same basis as authors. Book sellers, news vendors, or other "distributors," however, may only be held liable if they knew or had reason to know of a publication's defamatory content.

*Barrett v. Rosenthal*, --- Cal.Rptr.3d ----, 2006 WL 3346218, *4 (Cal. Nov. 20, 2006) (citing *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997); Prosser & Keeton, The Law of Torts (5th ed.1984) § 113, pp. 810-811; Rest.2d Torts, § 581, subd. (1), & coms. c, d, & e, pp. 232-234; *Osmond v. EWAP, Inc.* 153 Cal.App.3d 842, 852-854 (1984)).

For many years, this rule made sense because the publisher of traditional media sources can always review content <u>before</u> publication—in other words, virtually every word in a newspaper has been or could be reviewed by the publisher before printing. For that reason, courts have allowed defamation plaintiffs to sue a <u>publisher</u> even if the content at issue was written by a third party.

In recent years, the Internet has presented a new paradigm wherein people can publish statements by the millions on public message boards virtually instantly, at any time of the day or night, without any opportunity for pre-publication review by the site operator. Allowing traditional publisher or distributor-based liability against website operators in this context would thus provide an immense incentive for such websites to

7

prohibit any publication of messages by third parties, thereby reducing the amount of free speech available online.

For that reason, in 1996 Congress enacted the Communications Decency Act, 47 U.S.C. § 230, which prohibits all civil actions that treat an interactive computer service as the "publisher or speaker" of messages transmitted over its service by third parties. This federal statute, which was passed by Congress with the intent to "promote unfettered speech," provides in relevant part that:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

47 U.S.C. § 230(c)(1) (emphasis added). Section 230 further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Green v. America Online,* 318 F.3d 465, 470 (3rd Cir. 2003) (noting that the CDA, "'precludes courts from entertaining claims that would place a computer service provider in a publisher's role,' and therefore bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions - such as deciding whether to publish, withdraw, postpone, or alter content.'").

An outstanding explanation of this law and its history is set forth in the California Supreme Court's recent opinion in *Barrett v. Rosenthal,* --- Cal.Rptr.3d ----, 2006 WL 3346218 (Cal. Nov. 20, 2006), cited above. In fact, as the *Barrett* Court recognized, the CDA has been universally interpreted as providing immunity to interactive websites for content created by a third party. *See Barrett,* 2006 WL 3346218, *18 note 18; (citing *Blumenthal v. Drudge,* 992 F.Supp. 44, 51 (D.D.C. 1998); *Ben Ezra, Weinstein, and Co., Inc. v. America Online, Inc.,* 206 F.3d 980, 986 (10th Cir. 2000); *Morrison v. America Online, Inc.,* 153 F.Supp.2d 930, 933–934 (N.D.Ind. 2001); *PatentWizard, Inc. v. Kinko's, Inc.* 163 F.Supp.2d 1069, 1071 (D.S.D. 2001); *Green v. America Online,* 318 F.3d 465, 470-471 (3rd Cir. 2003); *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119,

8

1123-1124 (9th Cir. 2003); *Doe One v. Oliver*, 755 A.2d 1000, 1003-1004 (Conn.Super.Ct. 2000); *Doe v. America Online, Inc.*, 783 So.2d 1010, 1013-1017 (Fla. 2001); *Schneider v. Amazon.com, Inc.*, 31 P.3d 37, 40-42 (Wn.App. 2001); *Barrett v. Fonorow* 799 N.E.2d 916, 923-925 (Ill.App.Ct. 2003); *Donato v. Moldow* 865 A.2d 711, 720-727 (N.J. Super.Ct.App.Div. 2005); *Austin v. CrystalTech Web Hosting*, 125 P.3d 389, 392-394 (Ariz.App. 2005)).

Secondary authority has also explained that:

> [The CDA's] provisions set up a <u>complete shield</u> from a defamation suit for an online service provider, <u>absent an affirmative showing that the service was the actual author of the defamatory content</u>. Accordingly, a number of courts have ruled that the ISP was immune from liability for defamation where allegedly libelous statements were made available by third parties through an ISP or were posted by third parties on the server's billboards, as the ISP fell within the scope of 47 U.S.C.A. § 230.

Jay M. Zitter, J.D., Annotation—*Liability of Internet Service Provider for Internet or E-mail Defamation* § 2, 84 A.L.R.5th 169 (2000) (emphasis added) (citing Pantazis, Note, *Zeran v America Online, Inc.: Insulating Internet Service Providers From Defamation Liability*, 34 Wake Forest L. Rev. 531 (1999)); *see also Batzel v. Smith,* 333 F.3d 1018, 1027–28 (9th Cir. 2003) (recognizing, "Making interactive computer services and their users liable for the speech of third parties would severely restrict the information available on the Internet. Section 230 therefore sought to prevent lawsuits from shutting down websites and other services on the Internet.") (quoting *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980, 983–84 (10th Cir. 2000).

This significant body of authority unanimously confirms that the CDA provides complete immunity to interactive websites absent an affirmative showing that the service was the actual author of the defamatory content. No such showing can be made by GW Equity, and therefore it can sustain none of its claims against Defendants.

9

## V.    PRELIMINARY INJUNCTION ARGUMENT

Premised on every allegation made in its Complaint, GW Equity contends that "Defendants' conduct entitles GW Equity to injunctive relief." (Complaint, ¶¶37, 43, 50, 64, 71)  It is a basic legal principle that a preliminary injunction preserves the status quo between parties to prevent irreparable harm in a situation where legal remedies, such as money damages, would be inadequate without the protection of the preliminary injunction.  It is apparent on the face of GW Equity's pleadings that there is no threat of irreparable harm without the preliminary injunctions requested by GW Equity.

The purpose of a temporary injunction is to preserve the status quo of the subject matter of the litigation pending a trial on the merits.  *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 550 (Tex.App.-Dallas 1993, no pet.); *Elec. Data Sys. Corp. v. Powell*, 508 S.W.2d 137, 139 (Tex.Civ.App.-Dallas 1974, no writ).  To obtain a preliminary injunction, GW Equity must clearly establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to GW Equity outweighs any harm to Defendants that may result from the injunction; and, (4) that the injunction will not undermine the public interest.  *See Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir.1990); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir.1989); *see also  Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir. 1981); *Buchanan v. United States Postal Service*, 508 F.2d 259, 266 (5th Cir. 1975); *Allison v. Froehlke*, 470 F.2d 1123, 1126 (5th Cir. 1972); WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, § 2948.  A preliminary injunction is an extraordinary remedy, and it is well-settled law that it will only be granted if GW Equity clearly carries its burden of persuasion on all four factors.  *Allied Mktg. Group, Inc.*, 878 F.2d at 809. If the Court concludes that GW Equity has failed to carry its burden on any one of the four factors, then the Court must deny the motion for a preliminary injunction.

10

### A.   Status Quo.

The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex.2004); *see, e.g., Metra United Escalante, L.P. v. Lynd Co.*, 158 S.W.3d 535, 544 (Tex.App.-San Antonio 2004, no pet.); *Khaledi v. H.K. Global Trading, Ltd.*, 126 S.W.3d 273, 284 (Tex.App.-San Antonio 2003, no pet.); *Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 588 (Tex.App.-El Paso 2003, pet. ref'd). "If an act of one party alters the relationship between that party and another, and the latter contests the action, the status quo cannot be the relationship as it exists after the action." *Benavides Indep. Sch. Dist. v. Guerra*, 681 S.W.2d 246, 249 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.).

Here, GW Equity seeks to alter, not preserve, the status quo. GW Equity seeks to force Defendants to remove content from the ROR website that is currently posted and that has been posted since November of 2006.

### B.   No Likelihood of Success on the Merits.

The party seeking an injunction must have at least one valid legal theory to support a probable right to recover. *Brammer v. K.B. Home Lone Star, L.P.*, 114 S.W.3d 101, 110 (Tex.App.-Austin 2003, no pet.).

#### 1.   No Recovery for Defamation/Libel.

Defamation alone is not a sufficient justification for restraining an individual's right to speak freely. *See Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex.1983). It is well settled that Texas courts will not grant injunctive relief in defamation or business disparagement actions if the language enjoined evokes no threat of danger to anyone, even though the injury suffered often cannot easily be reduced to specific damages." *Brammer v. KB Home Lone Star, L.P.*, 114 S.W.3d 101, 107 (Tex.App.-Austin 2003, no pet.). Thus, even defamatory statements, with the exception of those that threaten others, are provided constitutional protection in most cases. *See*

11

*Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex.1983) (dissolving temporary injunction as violative of article one, section eight of Texas Constitution); *Brammer*, 114 S.W.3d at 106-09 (modifying temporary injunction to delete portions enjoining speech based on content); *Markel v. World Flight, Inc.*, 938 S.W.2d 74, 79-81 (Tex.App.-San Antonio 1996, no writ) (holding temporary injunction unconstitutional prior restraint on free expression); *Pirmantgen v. Feminelli*, 745 S.W.2d 576, 578-79 (Tex.App.-Corpus Christi 1988, no writ) (holding temporary injunction violated Texas Constitution); *Strang v. Biggers*, 252 S.W. 826, 827 (Tex.Civ.App.-Dallas 1923, no writ) (affirming dissolution of temporary injunction that violated appellee's freedom of speech); *see also Stansbury v. Beckstrom*, 491 S.W.2d 947, 947-50 (Tex.Civ.App.-Eastland 1973, no writ) (dissolving temporary injunction infringing on appellant's freedom of speech). No injunctive relief should be granted here premised on the mere fact that Plaintiff has alleged a claim for defamation.

Even if injunctive relief were available for claims of defamation, no recovery is available under the facts here. Defendants are immune from prosecution for defamation pursuant to the CDA. In order for a defendant to avail himself of the CDA's immunity, <u>three</u> elements must be established: "[1] the defendant must be a provider or user of an interactive computer service; [2] the asserted claims must treat the defendant as a publisher or speaker of information; and [3] the information must be provided by another information content provider." *Schneider*, 31 P.3d at 39.

The ROR Sites are indisputably an "interactive computer service" provider as that term has been defined by CDA § 230 and as interpreted by various courts:

> An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server ..." .

*Batzel*, 333 F.3d at 1030 (quoting 47 U.S.C. § 230(f)(2)). This definition includes any website that allows multiple users to connect to it. *See, e.g., Gentry v. eBay, Inc.*, 99

12

Cal.App.4th 816, 831 & n. 7, 121 Cal.Rptr.2d 703 (2002) (on-line auction website www.eBay.com is an "interactive computer service"). Because they allow multiple users to access the Rip-Off Report site to post comments and review comments left by others, Defendants' ROR Sites plainly fall within the CDA's definition of "interactive computer service".

The second element of CDA immunity cannot seriously be contested, as Plaintiff clearly seeks to impose liability upon Defendants for "publishing" material about Plaintiff on the ROR Sites. Plaintiff is well aware that Defendants did not create any of the content at issue on the ROR Sites, and cannot be held liable for merely publishing reports written by third parties. Not a single shred of evidence exists to establish that Defendants authored, edited, altered, changed, or otherwise created any reports at issue, in large part because Defendants did no such thing.

Plaintiff has premised its case, in its factual entirety, on the deposition testimony of a singular individual, Dickson Woodard taken in the First Lawsuit. Dickson Woodard is the very individual who GW Equity alleged in the First Lawsuit authored the reports. (Def. Appx. 0047; ¶ 8). Despite that position, GW Equity alleges in the complaint in this case that the deposition testimony of Dixon Woodard establishes that Defendants authored the reports at issue.

While GW Equity has only provided portions of the Woodard transcript, even the portions taken out of context demonstrate that the testimony does **not** establish that the Defendants in this case authored the reports at issue. Mr. Woodard appeared for his deposition without counsel. The questions are leading questions that elicit testimony for which there is no foundation. Even in this context, Mr. Woodard's testimony does not support the conclusion that Mr. Magedson wrote the reports at issue. In some portions of the transcript, Mr. Woodard admits that he does not know who authored the reports. (Ex. 2 to Plaintiff's Complaint). In other portions, Mr. Woodard claims that Defendants authored the reports, but when asked how he knows this he (incredibly) responds that it is

13

because Magedson adamantly denies writing the reports and "he protests too much." Mr. Woodward provides the Court with no basis, other than a creative imagination, as to how he came to his conclusions about the authorship of the reports.

Furthermore, Defendants had no chance to cross-examine Mr. Woodard at the taking of his deposition, and therefore were not given the proper opportunity to flush out the inaccuracies of Mr. Woodard's testimony. Had Defendants been granted the chance to do so, Mr. Woodward would have expressed, as he has done since the taking of his deposition, that he in fact personally wrote the reports in question, and that Defendants took no part in the development, creation, writing, authoring, or editing any reports at issue in the present action. (Def. Appx. 0006).

Because Defendants had no involvement in creating the content authored by Mr. Woodard, the Communications Decency Act applies and GW Equity cannot maintain a claim for defamation or libel against Defendants.

2.    No Recovery for Interference With Business Relationships.

To prove tortious interference with prospective contracts or business relationships, a plaintiff must prove that the defendant willfully and intentionally acted to prevent a contractual relationship that the plaintiff had a reasonable probability of realizing, which proximately caused the plaintiff actual damages. *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 659 (Tex.App.-Corpus Christi 1991, writ denied). The nature of a tortious interference claim is that a third party interfered with the plaintiff's business relationships. *Vireo, P.L.L.C. v. Cates*, 953 S.W.2d 489, 499 (Tex.App.-Austin,1997). The elements of a claim for tortious interference with prospective business relationship are:

> (1) a reasonable probability that the parties would have entered into a contractual relationship;
> (2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring;
> (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the

14

> interference was certain or substantially certain to occur as a
> result of his conduct; and
> (4) the plaintiff suffered actual harm or damage as a result of
> the defendant's interference.

*Allied Capital Corp. v. Cravens*, 67 S.W.3d 486, 491 (Tex.App.-Corpus Christi,2002);

*see Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 859-860, 2001 Tex.App. LEXIS 8012,

at 45-46 (Tex.App.-Houston [14th Dist.] no pet.) (citing *Ash v. Hack Branch Distrib. Co.*,

54 S.W.3d 401, 414-15 (Tex.App.-Waco 2001, pet. denied)).

    Defendants were not aware of the existence of GW Equity until it was contacted

by GW Equity in connection with reports that had appeared on the ROR Sites. At the

time of the initial contact with GW Equity, reports had already been posted by third party

consumers on the ROR Sites discussing their various experiences with GW Equity. As

noted previously, Defendants have not authored, edited, altered, changed, or otherwise

created any reports at issue. The lack of any tortious act on the part of Defendants

negates any possibility of a sustainable claim for interference with business relationships

by GW Equity.

### 3.    No Recovery for Texas Business Disparagement.

    As discussed above, it is well settled that Texas courts will not grant injunctive

relief in business disparagement actions if the language enjoined evokes no threat of

danger to anyone, even though the injury suffered often cannot easily be reduced to

specific damages." *Brammer v. KB Home Lone Star, L.P.*, 114 S.W.3d 101, 107

(Tex.App.-Austin 2003, no pet.).

    Even if injunctive relief were allowed, GW Equity cannot prevail on a claim for

business disparagement. To prevail on a business disparagement claim, a plaintiff must

establish that (1) the defendant published false and disparaging information about it, (2)

with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff.

*Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex.2003); *Hurlbut v.

Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987). A business disparagement claim

is similar in many respects to a defamation claim. *Forbes*, 124 S.W.3d at 170. The two torts differ in that defamation claims chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests. *Id.* In *Hurlbut*, a suit brought by an insurance agent against his former employer, the Texas Supreme Court noted that a business disparagement defendant may be held liable "only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion." *Id.* (emphasis added) (quoting RESTATEMENT (SECOND) OF TORTS § 623A, cmt. g (1977)).

The similarity of a business disparagement claim to a defamation claim applies not just in the elements necessary to prove the claim, but in the defenses available to such a claim. Defendants are entitled to publish the information at issue pursuant to the CDA. Furthermore, Defendants did not maliciously publish any information about GW Equity, since Defendants did not choose to publish any information about GW Equity. Instead, third party visitors to the ROR Sites chose to publish information about GW Equity. The actions of these third party visitors cannot be attributed to Defendants pursuant to the CDA, and therefore any claim for business disparagement is not sustainable.

4.    No Recovery for Civil Conspiracy.

GW Equity has made no request for injunctive relief pursuant to this claim. Regardless of whether GW Equity has requested injunctive relief pursuant to a theory of civil conspiracy, GW Equity has no probable right to recover under the theory of civil conspiracy.

The elements of a civil conspiracy are (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result. *Trostle v. Trostle*, 77 S.W.3d 908, 915 (Tex.App.-Amarillo,2002); *see Operation Rescue-National v. Planned*

16

*Parenthood of Houston and Southeast Texas, Inc.*, 975 S.W.2d 546, 553 (Tex.1998). The elements of a civil conspiracy require participation in some underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996). Since GW Equity cannot prove the existence of any underlying tort against Defendants, no recovery can be obtained under a theory of civil conspiracy.

5.    <u>No Recovery for Violation of RICO, 18 U.S.C. § 1962(c).</u>

The appellate courts of the United States have expressed considerable doubt over whether injunctive relief is even available to private plaintiffs under RICO. *Hinojosa v. City of Kingsville, Texas*, 266 F.Supp.2d 562, 564 -565 (S.D.Tex.,2003); *see Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 977 n. 42 (5th Cir.2000) (noting "there is considerable doubt that injunctive relief is available to private plaintiffs under RICO.... The only court of appeals case to address the issue has held that RICO does not allow private injunctive relief ... and we have agreed in dicta") (citing *Conkling v. Turner*, 18 F.3d 1285, 1296 n. 8 (5th Cir.1994); *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1082-89 (9th Cir.1986); *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir.1988)). Compare *Nat'l Org. for Women, Inc., v. Scheidler*, 267 F.3d 687 (7th Cir.2001) (finding that RICO civil remedies provision authorizes injunctive relief at the behest of private plaintiffs).

RICO creates a civil cause of action for " '[a]ny person injured in his business or property by reason of a violation of section 1962.' " *Beck v. Prupis*, 529 U.S. 494, 120 S.Ct. 1608, 1611, 146 L.Ed.2d 561 (2000) (quoting 18 U.S.C. § 1964(c)). Under all those subsections, to state a RICO claim, there must be: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct,

or control of an enterprise." *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir.1988).

Under the Racketeer Influenced and Corrupt Organizations act ("RICO"), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c). Racketeering activity includes the predicate act of extortion under 18 U.S.C. §1951. "Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. §1951(b)(2).    Here, GW Equity admits in its pleadings that it provided no compensation to Defendants and that Defendants merely offered a service that GW Equity chose not to avail itself of.

### 6.    No Recovery for Violation of RICO, 18 U.S.C. § 1962(d).

As discussed previously, injunctive relief should not be available for any claims under RICO. Under § 1962(d), a person cannot conspire to violate subsections (a) or (c). *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (C.A.5 (La.),2000); *see* 18 U.S.C. § 1962(d). With respect to a conspiracy to violate subsection (c), the Fifth Circuit has previously stated that just as a RICO person cannot employ or associate with itself, it cannot conspire to employ or associate with itself. *See Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir.1993). As the Second Circuit has held: "It will not do merely to track the language of Rule 10(b)-5 and rely on such meaningless phrases as 'scheme and conspiracy' or 'plan and scheme and course of conduct to deceive.'" *Ross v. A. H. Robins Co.*, 607 F.2d 545, 557-58 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, *reh'g denied*, 448 U.S. 911 (1980). To prove a conspiracy to extort it is necessary to show a plan to instill fear. *Carbo v. U.S.*, 314 F.2d 718, 741 (C.A.Cal. 1963).

Section 1962(d) requires proof of an agreement which is a substantive violation of RICO. *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir.1993).

GW Equity can not prevail on the merits of a RICO claim. This is a simple, garden variety, defamation claim. None of the ingredients of organized crime are present here.

### C.    No Threat of Irreparable Harm.

A trial court abuses its discretion in granting a temporary injunction unless "it is clearly established by the facts that one seeking such relief is threatened with an actual irreparable injury if the injunction is not granted." *See Markel v. World Flight, Inc.*, 938 S.W.2d 74, 80 (Tex.App.-San Antonio 1996, no pet.) (quoting *Dallas Gen. Drivers v. Wamix, Inc.*, 156 Tex. 408, 295 S.W.2d 873, 879 (1956)).

In the Fifth Circuit the law is clear, "only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974). As such, GW Equity is required "to show that the loss cannot be measured in money damages." *Millennium Restaurants Group, Incorporated v. City of Dallas*, 181 F.Supp.2d 659, 666 (N.D.Tex.2001) (Fish, J.). Simply arguing that they are losing customers and goodwill without showing that monetary damages are an inadequate remedy is insufficient to establish irreparable harm. *See Id.* This is true even if "the pecuniary injury [is] difficult to calculate ...." *Id.* The loss of goodwill of a business "is usually compensable in money damages." *DFW Metro Line Services v. Southwestern Bell Telephone Company*, 901 F.2d 1267, 1269 (5th Cir.1990). Thus, the Court concludes that "a total failure of proof as to why money damages are not measurable or adequate cannot be excused .... " *Pate, et al. v. The Houston Chronicle Publishing Company, et al.*, 462 F.Supp. 1114, 1118 (S.D.Tex.1977), aff'd, 572 F.2d 1106 (5th Cir.1978).

19

10297-1/DSG/DSG/591997_v1

Here, GW Equity has demanded injunctive relief *in addition to* a judicial remedy for all requests for relief. It has premised its request for a preliminary injunction solely because it feels that its "reputation can only suffer." GW Equity has not alleged why money damages are not adequate for any of the claims it has raised in its Complaint. Even if GW Equity were able to establish that all of its allegations against Defendants were viable, it still cannot demonstrate that it has or will suffer irreparable harm.

In addition, information about GWE on Rip-Off Report is widely available on other sites on the Internet. For example, in a message board posting about GWE from September 8, 2005, the original author asked, "Has anyone heard any bad/good things with GW Equity? Please be explicit as possible in your reply as this information means a great deal to me for many reasons. THANKS!" (Def. Appx. 0077). Numerous messages were posted in response to this request including a lengthy one dated October 13, 2005. In this response, the author explained that GW Equity was formerly known as "Great Western Business Services". (Def. Appx. 0078–80). This response explains that in 2001, a highly critical article about Great Western Business Services was published by Inc. Magazine. A copy of the Inc. Magazine article (which is also publicly available online) is attached hereto as Exhibit M. (Def. Appx. 0085–94). The author continues on to explain that Great Western's reputation was further tarnished by legal action taken against it by state agencies in California and Minnesota. As an example, the author points to a recommendation for a Cease and Desist order issued against Great Western Business Services in Minnesota. (Def. Appx. 00096–98). This post concludes with the author's suggestion: "Certainly, I would run from a company that is trying to mask its past by changing their name and address. But that's just me." (Def. Appx. 0080).

Because there is other information presently available on the internet which is at least as critical of GWE as the information on Rip-Off Report, if not more so, GWE is unlikely to suffer any harm should the Court refuse to enter a preliminary injunction in this matter.

20

**D.    The Possible Injury to GW Equity Does Not Outweigh The Harm to Defendants.**

"Where the defendant's likely harm if the injunction is granted is equal to or greater than any injury threatened by defendant's conduct, injunctive relief is generally denied." *Apple Barrel Prods. Inc. v. Beard*, 730 F.2d 384, 389-90 (5th Cir.1984). Defendants have a long-standing policy of not removing reports from ROR, as removing reports would greatly affect the integrity of the website. Demands have been made to Defendants by companies and individuals, large and small, and in keeping with its policy Defendants have refused to remove the reports of any and all comers. This policy is stated directly on ROR.

ROR is only effective when all complaints are maintained and preserved so that over time, patterns of truly bad business practices are exposed. If Defendants removed complaints, that would give companies an incentive to pressure authors and/or Defendants to remove true and accurate reports in exchange for money or simply to avoid a costly lawsuit. If an injunction is entered against Defendants, there will likely be an influx of businesses who believe the information on the ROR Sites is "harming" their business who will attempt to obtain injunctions requiring the removal of reports. The chilling effect on free speech would be substantial.

Mere economic loss is not the only injury that should be weighed when considering the entry of a preliminary injunction. The foundation upon which Defendants entire business is premised will be shaken if a preliminary injunction is entered. On the other side, if the preliminary injunction is not entered, GW Equity may suffer as yet unproven economic damages. When these interests are balanced, the harm suffered by Defendants upon the entry of a preliminary injunction will be far greater than any potential harm suffered by GW Equity.

21

E.    **The Injunction Will Undermine the Public Interest**.

As evidenced by the creation and implementation of the Communications Decency Act, there is a clear public interest in allowing the free flow of information on the internet. It is important to note that although GW Equity insists that all statements pertaining to GW Equity on the ROR Sites are either "false," "defamatory," "misleading," or "disparaging," GW Equity has proffered no proof as to its assertions. Indeed, the person who would know best as to the accuracy of the report would be the true author of the report. Defendants did not author the reports, and therefore can offer no presumption as to the truth or falsity of such reports; however, all persons who post a report on ROR are required to attest to the validity of the report. If a user does not agree to these terms, as they are free to do, then they will not be allowed to publish the report on ROR. There is a clear public interest in allowing the determination of "truth" or "falsity" by a weighing of information, as opposed to the mere assertions of an interest party.

VI.    **CONCLUSION**

For the reasons stated herein, Defendants respectfully request that the Court <u>deny</u> the Application for Preliminary Injunction requested by Plaintiff GW Equity, LLC and awarding Defendants their reasonable attorney fees incurred in defending this action.

DATED this 12th day of June, 2007.

**JABURG & WILK, P.C.**

/s/ Maria Crimi Speth
Maria Crimi Speth, Esq.
JABURG & WILK PC
3200 North Central Avenue
Suite 2000
Phoenix, Arizona 85012
(602) 248-1000
Attorneys for Defendants

22

*Pro Hac Vice* Application Pending

/s/ Jeffrey S. Seeburger
Jeffrey S. Seeburger
Texas State Bar No. 00788381
KANE RUSSELL COLEMAN
& LOGAN, P.C.
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Tel: (214) 777-4275
Fax: (214) 777-4299

23