UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

GW EQUITY, LLC,                          )
                                         )
                    Plaintiff,           )   CIVIL ACTION NO.
                                         )   3-07 CV 0976-K
v.                                       )
                                         )
XCENTRIC VENTURES, LLC, *ET AL.*,        )
                                         )
                    Defendants.          )

## APPENDIX

## DEFENDANT XCENTRIC VENTURES, L.L.C.'S
## OPPOSITION TO PLAINTIFF'S APPLICATION FOR INJUNCTIVE RELIEF

10297-1/DSG/DSG/591987_v1

Dockets.Justia.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

GW EQUITY, LLC,                         )
                                        )
                  Plaintiff,            )   CIVIL ACTION NO.
                                        )   3-07 CV 0976-K
v.                                      )
                                        )
XCENTRIC VENTURES, LLC, *ET AL.*,       )
                                        )
                  Defendants.           )

## DECLARATION OF EDWARD MAGEDSON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

EDWARD MAGEDSON state the following upon my personal knowledge:

1.      My name is Edward Magedson.  I am a resident of the State of Arizona, am over the age of 18 years, and if called to testify in court I could and would truthfully testify to the following information based upon my own personal knowledge.

2.      I am the manager of Defendant XCENTRIC VENTURES, L.L.C., ("Xcentric") which is based in Tempe, Arizona.  Xcentric operates a website known as "The Rip-Off Report" which is located at **www.ripoffreport.com** and **www.badbusinessbureau.com** ("ROR").

### HISTORY/BACKGROUND OF RIPOFF REPORT

3.      ROR is a free resource available to the public as well as government officials, the FBI, state and local, law enforcement, attorneys general, and so forth.  This website has been in operation since 1998 and we currently receive millions of hits every week.

10297-1/DSG/DSG/591880_v1

4.      As of June 2007, ROR contains almost 250,000 individual reports. Including "rebuttals" (responses to a report), the site contains more than one million unique entries, and we receive approximately 500–800 new reports/rebuttals every day.

5.      There is no fee to view reports, search reports, post reports or post rebuttals.

## HOW REPORTS ARE POSTED ON RIPOFF REPORT

6.      When a user wants to post a new report, they must first sign up for an account with Rip-Off Report. This process is absolutely free, and we ask the user to provide truthful and accurate information, but it is possible for individuals to sign up for an account using forged or fraudulent names, phone numbers, etc. Given the enormous volume of traffic to the website, like any other popular site with such a high level of traffic, other than a valid email address which is required to obtain an account, we cannot and do not verify the authenticity of the personal information provided by each user.

7.      Any time a user wishes to write a report or rebuttal, they must sign in with their username and password and submit their report using an online form. When they do so, our server logs the personal account information provided by the user (which is only as accurate as the information originally provided by the user). The server also logs the internet protocol or "IP" address of the user which is a unique number comprised of four sets of one to three digits each called "octets". When any person logs onto the Internet, their computer is automatically assigned a unique IP address by their Internet Service Provider ("ISP") which identifies that computer. While it is possible for a user to provide forged or fake personal information such as a name, it is very difficult, though not impossible, to forge an IP address.

8.      When the user is done writing their report, they click a button to post their story to the ROR Sites. There is no charge for submitting a report. As part of the process of submitting their report, the user creates a title or heading for the report. Once this is done, the story is held until it can be briefly reviewed by Xcentric's staff of editors before it is posted online for other users to view. When a report is reviewed, it is only to confirm that the report does not contain blatantly illegal, inappropriate, or offensive material (i.e., images of pornography, social security

10297-1/DSG/DSG/591880_v1

Def. Appx. 0001

numbers, credit card numbers, or other inappropriate material). Any report that contains such

material may be deleted or redacted at the discretion of Xcentric staff. Otherwise, reports posted

by users of the ROR Sites are not checked for accuracy. As a matter of policy, Xcentric staff

does not add to, or rewrite, any of the reports posted by users.

## REPORTS ABOUT PLAINTIFF GW EQUITY

    9.      Among the 250,000 reports on the ROR Sites, as of June 2007, I have located six

(6) reports that have been posted on Rip-Off Report regarding the Plaintiff in this matter, GW

EQUITY, L.L.C. ("GW Equity"). These six reports are reflected in the table below which shows

the results returned by performing a search for "GW EQUITY" on Rip-Off Report:

| Date/Time | Title | Report # |
|---|---|---|
| 1. 6/9/2007 8:41:00 AM | GW Equity Slick presentation at Four Seasons Hotel makes you want to give them 30k Ripoff Dallas Texas **Author:** Doss, Texas Small Business Services : **GW Equity** Texas | 253345 |
| 2. 3/2/2007 7:55:14 AM | Gw Equity, Citibank, Citigroup, Citi Commerce Solutions M&A / Business Consulting, paid $30,000 for an inflated analysis of my company that has yielded no results New York New York*Consumer Suggestion ..Real brokers work on contingency. **Author:** New York, New York Business Consulting : **Gw Equity, Citibank,citigroup,citi Commerce Solutions** New York | 222795 |
| 3. 11/29/2006 2:25:00 AM | GW Equity Wrongful Termination - Scam - perpetuating a fraud on the general public Dallas Texas **Author:** Dallas, Texas Business Consulting : **GW Equity** Texas | 222793 |
| 4. 11/26/2006 4:37:01 AM | Gw Equity - Geneva Business Research - Geneva Companies - Geneva Marketing Services - Geneval Consulting Services ripoff defrauded my company out of $30,000 for retainer to sell my business Dallas Texas*UPDATE *UPDATE ..You sir are a LIAR and have no connection with GW Equity whatsoever. **Author:** Saint Paul, Minnesota Corrupt Companies : **Gw Equity - Geneva Business Research** Texas | 218734 |
| 5. 12/8/2006 2:03:19 PM | Gw Equity, Geneva Corporate Finance, Geneva Capital Markets, wasted eight hours of my time then hit me up for $30K Dallas Texas*Consumer Comment ..GW Equity article found in Inc. Magazine **Author:** Rockford, Minnesota Financial Services : **Gw Equity, Geneva Corporate Finance** Texas | 219512 |

3

10297-1/DSG/DSG/591880_v1

Def. Appx. 0001

| | | |
|---|---|---|
| 6. 12/8/2006<br>1:45:46 PM | Gw Equity, Citibank, Citigroup, Citi Commerce Solutions Big<br>company Wasting Small Companies Time & Money New York New<br>York*Consumer Comment ..Due Diligence<br>**Author:** Rockford, MinnesotaBusiness Consulting : **Gw<br>Equity, Citibank,citigroup,citi Commerce Solutions**New<br>York | **222796** |

10.      I understand that an individual named RYAN BINKLEY, the President of GW

Equity ("Mr. Binkley"), has submitted an affidavit in this case attached to which were several

reports about GW Equity (including those above) which GW Equity alleges were written by me.

Those allegations are entirely untrue and provably false.

11.      Attached as **Exhibit 3** to Mr. Binkley's affidavit is a report dated November 2,

2006 with the heading "GW Equity ... Geneva Consulting Services rip off defrauded my

company out of $30,000 for retainer to sell my business ... The Truth about GW Equity and

Geneva." Although not reflected in Mr. Binkley's affidavit, this report is **#218734**[1] and is

available at: http://www.ripoffreport.com/reports/0/218/RipOff0218734.htm. This report is

also #4 in the above table.

12. As **Exhibit 3** to Mr. Binkley's affidavit shows, **Report #218734** consists of three

parts:

         1.) Initial report submitted on 11/2/2006 by "Jim, St. Paul, Minnesota"

         2.) Rebuttal entitled "The Truth about GW Eqiuty [sic] and Geneva" submitted on

            11/15/2006 by "Ray Wood, Office of General Counsel, GW Equity, LLC", and

         3.) Second rebuttal entitled, "You sir are a LIAR and have no connection with GW

            Equity whatsoever," submitted on 11/25/2006 by "Greg, Rockwall, Texas".

Collectively this initial report and the two corresponding rebuttals are referred to as **Report

#218734**.

---

[1] Report numbers are automatically generated by the ROR Site servers when a report is submitted and are useful for locating the actual report on our site. As an example, a Report #*123456* would be located at the address: http://www.ripoffreport.com/reports/0/218/RipOff0*123456*.htm.

4

Def. Appx. 0001

## NO REPORTS WERE WRITTEN BY DEFENDANTS

13.      Upon learning of GW Equity's claim that I wrote **Report #218734**.  I reviewed

the server logs for Rip-Off Report and located the "Administrator Version" or "Admin Version"

of **Report #218734**.  The "Admin Version" is an internal version of public reports which, in

addition to the text of the report itself, contains the personal contact information (name,

telephone number, and internet protocol or "IP" address) logged by our servers for each person

who posted a report or rebuttal to a report.  This personal contact information is available only to

me and my employees and is not publicly available.

14.      The Admin Version of **Report #218734** is attached hereto as **Exhibit A** (Def.

Appx. 000).  As this document shows, our server logged the personal information for each of the

authors involved in the creation of the initial report and two rebuttals in **Report #218734**:

| ADMIN COPY INFORMATION — REPORT #218734 | | | |
|---|---|---|---|
| Date | Author | Email | IP Address |
| 11/2/2006 | Greg Sinclair | hurtbygwequity@comcast.net | 76.184.169.187 |
| 11/15/2006 | Ray Wood | rwood@gwequity.com | 12.193.241.34 |
| 11/25/2006 | Greg Sinclair | hurtbygwequity@comcast.net | 76.184.169.187 |

15.      As this table shows, the original report dated 11/2/2006 was filed by someone

who called himself "Greg Sinclair" using an email address listed as

hurtbygwequity@comcast.net from a computer with an IP address of 76.184.169.187.

According to a search of internet records attached hereto as **Exhibit B**, this IP address was

assigned by Road Runner HoldCo LLC which was the user's Internet Service Provider (ISP).

16.      I did not author any part of **Report #218734** or the rebuttals thereto.  I did not

add content about GW Equity to any of these reports or rebuttals, and I did not author or modify

any of the titles to the reports.  Moreover, I have never received internet service from Road

Runner, and I have never had an email account with ComCast.net.

5

17.    Attached hereto as **Exhibits C–G** (Def. Appx. 000) are Admin Versions for the five other reports about GW Equity on Rip-Off Report. The table below reflects the actual Report # for all six of the reports at issue:

| ADMIN COPY SUMMARY | | |
|---|---|---|
| Exhibit | Report # | Appendix Pages |
| A | 218734 | |
| C | 253345 | |
| D | 222795 | |
| E | 219512 | |
| F | 222796 | |
| G | 222793 | |

18.    None of these reports were authored by me, nor did I author any of the rebuttals under these reports. I have reviewed all of the email addresses and IP addresses listed in these copies and have confirmed that none of this information corresponds with my email address or IP address.

19.    I have discussed this report with my staff of editors and based on those discussions and my own personal knowledge, none of these reports and/or rebuttals were authored or posted by any of Xcentric's editorial staff. It would be a clear violation of Xcentric's rules for any agent of Xcentric to author or post a report or rebuttal, or to add any content to any report or any report title, without my express permission. **All** of these reports and/or rebuttals were written by independent third-party users of the ROR Sites.

### THE REAL AUTHOR — DICKSON WOODARD

20.    Although GWE has alleged that I wrote the reports at issue in this case, I believe these reports were actually created by a former employee of GWE named DICKSON WOODARD ("Mr. Woodard"). I have previously spoken to Mr. Woodard in the past regarding the Rip-Off Report website and on June 11, 2007, I had a telephone conversation with Mr. Woodard in which he admitted to me that he authored all of the reports which are the subject of the current lawsuit against me.

10297-1/DSG/DSG/591880_v1

Def. Appx. 0001

## DEFENDANTS DO NOT SOLICIT DEFAMATORY REPORTS

21.    I understand that GW Equity has claimed in this lawsuit that notwithstanding the federal Communications Decency Act, I should be held liable for the statements posted by users of the ROR Sites because I have directly "solicited" these reports.  Although the ROR Site generally encourages people to write complaints when they have been victimized, we have <u>never</u> encouraged anyone to submit <u>false</u> complaints.  In fact, before a user is allowed to submit any report or rebuttal to the ROR Sites, they are required to first agree to a statement that includes the representation that "<u>By posting this report/rebuttal, I attest this report is valid.</u>"

22.    If a user is not willing to agree to this statement, he/she is not permitted to submit a report under any circumstances.  Also, on the very first page of the website I clearly explain that just because a company has been reported does not mean that it should be avoided:

> DOING BUSINESS WITH THE COMPANY OR INDIVIDUAL REPORTED
> Consumers, just because a company or individual is reported on Rip-off Report™
> does not necessarily mean you should not do business with them. By reading the
> experiences of other consumers, you will now be able to make more educated
> decisions, because now you know what to watch for.

23.    In addition, the website clearly explains to its users the following policy:

> Thank you for visiting our Rip-off Report web site.  By viewing this site you
> agree that you will not hold the Rip-off Report, the bad Business Bureau, or any
> of their owners, employees or entities responsible for any information contained
> herein.  The Rip-off Report is a non-substantiated source of information.  The
> information provided in the Rip-off Report is the sole creation of consumers from
> the general public. Please verify any claims that are made in this site, and make
> your own decisions about any companies and individuals listed within. Warning!
> The content within may be offensive, due to the unedited nature.

24.    Based on these terms/disclaimers, I feel that I have made it very clear to all users/viewers of the site that although Xcentric does not accept responsibility for the accuracy of content posted by third parties, we also do not allow or endorse anyone filing false complaints against anyone.  It is my belief that the usefulness and credibility of the ROR Sites is directly dependent upon the users of the site posting true and accurate information, and for that reason I have adopted the above policies to encourage people to submit only true complaints.

7

10297-1/DSG/DSG/591880_v1

Def. Appx. 0001

25.     It is also important to note that companies who have been the subject of a Rip-Off Report are welcomed and encouraged to post a rebuttal explaining their side of the story if they believe the report is inaccurate in any way.  The ROR Site charges nothing for this.

## DEFENDANTS HAVE NOT EXTORTED PLAINTIFF

26.     I understand that GW Equity has alleged in ¶ 26 of its Complaint that "in a series of emails", I engaged in (attempted) extortion because GW Equity claims I made a demand that GW Equity pay money "for remedying the falsities pursuant to the 'Rip-Off Report Corporate Advocacy Business Remediation & Customer Satisfaction Program". This allegation is false.

27.     First, I have searched my emails and have found no correspondence between me and GW Equity other than the email from GW Equity's attorney mentioned above, and a second email from Ray Wood who informed me that he was from GW Equity's "Office of General Counsel".  At no time during any of my communications with GW Equity did I ever ask for or demand money; any such claims are purely and simply false.

28.     Xcentric does offer something called the "Corporate Advocacy Business Remediation & Customer Satisfaction Program", but this program is not extortion.  Rather, when a company has received complaints on Rip-Off Report and wants to demonstrate its commitment to improving its customer service, it can become a member of my Corporate Advocacy Program or "CAP".  This is a voluntary service whereby companies pay me to act as a sort of "mediator" between them and their unhappy customers.

29.     When a company joins the CAP program, I personally contact all unhappy customers and determine what can be done to satisfy them.  This often involves the member-company making refunds to customers, but it may also involve other things.  Of course, I always explain to companies that contact me regarding complaints on Rip-Off Report that they are free to use their own time and resources to contact their customers, and sometimes they will do this, but many companies believe that their interests would be better served by having this work done by a neutral third party such as Xcentric.

8

10297-1/DSG/DSG/591880_v1

Def. Appx. 0001

30.    As far as I am aware, the companies who have joined my CAP program are thrilled with the services they have received from me and are very pleased with their improved customer relations. The fact that I do charge for my time in helping these companies is not extortion.

I declare under penalty of perjury that the foregoing is true and correct

EXECUTED ON: June 11  2007.

_____
Edward Magedson

9

Def. Appx. 0001

# Exhibit A

Def. Appx. 0010

Rip-off Report.com - badbusinessbureau.com                               Page 1 of 7

**David S. Gingras**

| | |
|---|---|
| **From:** | EDitor@ripoffreport.com |
| **Sent:** | Monday, June 11, 2007 3:30 PM |
| **To:** | EDitor@ripoffreport.com |
| **Subject:** | Report# 218734 = Gw Equity - Geneva Business Research - Geneva Companies - Geneva Marketing Services - Geneval Consulting Services ripoff defrauded my company out of $30,000 |





About the ads below



This report was created by Greg Sinclair - hurtbygwequity@comcast.net - 800-530-7964 - 76.184.169.187

✉ E-mail to a Friend
🖨 Printer Friendly Version
Category:
**Corrupt Companies**

Submitted:
**11/2/2006 5:14:17 AM**
Modified: **11/26/2006 4:37:01 AM**

## Gw Equity - Geneva Business Research - Geneva Companies - Geneva Marketing Services - Geneval Consulting Services ripoff defrauded my company out of $30,000 for retainer to sell my business Dallas Texas *REBUTTAL employee ..The Truth about GW Eqiuty and Geneva

Company
## Gw Equity - Geneva Business Research
Address:
**1755 Wittington Place**
**Dallas Texas  75234**
**U.S.A.**
Phone:
972-481-2801
Fax: 972-232-1124

6/11/2007

Email: sschreiber@gwequity.com



GW Equity is actually a $120 billion dollar enterprise called Geneva Business Research that settled a $45 Million dollar class action suit in March of 2003 in Irvine California "for defrauding thousands of small businesses out of monies paid in advance".

They have changed their name to GW Equity and subsequently moved to Dallas, Texas. Without knowing the connection, I was contacted by someone who said she was a "Senior Account Manager" from GW Equity. She told me that her company was the largest Mergers and Acquisitions firm in the Country. She assured me that this was not a random call and that a "research team" had done a lot of work in qualifying company because several Fortune 400 companies that were interested in Merging or Acquiring my company. She said her and that the investors urgent and were very interested in talking to me.

She said they also happened to be in the area and my exposure to these investors was contingent upon spending an entire day with their "M & A Specialist" and a "Business Analyst" they could explain how this "offer on my company would occur and that they would explain these buyers motives." The Seminar turned out to be a cattle cal with about 15 other clueless private business owners.



I listened to their day long sales pitch and at the end they dropped the $30,000 retainer fee on me. My company's revenues are close to the $100 million mark and it sounded like a drop in the bucket compared to what they were telling me that I could actually get for my company. These figures were way above anything my CPA or attorneys calculated but GW Equity assured me that only M&A people know how to calculate the "true & future value of a company".

After paying the $30,000 I met with David Gilliland the M&A specialist and he explained that the evaluation would take about 6 months and it might be years before he could attempt to take my company to market. When I asked where the buyers were (that the initial senior account manager) told me were interested and urgent, he explained that those buyers were simply "buying into my industry and that I never had any type of guarantee that they could actually sell my business.

Essentially I paid $30,000 for an inflated analysis of my company that has yielded no results. I had the cell phone of the senior account manager who later told me that she had been fired because she had asked Steve Schreiber "of the companies we take retainers from... how many actually get sold. She was fired the next day due to lack of performance. She also explained that the investors that they claim to have in their pockets do not know that GW Equity even exists and that her call to me was a strictly random cold call from a D&B database and that there was no research done on my company at all. She was just getting paid to get me into this seminar.

After 3 years I have never seen any kind of an offer on my company and I am reminded that I was never guaranteed that they could sell my business for sure. Robert Brenner is your connection between the same scam conducted i California and was Senior Vice president there as well. Not only did I waste an

Rip-off Report Corporate Advocacy Business Remediation & Customer Satisfaction Program; ED Magedson, Founder Rip-off Report explains how this program works to benefit consumers & businesses

**CLICK HERE**

Add pictures
to your
Rip-off Report

entire day at some sales seminar under the premise that they had several buyers for my company, I was hit with a $30,000 retainer fee and actually learned nothing about the M&A process.

These guys are shrewd salespeople but I cannot find even one company that they have ever sold. "That is a matter of confidentiality" they say. But cannot even give me the statistics of even selling one. GW Equity is another fraud under a different name that just moved to another State.

Jim
Saint Paul, Minnesota
U.S.A.

## Company Search

If you would like to see more Rip-off Reports™ on Gw Equity - Geneva Business Research, please use the search box below

| Gw Equity - Geneva Business Research | Search |

In order to assure the best results in your search:
- *Keep the name short & simple, and try different variations of the name.*
- *Do not include ".com", "S", "Inc.", "Corp", or "LLC" at the end of the Company name.*
- *Use only the first/main part of a name to get best results.*
- *Only search one name at a time if Company has many AKA's.*

Click here to go to our *advanced search* page.

Ray Wood - 972-232-1100   rwood@gwequity.com 12.193.241.34

## Rebuttal REBUTTAL employee
Submitted: 11/15/2006 11:15:09 AM
Modified: 11/17/2006 2:21:29 AM
- - 12.193.241.34

## The Truth about GW Eqiuty and Geneva

Dear ?Jim from St. Paul, Minnesota?:

It has come to my attention that you recently posted an item on the above-referenced website that contains some negative information about GW Equity but which, I'm afraid, inaccurately depicts a number of important facts. I am writing today as a representative of the company, to provide factual data that you may not previously have had, and to ask that you kindly remove or edit the inaccurate information pertaining to GW Equity.

At GW Equity, we take great pride in our professional reputation and our extremely high level of customer service, so I hope you will take this letter In the friendly spirit with which it is offered. I would also be happy to speak with you personally if you have any remaining questions or concerns after reviewing the information provided below.

The information contained in your posting refers to a company, Geneva, whic is in no way related to GW Equity, LLC, and never has been related to GW

Def. Appx. 0013

Equity. Such a posting could be very confusing to readers. GW Equity, LLC is not ?a $120 billion enterprise? nor has GW Equity, LLC ?settled a $45 million dollar class action in March of 2003 in Irvine, California.? It may be that you have our company confused with The Geneva Companies, a company that was purchased by Citigroup in 2001 and that has never been tied to GW Equit in any way. See http://www.hoovers.com/citigroup-capital-strategies/-- ID__125848--/free-co-factsheet.xhtml and for more information about this company, now known as Citigroup Capital Strategies.

This link clearly communicates the following:

Citigroup Capital Strategies Inc.
24022 Calle de la Plata
Laguna Hills, CA 92653 (Map)
Phone: 949-206-5000
Fax: 949-206-5010
Company Web Site

Hoover's coverage by Ryan Caione
Overview
Located far away from the snowy Alps, Citigroup Capital Strategies (formerly Citigroup Geneva Capital Strategies, and before that, The Geneva Companies isn't about making chocolate or fine watches; it makes deals. The boutique investment bank specializes in mergers, acquisitions, and divestitures of private, middle-market businesses with revenues ranging from $3 million to $500 million per year. The company was founded in 1977 and acquired by Citigroup in 2001; it is now a division of Citigroup Global Markets. Citigroup Capital Strategies has six US offices.

Further, GW Equity was not conducting seminars in the Minnesota area as far back as three years ago, so I do not believe the seminar you reference could have been one of ours. We also typically receive very favorable comments from attendees at our free seminars, who cite valuable information they learned about the M&A process, even if they ultimately decide not to retain an M&A firm to help them sell their company.

I should also point out that GW Equity, since the company's inception, has always been based in Dallas, Texas, contrary to the claim in your online post. GW Equity has added to our team a small handful of ex-Geneva advisors with extensive experience in the mergers and acquisitions industry, and these are reputable professionals who also have experience with Merrill Lynch, Morgan Stanley Dean Witter and other world-class investment banking firms. Other than that, however, there is absolutely no connection between GW Equity and Geneva.

You mention that you ?cannot find even one company that they have ever sold,? but this clearly cannot be a reference to GW Equity, as we have publicized a number of our successfully closed deals on behalf of middle market clients nationwide. A few press releases highlighting representative deals can be found in our online newsroom at www.gwequity.com, and you may also see our ad soon in the Wall Street Journal showcasing additional, recent transactions. Of course, we cannot publicize many of our client transactions, as a significant number of clients request that their confidentiality be protected when they sell their business ? a request we are

obligated to honor.

I am truly sorry to hear that you had a frustrating experience, apparently with Geneva, and I would be pleased to chat with you by phone about the M&A process and how it should work. Of course, you should never be prematurely assured that there are buyers already interested in your specific company, although it may be true that an investment banking firm has a stable of private equity investors who are interested in companies in your industry sector and eager to make profitable investments.

Further, if you do contract with an M&A firm to perform a valuation of your company and to position you for a sale, you should certainly receive a sound analysis of your company's potential value to a buyer and should receive a fa look at your company by a number of possible investors ? who may, ultimately, decide not to invest in your company for a variety of reasons wholly unrelated to the quality of the valuation and the soundness of the professional advice your receive.

We stand by our track record of success and customer service, and hope you will agree to correct your online post to acknowledge both our outreach to yo and our lack of a business relationship with the company formerly known as Geneva. I hope you will contact me with any additional questions or concerns as I would be pleased to speak with you personally.

I hope you will contact me with any additional questions or concerns, as I would be pleased to speak with you personally. I may be reached directly by phone, 972-232-1100, or via e-mail to rwood@gwequity.com

Sincerely,

Ray Wood, SIU
Office of General Counsel
GW Equity, LLC

Ray - Dallas, Texas
U.S.A.

Greg Sinclair - hurtbygwequity@comcast.net

**Update** Submitted by the original author
Submitted: 11/25/2006 5:51:25 PM
Modified: 11/26/2006 4:37:01 AM
- -

## You sir are a LIAR and have no connection with GW Equity whatsoever.

Mr. Wood,

Let me start by clarifying what the State Bar of Texas and the Grievance Assistance Program assures me (and what I already knew) is that you do NOT work for, nor do you represent GW Equity in any form. Your salutation represents:

Ray Wood SIU
Office of General Counsel
GW Equity, LLC
Ray ? Dallas, Texas
USA

That is a LIE, I have attempted numerous times to get in touch with you at the
Ph# you left (972)232-1100, not only are you NOT in their system but no one
knows you even exist much less are you general counsel of anything. The E-
mail address also immediately bounces back as non existent. You have no
specialization in anything anf the State Bar has no idea what SIU is supposed
to mean. They have determined to find that out on their own.

You are actually Randall Buck Wood of Ray, Wood & Bonilla, LLP State Bar #
21905000 & Licensed in the State since 09/16/1968 Phone #512-328-8877 whic
explains why you cannot be reached as ?General Counsel? in Dallas. You
have not listed address, just a PO box 165001, Austin, TX 78716. The State Ba
insists they need a physical address from you ASAP.

You sir are a LIAR and have no connection with GW Equity whatsoever. If you
going to make such an official connection with this company, I suggest you d
so quickly! The general public should feel free to call the (512) 328-8877 and
ask for ?Ray? and see if he actually offices out of an Austin location or is
actually telling the truth about having a Dallas office. A clear violation of
TDRPC Part VII Rule7.01 Firm Names and Letterhead, you sir, should read the
rules that govern your liscence. I hope you feel it was worth it.

Now that we have clarified you as much as a fraud as GW Equity, lets get bacl
to them?

As to GW Equity having nothing to do with Geneva Business Research and
what you call the ?may or may not have settled a $45,000,000 lawsuit? I direc
you to

Ereba, et al. v Geneva Companies, Geneva Business Research, et al. Superior
Court of Orange County, Santa Ana, CA March 15, 2003? Award $45,000,000 |
Mediated Settlement Civil Practice ? Class Action | Damages ? Restitution |
Fraud ? Statutory, Summary defrauding thousands of small business owners
out of monies paid in advance to sell their businesses.

Look it up Mr. Wood. Now find the Senior vice president serving then and
NOW both between Geneva Business Research and GW Equity and you will
find the same name, Robert Brenner. Really NO connection? See the Bios for
gwequity.com he's right there loud & proud. Check D&B's estimation of
Geneva Business Research's last years Sales as $120,318,000,000 to be exact
Any questions?
Are you honestly telling me these companies have the same Senior VP but
are ?in no way connected??

As to Any business sold by GW Equity (of course you can go to GW Equity's
web sit and find crap that means nothing, no names, no dates, no buyers, etc.
They will claim confidentiality as the reason they cannot name those
companies but the fact is that happy buyers and sellers are more than happy
to release the names of the M&A firms that helped them sell their businesses.

6/11/2007

**Don't you think you would find even one?**

**Go to mergerstat.com, valuline.com, forbes.com or any other online M&A authority and they will be screaming who sold them and for how much. No go to those same web sites and search GW Equity? You will have NOTHING. The same question the FTC and Department of Labor is probably asking itself righ now.**

**If there are others that feel they have been screwed by GW Equity please, please, please post to this web site. DON'T GET SCREWED, Why risk it?**

**Greg - rockwall, Texas**
**U.S.A.**

---

### *REBUTTAL BOX*
**MY COMPANY HAS BEEN REPORTED!**
**HOW DO I RESPOND?**

Are you an owner, employee or ex-employee with either negative or positive information about the company or can you provide "insider Information" on this company? Do you have a consumer suggestion on how to resolve this problem or how to avoid it in the future? ONLY these types of responses will be added to the filed report, and will be posted within 24 hours of receipt. Make your voice heard. Let them know your side, too!

CLICK HERE to Send us your rebuttal on this specific report only.
or
***If you are also a victim of the same company or person,
**YOU NEED TO FILE YOUR OWN RIP-OFF REPORT.**
CLICK HERE to File your OWN Rip-Off Report

---

x Banner 468x60







Feel free to send us suggestions and comments to our editorial staff.   |   Technical questions can be addressed to our webmaster.   |   Best if viewed with Netscape 4, Internet Explorer 4, or AOL 4.0. Support for JavaScript is needed to submit and search for reports.   |   Having trouble searching or filing a report? It may be a browser problem. See our FAQ for help

Home | File | Update | Search | Pictures | Lawsuits(Coming Soon) | Revenge Guide | Privacy Policy
Volunteers | Thank You! | Editorial | Donate | Link | FAQ | E-Mail Us | ED Magedson - Founder Rip-off Report.com

Copyright © 2002 ... badbusinessbureau.com

Def. Appx. 0017

Exhibit B

Def. Appx. 0018

broadband help » What is my IP address?                                      Page 1 of 1

# BROADBAND
Reports.com  login                                              Theme:

Search: [_____] Go

# T1 Internet From $359
Free Install & Router- 888.757.5800 Security Upgrades, Quick Install!
MegaPath.com/T1-Quote
Ads by Google - Advertise on this site

| Home | Find Service | Reviews | News | FAQs | Forums | Tools | Maps | About |

Intro   FAQ   Tweak Test   Speed Tests   Line Quality   Line Monitor   **Whois**   Doctor Ping   »»

Ads by Google

**PC Speed Test?**
Clean & Optimize
your Computer.
Free download,
Speed-up your PC!
www.PCPerformanceTool

**Reverse IP
Address Lookup**
Want to Find
Location or Domain
of an IP Address?
Access Data Now!
www.ReverseRecords.org

**Broadband
Service**
Top 6 Websites For
Broadband Service
www.picks-finder.com

**VoIP Provider
Reviews**
Internet Phone
Service Providers
Ratings, Reviews,
and Specials.
www.BestVoIPProviders.c

how-to block ads

Check another:                    or back to dslreports.com/whois

Result for **76.184.169.187**

```
--> fwhois 76.184.169.187@whois.arin.net
[whois.arin.net]

OrgName:    Road Runner HoldCo LLC
OrgID:      RRSW
Address:    13241 Woodland Park Road
City:       Herndon
StateProv:  VA
PostalCode: 20171
Country:    US

ReferralServer: rwhois://ipmt.rr.com:4321

NetRange:   76.184.0.0 - 76.187.255.255
CIDR:       76.184.0.0/14
NetName:    RRACI
NetHandle:  NET-76-184-0-0-1
Parent:     NET-76-0-0-0-0
NetType:    Direct Allocation
NameServer: DNS1.RR.COM
NameServer: DNS2.RR.COM
NameServer: DNS3.RR.COM
NameServer: DNS5.RR.COM
NameServer: DNS6.RR.COM
Comment:
RegDate:    2006-07-26
Updated:    2007-03-12

OrgAbuseHandle: ABUSE10-ARIN
OrgAbuseName:   Abuse
OrgAbusePhone:  +1-703-345-3416
OrgAbuseEmail:  abuse@rr.com

OrgTechHandle: IPTEC-ARIN
OrgTechName:   IP Tech
OrgTechPhone:  +1-703-345-3416
OrgTechEmail:  abuse@rr.com

# ARIN WHOIS database, last updated 2007-06-10 19:10
# Enter ? for additional hints on searching ARIN's WHOIS database.
```

Terms of Use | Privacy Policy | Hosting by www.nac.net - DSL,Hosting & Co-lo | feedback | contact
Seventh year online © 1999-2007 dslreports.com.

http://www.dslreports.com/whois                                      6/11/2007

Def. Appx. 0019

# Exhibit C

Def. Appx. 0020

Rip-off Report.com - badbusinessbureau.com                                    Page 1 of 3

## David S. Gingras

| | |
|---|---|
| **From:** | EDitor@ripoffreport.com |
| **Sent:** | Monday, June 11, 2007 3:14 PM |
| **To:** | EDitor@ripoffreport.com |
| **Subject:** | Report# 253345 = GW Equity Slick presentation at Four Seasons Hotel makes you want to give them 30k |







This report was created by Phil Jackson - phil@granite-iron.com - 5124227025 - 24.153.195.199

✉ E-mail to a Friend                          Submitted: 6/9/2007
🖨 Printer Friendly Version                              8:40:55 AM
Category:                                    Modified: 6/9/2007
**Small Business Services**                          8:41:00 AM

## GW Equity Slick presentation at Four Seasons Hote makes you want to give them 30k Ripoff Dallas Texas

Company
**GW Equity**
Address:
**14241 Dallas Pkwy #600**
**Dallas Texas  75254**
**U.S.A.**
Phone:

Fax: -

GW Equity rep calls me up and ask if I would be interested in selling my business and I said I really hadn't thought about it. He invited me to a seminar in Austin at the Four Seasons Hotel that is free that would tell me all about selling my business down the road if I'm interested. I went and the seminar was first class and made me want to sell today even when they told me it cost 30k upfront. They said they have lots of big companies and foreign buyers

Def. Appx. 0021



looking for businesses like mine and the value of my company would be based on future earnings. They planned to visit my business the next day. I come home and start checking out GW Equity and after about 10 sources had nothing good to say about GW I ask them to show me something about there track record, let me talk to someone that they had sold their company, show me how many companies you sold last year, something anything. They didn't show me anything and got mad because I ask. Now I understand they get 90% of their income from the 30K they collect upfront. I wonder how many small business owners these people rip off each year.

**Phil**
**Doss, Texas**
**U.S.A.**

## Company Search

**If you would like to see more Rip-off Reports™ on GW Equity, please use the search box below**

| GW Equity |   Search  |

In order to assure the best results in your search:
- *Keep the name short & simple, and try different variations of the name.*
- *Do not include ".com", "S", "Inc.", "Corp", or "LLC" at the end of the Company name.*
- *Use only the first/main part of a name to get best results.*
- *Only search one name at a time if Company has many AKA's.*

Click here to go to our *advanced search* page.

---

### REBUTTAL BOX
**MY COMPANY HAS BEEN REPORTED!**
**HOW DO I RESPOND?**

Are you an owner, employee or ex-employee with either negative or positive information about the company or can you provide "insider information" on this company? Do you have a consumer suggestion on how to resolve this problem or how to avoid it in the future? ONLY these types of responses will be added to the filed report, and will be posted within 24 hours of receipt. Make your voice heard. Let them know your side, too!

CLICK HERE to Send us your rebuttal on this specific report only.
or
***If you are also a victim of the same company or person,
**YOU NEED TO FILE YOUR OWN RIP-OFF REPORT.**
CLICK HERE to File your OWN Rip-Off Report

---

| ☒ Banner 468x60 |

**CLICK HERE**



**WANTED**
**DEAD BEAT**



Rip-off Report.com - badbusinessbureau.com

DADS &
MOMS
PUT YOUR
DEADBEAT
SPOUSE ON
TV!!!
So maybe you
can finally
COLLECT $$$
**WANTED**
Moms or dads
who are owed
more than six
months child
support by a
deadbeat
spouse...
After you filed
your
Rip-off Report
*email us at*
EDitor@ripoffreport.com
*Rip-off Report
will forward your
filed
Report to
Producers.*

Add pictures
to your
Rip-off Report

Feel free to send us suggestions and    Technical questions can be    Best if viewed with Netscape 4,    Having trouble searching or filing a
comments to our editorial staff.    addressed to our webmaster.    Internet Explorer 4, or AOL 4.0.    report? It may be a browser problem.
                                        Support for JavaScript is needed to    See our FAQ for help
                                        submit and search for reports.

Home | File | Update | Search | Pictures | Lawsuits(Coming Soon) | Revenge Guide | Privacy Policy
Volunteers | Thank You! | Editorial | Donate | Link | FAQ | E-Mail Us | ED Magedson - Founder Rip-off Report.com



Copyright © 2002 a service of badbusinessbureau.com

6/11/2007

Exhibit D

Def. Appx. 0024

Rip-off Report.com – badbusinessbureau.com                                    Page 1 of 5

## David S. Gingras

**From:** EDitor@ripoffreport.com
**Sent:** Monday, June 11, 2007 3:12 PM
**To:** EDitor@ripoffreport.com
**Subject:** Report # 222795 = Gw Equity, Citibank, Citigroup, Citi Commerce Solutions M&A / Business Consulting, paid $30,000 for an inflated analysis of my company





 This report was created by Greg Sinclair – hurtbygwequity@comcast.net – 800-530-7964 – 76.183.12

📧 E-mail to a Friend                                                              11/2!
🖨 Printer Friendly Version
Category:                                                                          Moc
**Business Consulting**

## Gw Equity, Citibank, Citigroup, Citi Commerce Solu
## Business Consulting, paid $30,000 for an inflated ar
## company that has yielded no results New York New
## Comment ..GW Equity article found in Inc. Magazine

Company
## Gw Equity, Citibank,citigroup,citi Commerce Solutio
Address:
**399 Park Ave.**
**New York New York  10043**
**U.S.A.**
Phone:
212-559-1000
Fax: -
Email: www.citigroup.com

**GW Equity is actually a $120 billion dollar enterprise called Geneva Business**
**Million dollar class action suit in March of 2003 in Irvine California "for defrau**
**businesses out of monies paid in advance".**

6/11/2007

Def. Appx. 0025



They have changed their name to GW Equity and subsequently moved to Dall
the connection, I was contacted by someone who said she was a "Senior Acc
Equity. She told me that her company was the largest Mergers and Acquisitio
assured me that this was not a random call and that a "research team" had do
qualifying company because several Fortune 400 companies that were interes
Acquiring my company. She said her and that the investors urgent and were \
me.

She said they also happened to be in the area and my exposure to these inve
spending an entire day with their "M & A Specialist" and a "Business Analyst'
this "offer on my company would occur and that they would explain these buy
turned out to be a cattle cal with about 15 other clueless private business ow

I listened to their day long sales pitch and at the end they dropped the $30,00(
company's revenues are close to the $100 million mark and it sounded like a (
compared to what they were telling me that I could actually get for my compar
above anything my CPA or attorneys calculated but GW Equity assured me th
how to calculate the "true & future value of a company".

After paying the $30,000 I met with David Gilliland the M&A specialist and he e
evaluation would take about 6 months and it might be years before he could a
to market. When I asked where the buyers were (that the initial senior account
interested and urgent, he explained that those buyers were simply "buying int
never had any type of guarantee that they could actually sell my business.



Essentially I paid $30,000 for an inflated analysis of my company that has yiel
cell phone of the senior account manager who later told me that she had beer
asked Steve Schreiber "of the companies we take retainers from... how many
fired the next day due to lack of performance. She also explained that the inve
have in their pockets do not know that GW Equity even exists and that her cal
random cold call from a D&B database and that there was no research done o
was just getting paid to get me into this seminar.

After 3 years I have never seen any kind of an offer on my company and I am i
guaranteed that they could sell my business for sure. Robert Brenner is your
same scam conducted in California and was Senior Vice president there as w
entire day at some sales seminar under the premise that they had several buy
hit with a $30,000 retainer fee and actually learned nothing about the M&A pro

These guys are shrewd salespeople but I cannot find even one company that
is a matter of confidentiality" they say. But cannot even give me the statistics
Equity is another fraud under a different name that just moved to another Stai

Rip-off Report Corporate
Advocacy Business
Remediation & Customer
Satisfaction Program; ED
Magedson, Founder Rip-
off Report explains how
this program works to
benefit consumers &
businesses

**CLICK
HERE**

Greg
New York, New York
U.S.A.

Click here to read other Rip Off Reports on Citibank

**Company Search**

If you would like to see more Rip-off Reports™ on Gw Equity,

Def. Appx. 0026

Add pictures
to your
Rip-off Report

**Citibank,citigroup,citi Commerce Solutions, please use the search box below**

| Gw Equity, Citibank,citigroup,citi Commerce Solutions | Search |

**In order to assure the best results in your search:**
- *Keep the name short & simple, and try different variations of the name.*
- *Do not include ".com", "S", "Inc.", "Corp", or "LLC" at the end of the Company name.*
- *Use only the first/main part of a name to get best results.*
- *Only search one name at a time if Company has many AKA's.*

Click here to go to our *advanced search* page.

David Tussing -   dtussing@hotmail.com 24.221.10.49

# Rebuttal Consumer Comment
Submitted: **12/8/2006 1:55:54 PM**
Modified: **12/9/2006 3:45:33 AM**
- - 24.221.10.49

## GW Equity article found in Inc. Magazine

Inc. Magazine wrote an interesting article on GW Equity (Great Western) in No
"For Sale: The American Dream". You may find it at Inc's website and by sear
within the website. It is lengthy but gives details of how the company operate

**David - Phoenix, Arizona**
**U.S.A.**

Lucas Dixon -   lukc22@aol.com 24.26.205.201

# Rebuttal Consumer Comment
Submitted: **2/14/2007 8:45:13 AM**
Modified: **2/16/2007 7:36:59 PM**
- - 24.26.205.201

## future employee

Hello- I am looking at becoming a representative for this company. I am doing
company's ethics and overall validity. I have worked for several Fortune 100 c
obligated to such research. I have found this article from Forbes and they pra
http://www.forbes.com/businesswire/feeds/businesswire/2007/01/26/business

I also have to say that if this company has defrauded so many business owne
complaints? I used to work with Nextel Communications. This is a huge comp
had many many complaints on this site from consumers with percieved fraud
number on the spectrum of things.

**Lucas - Belton, Texas**
**U.S.A.**

David Tussing -   dtussing@hotmail.com 24.221.10.49

Def. Appx. 0027

# Rebuttal Consumer Comment

Submitted: 3/1/2007 2:33:39 PM
Modified: 3/1/2007 7:15:13 PM
- - 24.221.10.49

## note to Future Employee

The link to the Forbes article is not an "article" but rather a Business Wire pre
Equity and printed in Forbes. Of course they are speaking highly of themselve

Secondly, statistically speaking, only a small fraction of people who feel they
actually file complaints or publish their views. This is a result of any number o
knowledge, unwillingness to admit they have been defrauded, thoughts that p
happen, ego, pride, etc.

**David - Phoenix, Arizona**
**U.S.A.**

Thomas Mashey - 864 231 8981   Thomas_Mashey@msn.com 4.136.255.30

# Rebuttal Consumer Comment

Submitted: 3/1/2007 8:53:58 PM
Modified: 3/1/2007 10:47:03 PM
- - 4.136.255.30

## I did not understand the relevance of the rebuttal fro
## employee....

So I won't worry about "future employee" but maybe he should?

Greg, I do wonder why you would believe some fast talking nobodies' figures
anything" your [presumeably trusted] CPA had calculated ?? And I have neve
values. All attorneys do is create problems. OK, and help you avoid problems

I do wonder how you could have a $1 mil gross company and still let yourself
your eyes wide shut. At a 10% margin you are making $100,000 a year. Not gr
definitely above minimums.

**Thomas - Anderson, South Carolina**
**U.S.A.**

Mike Keitz -   mkeitz@juno.com 164.106.129.132

# Rebuttal Consumer Suggestion

Submitted: 3/2/2007 6:40:06 AM
Modified: 3/2/2007 7:55:14 AM
- - 164.106.129.132

## Real brokers work on contingency.

This company is obviously a scam. Money up front should not be required to
find buyers for anything.

Def. Appx. 0028

When you're selling your house for example, the agent doesn't get paid until a
potential buyer wants to evaluate the actual value of the property, the BUYER
An investigation provided by the seller is worthless to a potential buyer becau
seller's favor.

**Mike - Radford, Virginia
U.S.A.**

---

### *REBUTTAL BOX*
**MY COMPANY HAS BEEN REPORTED!**
**HOW DO I RESPOND?**

Are you an owner, employee or ex-employee with either negative (
positive information about the company or can you provide "inside
information" on this company? Do you have a consumer suggestion
how to resolve this problem or how to avoid it in the future? ONLY th
types of responses will be added to the filed report, and will be post
within 24 hours of receipt. Make your voice heard. Let them know yc
side, too!

CLICK HERE to Send us your rebuttal on this specific report only
**or**
***If you are also a victim of the same company or person,
**YOU NEED TO FILE YOUR OWN RIP-OFF REPORT.**
CLICK HERE to File your OWN Rip-Off Report

---

☒ Banner 468x60



Feel free to send us suggestions and          Technical questions can be          Best if viewed with Netscape 4,          Having trouble searching or filing a
comments to our editorial staff.               addressed to our webmaster.         Internet Explorer 4, or AOL 4.0.          report? It may be a browser problem.
                                                                                   Support for JavaScript is needed to       See our FAQ for help
                                                                                   submit and search for reports.

Copyright © 2002 A service of badbusinessbureau.com

6/11/2007

Exhibit E

Def. Appx. 0030

Rip-off Report.com - badbusinessbureau.com

## David S. Gingras

**From:** EDitor@ripoffreport.com
**Sent:** Monday, June 11, 2007 3:16 PM
**To:** EDitor@ripoffreport.com
**Subject:** Report# 219512 - Gw Equity, Geneva Corporate Finance, Geneva Capital Markets, wasted eight hours of my time then hit me up for $30K Dallas Texas



About the ads below...





This report was created by Dave Mccormick - dmccormick777@comcast.net - - 76.184.169.187

✉ E-mail to a Friend
🖨 Printer Friendly Version

Submitted:
**11/7/2006 4:00:19 PM**

Category:
**Financial Services**

Modified: **12/8/2006 2:03:19 PM**

## Gw Equity, Geneva Corporate Finance, Geneva Capital Markets, wasted eight hours of my time then hit me up for $30K Dallas Texas *UPDATE EX-employee responds ..GW Equity stands behind its name

Company
## Gw Equity, Geneva Corporate Finance
Address:
**14241 Dallas Pkwy #600**
**Dallas Texas 75254**
**U.S.A.**
Phone:
877-213-1797
Fax: 972-232-1193
Email: info-us@gwequity.com

I was contacted by GW Equity an investment banking firm that maintained that they were the largest M&A Firm in the country. They assured me that a

Def. Appx. 0031



research team had qualified my company and that they had some investors that were specifically interested in my company and asked if I might be interested in selling off all or a portion of my company. I told them that "everything was for sale fro a price and that I was listening."

They told me that they had 1600 Fortune 500 Companies that were in their back pocket and that they could sell any company if the business owner could get his figures straight and represent the companies "Value correctly" or something. It was a sellers market but this opportunity would only last as long as the interest was there.

Incidentally, they also had two experts that happened to be in my area and if I understood this was the most important sale my business would ever transac that I should drop everything and go to this seminar. I did drop everything and went.

Around noon, after explaining that what I was attempting to do was impossibl without them, they told me that the simple retainer would cost me $29,000. I already have an evaluation of what my company is worth through a company that is immensely more credible than this GW Equity place so I did not even need that. What's more there was NO discussion about these "interested" investors and the only way I could find that out was to go ahead and pay them the $29k so they could get started...Get started on what? I thought they already had interested investors, so what would be the big deal? They also assured me that "By law" they could not guarantee the sale of my company n matter how much I paid them. So I got took. That I can take.

But what I cant take is the fact that this seminar cost me an entire day (Appro $5,000) that I wasted and that I cannot get back. I don't know who to sue, but you bet your backside I am looking into it.

Dave
Rockford, Minnesota
U.S.A.

Rip-off Report Corporate
Advocacy Business
Remediation & Customer
Satisfaction Program: ED
Magedson, Founder Rip-
off Report explains how
this program works to
benefit consumers &
businesses

## CLICK HERE

**Company Search**

**If you would like to see more Rip-off Reports™ on Gw Equity, Geneva Corporate Finance, please use the search box below**

Gw Equity, Geneva Corporate Finance          [ Search ]

In order to assure the best results in your search:
- *Keep the name short & simple, and try different variations of the name.*
- *Do not include ".com", "S", "Inc.", "Corp", or "LLC" at the end of the Company name.*
- *Use only the first/main part of a name to get best results.*
- *Only search one name at a time if Company has many AKA's.*

Click here to go to our *advanced search* page.

Carl Ikon - 800-793-7520  carlikon@excite.com 4.225.191.243

**Rebuttal** UPDATE EX-employee responds
Submitted: **11/15/2006 8:02:35 PM**
Modified: **11/15/2006 9:23:35 PM**

Def. Appx. 0032

- - 4.225.191.243

Add pictures
to your
Rip-off Report

# GW Equity stands behind its name

Dave from Rockford, MN, it is my understanding that there are several
business owners in these meetings at the same time. It is also my
understanding that GW Equity facilitates numerous meetings on a weekly
basis throughout the country.

The company has facilitated these owners' conferences for several years. It is
difficult to believe that out of all of the business owners that have met with the
representatives from GW Equity, only one business owner feels "taken"
enough to post a complaint online.

You wrote that "Around noon, after explaining that what I was attempting to d
was impossible without them, they told me that the simple retainer would cos
me $29,000. I already have an evaluation of what my company is worth
through a company that is immensely more credible than this GW Equity plac
so I did not even need that."

If that is the case, then why did you waste eight hours as you said you did at
the meeting. Why didn't you leave at noon, after you decided you were not
interested in paying the retainer?

Were there armed guards preventing you from leaving the meeting?

GW Equity's CEO is Dr. John Binkley. He has been selling companies for 20
years. He also has a Doctorates degree in Theology. His bio is posted on the
GW Equity Web site as is the other executives, advisors, and analysts.

The company's Web site provides a great deal of information about the
meetings you supposedly attended. The company has sold more companies
and has helped more business owners than you could imagine.

$5000? It really appears that you are looking for a way to tarnish the reputatio
of the company rather than recovering your day's wages.

If you are a business owner that attended the conference and not someone
working for one of GW Equity's competitors, I invite you contact the corporate
office and discuss your complaint with them. This should have been your firs
step if indeed you are so concerned about recovering your lost wages.

It appears that you are more interested in causing damage to GW Equity rathe
than recovering your financial loss. The reasons for this are you work for a
competitor, you are a disgruntled ex-employee, or your business wasn't
marketable and you can't handle rejection.

Carl - Irving, Texas
U.S.A.

Carl Ikon - 800-793-7520  carlikon@excite.com 4.225.191.243
**Update Submitted by the original author**
Submitted: **11/26/2006 7:38:53 PM**

6/11/2007

Def. Appx. 0033

Modified: **11/27/2006 3:35:29 AM**

- -

## GW Equity Is STILL a Rip-off

Yes, you are correct, GW Equity facilitates several hundred of these seminars yearly. To my knowledge ALL of the owners felt screwed not only by the meetings, but if they were stupid enough to pony up the $50,000 requiresd by these rip-off artists, they realy GOT screwed. They just didn't know enough about this post to complain. Doest that mean they aren't angry?

The reason I stayed eight hours is because I promised the salesperson that originally contacted me is that I WOULD stay until the end. Additionally, I really thought that GW Equity would eventually make sense of this whole thin and that I wouldn't feel SO screwed. They did not. You are right in that I shoul not have stayed the whole eight hours and not have run out earlier. I stayed because I do what I say I am going top do and that is why I stayed. I stayed because I promised I would.

And as you stated there ?were No armed guards at the door? just like the salesperson promised that there would not be. There were Not, but I stayed anyway, because I said I would, Or he would not get credit for my attending. I ask you sir, What is wrong with honoring my word? I said I wouldn't leave SO DIDN'T.

As to DR. John Binkley's PhD. In Theology, He got it out of a crackerjack box. Not the University of Phoenix, but Phoenix University and I challenge you to find it among ANY accredited School and rings at his office in Dallas somewhere. As for his most acclaimed book (Noted on gwequity.com) ?A place called Destiny? try to buy it. I will give you a $1,000 for every published copy you can find. Fraud again.

Dave - Rockford, Minnesota
U.S.A.

CLICK here to see why Rip-off Report, as a matter of policy, deleted either a phone number, link or e-mail address from this Report.

David Tussing -   dtussing@hotmail.com 24.221.10.49

## Rebuttal Consumer Comment
Submitted: **12/8/2006 1:52:25 PM**
Modified: **12/8/2006 2:03:19 PM**
- - 24.221.10.49

## GW Equity article found in Inc. Magazine

Inc. Magazine wrote an interesting article on GW Equity (Great Western) in November of 2001 entitled "For Sale: The American Dream". You may find it a Inc's website and by searching "Great Western" within the website. It is lengthy but gives details of how the company operates.

David - Phoenix, Arizona

Def. Appx. 0034

U.S.A.

### *REBUTTAL BOX*
**MY COMPANY HAS BEEN REPORTED!**
**HOW DO I RESPOND?**
Are you an owner, employee or ex-employee with either negative or positive information about the company or can you provide "insider information" on this company? Do you have a consumer suggestion on how to resolve this problem or how to avoid it in the future? ONLY these types of responses will be added to the filed report, and will be posted within 24 hours of receipt. Make your voice heard. Let them know your side, too!

CLICK HERE to Send us your rebuttal on this specific report only,
or
***If you are also a victim of the same company or person,
**YOU NEED TO FILE YOUR OWN RIP-OFF REPORT.**
CLICK HERE to File your OWN Rip-Off Report

Banner 468x60



Over

Feel free to send us suggestions and comments to our editorial staff.

Technical questions can be addressed to our webmaster.

Best if viewed with Netscape 4, Internet Explorer 4, or AOL 4.0. Support for JavaScript is needed to submit and search for reports.

Having trouble searching or filing a report? It may be a browser problem. See our FAQ for help

Home | File | Update | Search | Pictures | Lawsuits(Coming Soon) | Revenge Guide | Privacy Policy
Volunteers | Thank You! | Editorial | Donate | Link | FAQ | E-Mail Us | ED Magedson - Founder Rip-off Report.com

Copyright © 2002 A Service of badbusinessbureau.com

6/11/2007

Def. Appx. 0035

Exhibit F

Def. Appx. 0036

**David S. Gingras**

| | |
|---|---|
| **From:** | EDitor@ripoffreport.com |
| **Sent:** | Monday, June 11, 2007 3:22 PM |
| **To:** | EDitor@ripoffreport.com |
| **Subject:** | Report # 222796 = Gw Equity, Citibank, Citigroup, Citi Commerce Solutions Big company Wasting Small Companies Time & Money New York New York |



About the ads below.

This report was created by Dave Mccormick - dmccormick777@comcast.net - - 76.183.127.24

✉ E-mail to a Friend

🖨 Printer Friendly Version

Category:
**Business Consulting**

Submitted:
**11/29/2006 3:11:09
AM**
Modified: **12/8/2006
1:45:46 PM**

# Gw Equity, Citibank, Citigroup, Citi Commerce Solutions Big company Wasting Small Companies Time & Money New York New York *Consumer Comment ..Due Diligence

Company
**Gw Equity, Citibank,citigroup,citi Commerce Solutions**
Address:
**399 Park Ave.
New York New York  10043**
U.S.A.
Phone:
212-559-1000
Fax: -
Email: www.citigroup.com

I was contacted by GW Equity an investment banking firm that maintained tha

Def. Appx. 0037

Rip-off Report.com - badbusinessbureau.com                                    Page 2 of 4



they were the largest M&A Firm in the country. They assured me that a research team had qualified my company and that they had some investors that were specifically interested in my company and asked if I might be interested in selling off all or a portion of my company. I told them that ? everything was for sale fro a price and that I was listening.?

They told me that they had 1600 Fortune 500 Companies that were in their back pocket and that they could sell any company if the business owner coul get his figures straight and represent the companies ?Value correctly? or something. It was a sellers market but this opportunity would only last as lon as the interest was there.

Incidentally, they also had two experts that happened to be in my area and if I understood this was the most important sale my business would ever transac that I should drop everything and go to this seminar. I did drop everything an went.

Around noon, after explaining that what I was attempting to do was impossibl without them, they told me that the simple retainer would cost me $29,000. I already have an evaluation of what my company is worth through a company that is immensely more credible than this GW Equity place so I did not even need that. What's more there was NO discussion about these ?interested? investors and the only way I could find that out was to go ahead and pay them the $29k so they could get started?Get started on what? I thought they alread had interested investors, so what would be the big deal? They also assured me that ?By law? they could not guarantee the sale of my company no matter how much I paid them. So I got took. That I can take.

But what I cant take is the fact that this seminar cost me an entire day (Appro: $5,000) that I wasted and that I cannot get back. I don't know who to sue, but you bet your backside I am looking into it.

Dave
Rockford, Minnesota
U.S.A.



Rip-off Report Corporate
Advocacy Business
Remediation & Customer
Satisfaction Program; ED
Magedson, Founder Rip-
off Report explains how
this program works to
benefit consumers &
businesses

Dave
Rockford, Minnesota
U.S.A.

Click here to read other Rip Off Reports on Citibank

**Company Search**

**CLICK
HERE**

If you would like to see more Rip-off Reports™ on Gw Equity, Citibank,citigroup,citi Commerce Solutions, please use the search box below

| Gw Equity, Citibank,citigroup,citi Commerce Solutions | Search |

In order to assure the best results in your search:
- *Keep the name short & simple, and try different variations of the name.*
- *Do not include ".com", "S", "Inc.", "Corp", or "LLC" at the end of the Company name.*
- *Use only the first/main part of a name to get best results.*
- *Only search one name at a time if Company has many AKA's.*

S.

6/11/2007

Add pictures
to your
Rip-off Report

Click here to go to our *advanced search* page.

Mark Reynolds -   loans@loans2build.com 70.112.120.250
**Rebuttal Consumer Comment**
Submitted: **12/8/2006 10:34:47 AM**
 Modified: **12/8/2006 1:45:46 PM**
 - - 70.112.120.250

# Due Diligence

Dave,

I'm sorry you had a bad experience with this firm.

On the other hand, my brother went to one of this firms seminars in Vienna,
Virginia recently and told me that it was very informative and very
professional. He said he was not pressured at all, and he learned some things
that made him think about his business and personal financial picture in a
whole new way.

He did say that there is a fairly substantial fee that a company pays this firm t
help sell their business, but he did not pay the fee and decided to consult with
his attorney and estate planner instead as to whether or not he should sell his
business right now. He did say one of the partnares at the firm wanted to set
up a meeting after the seminar, but he thought it was just a sales pitch so he
did not meet with the partner. By the way, my brother owns a 30 employee, 8
million yearly sales janitorial business that is very profitable.

I'm not sure why you are so upset about the firm, other than it seems you
weren't diligent enough in getting your questions answered about the semina
you went to. As a small business owner myself, I make darn sure that I ask all
the questions I need to about any 'firm' that wants to take some of my time or
gives me some fluffy sales pitch that they can do things for my business that
cannot already do.

And if you are 'paying' yourself $5,000 per day, I would think that you are
smart enough to know how to ask the right questions. By what you wrote and
how you wrote it, I'm not convinced that you are.

Sounds more like sour grapes to me.

Either way, good luck to you.

Mark - Reston, Virginia
U.S.A.

> ## *REBUTTAL BOX*
> **MY COMPANY HAS BEEN REPORTED!**
> **HOW DO I RESPOND?**
> Are you an owner, employee or ex-employee with either negative or
> positive information about the company or can you provide "insider
> information" on this company? Do you have a consumer suggestion on

Def. Appx. 0039

how to resolve this problem or how to avoid it in the future? ONLY these
types of responses will be added to the filed report, and will be posted
within 24 hours of receipt. Make your voice heard. Let them know your
side, too!

CLICK HERE to Send us your rebuttal on this specific report only.

or

***If you are also a victim of the same company or person,
**YOU NEED TO FILE YOUR OWN RIP-OFF REPORT.**
CLICK HERE to File your OWN Rip-Off Report

☒ Banner 468x60





Feel free to send us suggestions and        Technical questions can be        Best if viewed with Netscape 4,        Having trouble searching or filing a
comments to our editorial staff.            addressed to our webmaster.        Internet Explorer 4, or AOL 4.0.       report? It may be a browser problem.
                                                                               Support for JavaScript is needed to     See our FAQ for help
                                                                               submit and search for reports.

Home | File | Update | Search | Pictures | Lawsuits(Coming Soon) | Revenge Guide | Privacy Policy
Volunteers | Thank You! | Editorial | Donate | Link | FAQ | E-Mail Us | ED Magedson - Founder Rip-off Report.com

Copyright © 2002 a service of badbusinessbureau.com

Def. Appx. 0040

# Exhibit G

Def. Appx. 0041

Rip-off Report.com - badbusinessbureau.com                      Page 1 of 3

## David S. Gingras

**From:**    EDitor@ripoffreport.com
**Sent:**    Monday, June 11, 2007 3:24 PM
**To:**      EDitor@ripoffreport.com
**Subject:** Report # 222793 = GW Equity Wrongful Termination - Scam - perpetuating a fraud on the general public
             Dallas Texas



About the ads below.





This report was created by Tracy Taylor - tracy_taylor_gwequity@yahoo.com - 972-481-2801 - 76.183.127.24

✉ E-mail to a Friend
🖨 Printer Friendly Version
Category:
**Business Consulting**

Submitted:
**11/29/2006 2:25:17
AM**
Modified: 11/29/2006
**2:25:00 AM**

# GW Equity Wrongful Termination - Scam - perpetuating a fraud on the general public Dallas Texas

Company
## GW Equity
Address:
**1755 Wittington Place #150
Dallas Texas  75234**
U.S.A.
Phone:
972-481-2801
Fax: 972-232-1124
Email: sschreiber@gwequity.com

Last week I was terminated due to the presumption that I knew something about this company that I really did not know at the time. Now that I have been

6/11/2007

Def. Appx. 0042

Rip-off Report.com - badbusinessbureau.com                                Page 2 of 3



terminated I was offered $3,000 for information that I do now know; which is this company is only able to sell less than 4% of the companies that I actually took $40,000 retainers for and we have no actual buyers / investors for these companies.

I lost my job because I was associated with an EX employee that asked questions regarding these numbers and was immediately terminated as well. I refused the ?severance? they offered me and have now been forced to retain counsel as to a wrongful termination suit against this company. I was terminated from a company that I would have immediately have quit had I known that we were actually perpetuating a fraud on the general public. ODD to be fired from a job I would have quit anyway if I had actually known the facts. But let it be known? There are NO investors or any kind of buyers that this company has for the victims that it assaults on a hourly basis. There were 115 of us that were required to randomly make 100 calls a day from Dunn & Bradstreet to business owners that actually thought we had done research on their company and that we had a buyer. Had I known differently they could have spare themselves a wrongful termination lawsuit and me the time it took to sell their B/S service.

Tracy
Dallas, Texas
U.S.A.

Click here to read other Rip Off Reports on Citibank



## Company Search

**If you would like to see more Rip-off Reports™ on GW Equity, please use the search box below**

| GW Equity |          | Search |

In order to assure the best results in your search:
- *Keep the name short & simple, and try different variations of the name.*
- *Do not include ".com", "S", "Inc.", "Corp", or "LLC" at the end of the Company name.*
- *Use only the first/main part of a name to get best results.*
- *Only search one name at a time if Company has many AKA's.*

Click here to go to our *advanced search* page.

Rip-off Report Corporate Advocacy Business Remediation & Customer Satisfaction Program; ED Magedson, Founder Rip-off Report explains how this program works to benefit consumers & businesses

**CLICK HERE**

## REBUTTAL BOX
### MY COMPANY HAS BEEN REPORTED!
### HOW DO I RESPOND?
Are you an owner, employee or ex-employee with either negative or positive information about the company or can you provide "insider information" on this company? Do you have a consumer suggestion on how to resolve this problem or how to avoid it in the future? ONLY these types of responses will be added to the filed report, and will be posted within 24 hours of receipt. Make your voice heard. Let them know your side, too!
CLICK HERE to Send us your rebuttal on this specific report only.
or
***If you are also a victim of the same company or person,
**YOU NEED TO FILE YOUR OWN RIP-OFF REPORT.**

Def. Appx. 0043

Rip-off Report.com - badbusinessbureau.com                                    Page 3 of 3

CLICK HERE to File your OWN Rip-Off Report

Add pictures
to your
Rip-off Report

☒ Banner 468x60



RIP-OFF Report.com — Do-it-yourself guide

Over

Feel free to send us suggestions and        Technical questions can be        Best if viewed with Netscape 4,        Having trouble searching or filing a
comments to our editorial staff.            addressed to our webmaster.        Internet Explorer 4, or AOL 4.0.       report? It may be a browser problem.
                                                                               Support for JavaScript is needed to     See our FAQ for help
                                                                               submit and search for reports.

Home | File | Update | Search | Pictures | Lawsuits(Coming Soon) | Revenge Guide | Privacy Policy
Volunteers | Thank You! | Editorial | Donate | Link | FAQ | E-Mail Us | ED Magedson - Founder Rip-off Report.com

Copyright © 2002 A Service of badbusinessbureau.com

6/11/2007

Def. Appx. 0044

# Exhibit H

Def. Appx. 0045



CAUSE NO. 06/12231

| | | |
|---|---|---|
| GW EQUITY, LLC | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | F-116th JUDICIAL DISTRICT |
| | § | |
| DICKSON WOODARD and | § | |
| TRACY TAYLOR | § | |
| Defendants, | § | DALLAS COUNTY, TEXAS |

**PLAINTIFF'S ORIGINAL PETITION FOR TEMPORARY RESTRAINING ORDER,
TEMPORARY INJUNCTION AND PERMENANT INJUNCTION**

TO THE HONORABLE COURT:

GW Equity, LLC, Plaintiff, complains of Dickson Woodard, and Tracy Taylor, Defendants, and for cause of action shows:

I.

**DISCOVERY**

Plaintiff intends that discovery be conducted under Level II of *Texas Rules of Civil Procedure* 190.

II.

**PARTIES**

1. Plaintiff GW Equity, LLC is a limited liability company that is organized under the laws of the State of Delaware, with its principle place of business being in Dallas County, Texas.

2. Defendant Dickson Woodard is an individual who resides in Dallas County. He may be served at 3944 Clubway Lane, Farmers Branch, Dallas County, Texas 75244.

Plaintiff's Original Petition for Injunction                                 Page 1 of 11

Def. Appx. 0046

3. Defendant Tracy Taylor is an individual who resides in Denton County. He may be served at 11070 Sonterra Lane, Frisco, Denton County, Texas 75034.

III.

## TEXAS BUSINESS DISPARAGEMENT

4. The acts and conduct of Defendants as alleged in this petition constitute injurious falsehood and/or business disparagement under Texas law.

5. The Plaintiff is the owner of certain property rights threatened with irreparable injury by the conduct of the Defendants.

6. In particular, Plaintiff is a global mergers and acquisitions firm located in Dallas County, Texas, that, since 1987, has been involved in assisting clients in mergers, acquisitions and strategic growth in interstate commerce in Texas, throughout the United States, and Western Europe.

7. The GW Equity, L.L.C. name has been in existence since January 2005. Plaintiff has developed goodwill in the business community.

### A. Defendant Woodard

8. On or about November 2, 2006, Defendant Woodard, writing under the name "Jim from St. Paul, Minnesota," published a statement on the website www.ripoffreport.com regarding the Plaintiff and the Plaintiff's business practices.

9. Although Defendant Woodard attempted to mislead by writing under the name "Jim from St. Paul, Minnesota", Defendant Woodard admitted that he had actually authored the aforementioned statement.

10. This information was obtained by the Plaintiff who hired an independent investigator to conduct interviews with several of Plaintiff's employees who possessed

Def. Appx. 0047

information regarding this defamatory publication. During these interviews, Defendant Taylor stated that Defendant Woodard admitted to writing under the name "Jim from St. Paul, Minnesota".

11. Attached as Plaintiff's exhibit 1 is the sworn affidavit of Jim Willingham who conducted the independent investigation and interviews which confirms Defendant Woodard was responsible for the defamatory publication.

12. Additionally, Plaintiff searched its records and confirmed that no Jim from St. Paul, Minnesota has ever attended one of Plaintiff's seminars. However, this is the name and location of the last potential client that Defendant Woodard spoke to before being terminated from employment at GW Equity.

13. Attached as Plaintiff's exhibit 2 is an affidavit from Ryan Binkley, President of GW Equity, LLC confirming the former.

14. Defendant Woodard's published statement suggested that "GW Equity is actually a $120 billion enterprise called Geneva Business Research that settled a $45 million class action suit in March of 2003 in Irvine California for defrauding thousands of small businesses out of monies paid in advance." Defendant's statement goes on to allege that "[Geneva Enterprise] has changed their name to GW Equity and subsequently moved to Dallas, Texas." Defendant's statement ends with, "GW Equity is another fraud under a different name that just moved to another State." This information is false, misleading and defamatory.

15. As evidenced by the attached affidavit of Ryan Binkley (Plaintiff's exhibit 2), Plaintiff is not a $120 billion enterprise and is in no way related to a company known as Geneva Enterprises. Plaintiff has had no involvement or participation in a $45

million class action suit based in Irvine, California.  At no point did the Plaintiff

conduct business under the title of Geneva Enterprises.  The Plaintiff and its parent

company have been in Dallas, Texas for the last 20 years, and have not recently

changed locations.

16. These statements were published without Plaintiff's consent and with a lack of

privilege.  These statements were published with the knowledge of the falsity of the

statements or with reckless disregard for their truth.  These false statements have

caused special damages and will continue to cause special damages to the Plaintiff

in the form of lost sales.  Defendant Dickson Woodard's publishing of these

statements about the Plaintiff has played a substantial role in inducing others not to

deal with Plaintiff with the result that Plaintiff has suffered special damages, in the

form of the loss of trade and/or other dealings.

### B. Defendant Taylor

17. On or about November 29, 2006, Defendant Taylor published a statement on the

website www.ripoffreport.com regarding the Plaintiff.  The statement published by

Defendant Taylor stated, among other things, that "...[Plaintiff] is only able to sell

less than 4% of the companies that I actually took $40,000 retainers for and we

have no actual buyers/investors or companies."  The statement also references

Defendant Taylor being terminated for associating with an ex-employee and being

offered "...$3,000 for information..." This information is false, misleading and

defamatory.

18. Defendant Taylor was terminated for breaching the Confidential & Proprietary

Information contract he entered into with the Plaintiff, attached as Plaintiff's exhibit 4

Plaintiff's Original Petition for Injunction                                Page 4 of 11

Def. Appx. 0049

19. These statements were published without Plaintiff's consent and with a lack of privilege. These statements were published with the knowledge of the falsity of the statements or with reckless disregard for their truth. These false statements have caused special damages and will continue to cause special damages to the Plaintiff in the form of lost sales.

20. Unless Defendants are restrained from the acts complained of, the Plaintiff and the public will continue to suffer irreparable harm, for which the Plaintiff has no adequate remedy at law. The Plaintiff is entitled to an injunction pursuant to Civil Procedure Rule 680.

IV.

## MISAPPROPRIATION OF TRADE SECRETS

21. The acts and conduct of the Defendants as alleged in this petition constitute the misappropriation of trade secrets.

22. Defendant Woodard has actively solicited several of Plaintiff's employees, including Defendant Taylor, seeking, among other things, confidential information relating to the identities of attendees of Plaintiff's seminars.

23. Under information and belief, Defendant Woodard is actively seeking this information in order to turn it over to a law firm based out of Newport Beach, California to assist an attorney in the unwarranted filing of a class action lawsuit against the Plaintiff.

24. Defendant Woodard signed a Confidential & Proprietary Information contract of which he is in breach of attached as Plaintiff's exhibit 3.

)

25. Defendant Taylor, as a recently terminated employee of the Plaintiff, possesses confidential information and trade secrets. This information has been developed over time, and through the effort and expense of the Plaintiff. This information is not readily available elsewhere and provides the Plaintiff an advantage over its competition.

26. During the interviews conducted by Jim Willingham, Defendant Taylor admitted to Jim Willingham that Defendant Woodard and Defendant Taylor had conversations about Plaintiff's confidential and proprietary information. The attached affidavit by Jim Willingham (Plaintiff's exhibit 1) confirms this admission.

27. Defendant Woodard is seeking to acquire this information by means of breaching the confidential relationship Plaintiff shared with Defendant Taylor as an employee and/or through other improper means.

28. Defendant Woodard and Defendant Taylor are seeking to use this information without Plaintiff's authorization. Both Defendants have signed the attached Confidential & Proprietary Information contracts (Plaintiff's exhibits 3 and 4) as a condition of their employment with the Plaintiff. Both Defendants are breaching the terms of this agreement. The use of this information has and shall cause the Plaintiff to suffer damages.

29. Unless the Defendants are restrained from the acts complained of, the Plaintiff and the public will continue to suffer irreparable harm for which the Plaintiff has no adequate remedy at law. The Plaintiff is entitled to an injunction pursuant to Civil Procedure Rule 680

Def. Appx. 0051

## V.

### Threat of Irreparable Injury to Real or Personal Property

30. The acts and conduct of the Defendants as alleged in this petition constitute a threat of irreparable injury to real or personal property of the Plaintiff under CPRC 65.011 (5).

31. As evidenced by the attached affidavit of Jim Willingham, (Plaintiff's Exhibit 1) Defendant Woodard has made a variety of disturbing statements to GW Equity employees. These statements include, but are not limited to Defendant's Woodard delusional belief that he has been hired by the FBI to assassinate Ed Magedson, the owner of www.ripoffreport.com Defendant Woodard is also operating under the belief that Steve Schrieber, his supervisor at GW Equity, is trying to shoot him.

32. Upon information and belief, Plaintiff fears that these paranoid delusions may cause Defendant Woodard to take violent action and cause damage to the real and personal property of the Plaintiff and its employees.

33. Unless the Defendants are restrained from coming into contact with Employees of the Plaintiff or entering Plaintiff's facilities, the Plaintiff and the public will continue to suffer a threat of irreparable harm, for which the Plaintiff has no adequate remedy at law. The Plaintiff is entitled to an injunction pursuant to Civil Practice and Remedies Code 65.011 (5).

## VI.

### TEMPORARY RESTRAINING ORDER

34. It is essential that the Court immediately and temporarily restrain the Defendants from continuing with the conduct described in this petition.

Def. Appx. 0052

35. It is essential that the Court act immediately, prior to notice to the Defendants and a hearing on the matter, because Defendants continue to cause damage to Plaintiff's reputation and goodwill, as well as cause Plaintiff to lose existing and perspective customers by publishing false, misleading and defamatory statements regarding the Plaintiff.

36. Defendants are also continuing to solicit and misappropriate certain trade secrets that are the property of the Plaintiff. Defendants are contacting and/or attempting to contact Plaintiff's employees and customers using this proprietary information.

VII.

TEMPORARY INJUNCTION

37. In order to preserve the status quo and the property and rights of the plaintiff during the pendency of this action, Defendants should be cited to appear and show cause why they should not be temporarily restrained, during the pendency of this action, from posting further false, misleading and defamatory statements concerning the plaintiff, and further solicitation and misappropriation of Plaintiff's trade secrets.

VIII.

INJURIES

38. The Plaintiff has been damaged by the foregoing acts of the Defendants in at least one of the following respects:

    a. The Plaintiff has lost profits;

    b. The Plaintiff has lost valuable goodwill;

Def. Appx. 0053

   c. Unless the Defendants are enjoined from the acts complained of,
the Plaintiff and the public will suffer irreparable harm, for which the
Plaintiff has no adequate remedy at law.

IX.

### PRAYER FOR RELIEF

For these reasons, Plaintiff requests that:

1. A temporary restraining order be issued without notice to Defendants, restraining Defendants, their agents, servants, and employees, from making further false, misleading, defamatory and/or disparaging remarks about the Plaintiff.

2. A temporary injunction be issued after notice to the Defendants and an evidentiary hearing, restraining Defendants, their agents, servants, and employees, from making further false, misleading, defamatory and/or disparaging remarks about the Plaintiff.

3. A permanent injunction be issued, on final trial of this cause, enjoining Defendants, their agents, servants, and employees, from making further false, misleading, defamatory and/or disparaging remarks about the Plaintiff.

4. A temporary restraining order be issued without notice to Defendants, restraining Defendants, their agents, servants and employees from further misappropriating trade secrets of the Plaintiff, and contacting and/or soliciting present and/or former employees of the Plaintiff for confidential information.

5. A temporary injunction be issued after notice to the Defendants and an evidentiary hearing, restraining Defendants, their agents, servants and employees from further

Def. Appx. 0054

Dec 16 06 11:47p    Jack Woodard              972-203-9458           p.12

misappropriating trade secrets of the Plaintiff, and contacting and/or soliciting present and/or former employees of the Plaintiff for confidential information.

6. A permanent injunction be issued, on final trial of this cause, enjoining Defendants, their agents, servants, and employees, from further misappropriating trade secrets of the Plaintiff, and contacting and/or soliciting present and/or former employees of the Plaintiff for confidential information.

7. A temporary restraining order be issued without notice to Defendants, restraining Defendant, their agents, servants, and employees, from coming within 100 feet of any employee of the Plaintiff.

8. A temporary injunction be issued after notice to the Defendants and an evidentiary hearing, restraining their agents, servants and employees from coming within 100 feet of any employee of the Plaintiff.

9. A permanent injunction be issued, on final trial of this cause, enjoining Defendants, their agents, servants, and employees, from coming within 100 feet of any employee of the Plaintiff.

10. A temporary restraining order be issued without notice to Defendants, restraining Defendants, their agents, servants, and employees, from coming within 1000 feet of any facility of the Plaintiff.

11. A temporary injunction be issued after notice to the Defendants and an evidentiary hearing, restraining their agents, servants and employees from further coming within 1000 feet of any facility of the Plaintiff.

Def. Appx. 0055

12. A permanent injunction be issued, on final trial of this cause, enjoining Defendants, their agents, servants, and employees, from coming within 1000 feet of any facility of the Plaintiff.

13. Costs of suit including reasonable attorney's fees.

14. Such other and further relief to which Plaintiff may be justly entitled, including, but not limited to damages within the jurisdictional limits of this Court, together with pre-judgment and post-judgment interest as allowed by law.

Respectfully Submitted,

McCreary and Stockford, L.P.
18333 Preston Rd., Ste. 150
Dallas, Texas 75252
(214) 291-0800 telephone
(214)291-0801 facsimile

By
Brad Stockford
State Bar No. 24031225
Kristen M. Pannell
State Bar No. 24046580
Nate Brignon
State Bar No. 24055214

ATTORNEYS FOR PLAINTIFF

Def. Appx. 0056



## AFFIDAVIT OF JIM WILLINGHAM

**STATE OF TEXAS**               §
                                 §
**COUNTY OF DENTON**             §

Before me, the undersigned Notary Public, on this day personally appeared Jim Willingham, who, after being duly sworn, stated under oath as follows:

1. My name is Jim Willingham. I am an adult person, of sound mind, and competent in all respects to make this Affidavit. I have personal knowledge of every statement of fact contained in this Affidavit and every statement of fact contained in it is true and correct.

2. On November 20, 2006, I was retained by McCreary and Stockford, LP to perform interviews of various GW Equity, LLC employees relating to a dispute between GW Equity, LLC and Dickson Woodard, www.ripoffreport.com, and various other persons.

3. On November 21, 2006, I conducted an interview with Josh Bammel, a GW Equity employee who was the direct supervisor of Tracy Taylor and Dickson Woodard, at the office of outside counsel in Dallas, Texas.

4. During the course of the interview, Josh Bammel stated that he happened to run into Dickson Woodard and Tracy Taylor at Champ's Sports Bar in Addison, Texas on November 19, 2006.

5. Josh Bammel stated that on November 19, 2006, Dickson Woodard asked Josh Bammel what he thought of the posting on www.ripoffreport.com.

6. Dickson Woodard admitted to Josh Bammel that Dickson Woodard was friends with Ed Magedson, the owner and editor of www.ripoffreport.com. Further, Dickson Woodard used his cell phone to call Ed Magedson in order to prove to Josh Bammel that Dickson Woodard knew Ed Magedson.

7. Dickson Woodard also made several other disturbing statements to Josh Bammel alleging that Dickson Woodard was hired by the FBI to kill Ed Magedson and that Dickson Woodard thought that Steve Schrieber, Dickson Woodard's supervisor at GW Equity, was trying to shoot him.

8. Josh Bammel, during his interview, further stated that Dickson Woodard had informed Josh Bammel that Tracy Taylor was helping Dickson Woodard from inside the company. Dickson Woodard expressed concerns that Tracy Taylor was "too much of a pussy" and asked Josh Bammel to be his new "inside man".

Def. Appx. 0057

9. Josh Bammel stated that Dickson Woodard asked Josh Bammel for a list of 80 clients who had been with GW Equity, LLC at least one year who had not had their businesses sold yet. Dickson Woodard stated that the purpose of this request was to furnish such information to an attorney out of Newport Beach, California so that a class-action suit could be filed against GW Equity, LLC.

10. The attorney mentioned by Dickson Woodard to Josh Bammel is the attorney who obtained a $45 million class action law suit against Geneva Corporation in Irvine, California.

11. Dickson Woodard told Josh Bammel that Josh Bammel could be paid as much as $4 million by the California attorney for providing this information to Dickson Woodard.

12. On November 22, 2006, I conducted an interview with Tracy Taylor at the GW Equity, LLC call center located in Dallas, Texas.

13. During the course of this interview, Tracy Taylor stated that Dickson Woodard had asked Taylor to provide Dickson Woodard with a list of GW Equity, LLC seminar attendees.

14. Tracy Taylor further stated that Dickson Woodard admitted to wanting this information so that Dickson Woodard could provide the list of names to an attorney out of Newport Beach, California, who was working with Dickson Woodard to file a class action lawsuit against GW Equity, LLC.

15. The information, specifically the customer lists, requested by Dickson Woodard, is proprietary information belonging to GW Equity, LLC. This information is assembled by GW Equity. LLC and is not readily available to the general public.

16. During this same interview on November 22, 2006, which took place at the GW Equity call center in Dallas, Texas, Tracy Taylor stated that Dickson Woodard had admitted to posting the defamatory statement on www.ripoffreport.com using the name Jim from St. Paul, Minnesota.

Jim Willingham, Affiant

Def. Appx. 0058

SUBSCRIBED AND SWORN TO before me by Jim Willingham on this __4__ day

of __Dec.___, 2006, to certify which witness my hand and official seal.

Notary Public in and for The State of Texas

My Commission Expires:

__9/11/ 2010__

JUSTIN A HESS
My Commission Expires
September 11, 2010

Def. Appx. 0059

## AFFIDAVIT OF RYAN BINKLEY

THE STATE OF TEXAS
COUNTY OF DALLAS

"My name is Ryan Binkley. I am of sound mind and do hereby state that I am over the age of twenty one (21) and otherwise qualified to make this affidavit. I am making this statement of my own free will and without duress, coercion and do state as follows:

1. I am employed as President of GW Equity, L.L.C. After a search of the records of GW Equity, I have confirmed that no "Jim from St. Paul, Minnesota," has ever attended a GW Equity seminar. However, this was the name and location of the last potential client that Dickson Woodard spoke to before being terminated from his employment with GW Equity.

2. GW Equity is not a $120 billion enterprise and is in no way related to a company known as Geneva Enterprises. At no point in its history has GW Equity conducted business under the title of Geneva Enterprises.

3. GW Equity has had no involvement or participation in a $45 million class action lawsuit that was based in Irvine, California.

4. GW Equity and its parent company have been in Dallas, Texas for the last 20 years, and have not recently changed locations.

5. GW Equity has buyers and investors for the companies of its customers and successfully sells many of these companies that it accepts as clients.

6. Dixon Woodard and Tracy Taylor were provided with confidential and proprietary information while employed with GW Equity, including lists containing email addresses

AFFIDAVIT OF ANY FACT                                          Page 1 of 2

Def. Appx. 0060

and phone numbers of present and potential clients of GW Equity, as well as email addresses of GW Equity employees.

7. Tracy Taylor was terminated for breaching the Confidential and Proprietary Information provision of his employment contract with GW Equity.

8. Dickson Woodard was terminated from GW Equity due to a lack of productivity during his probationary period of employment.

Anything furthermore Affiant sayeth not."

_Ryan Binkley_
Ryan Binkley

THE STATE OF TEXAS
COUNTY OF DALLAS

BEFORE ME, the undersigned authority, on this day personally appeared Ryan Binkley, known to me to be the person whose name is subscribed to the foregoing instrument, and after being duly sworn by me, did state upon his oath that the facts contained in said instrument are true and correct.

SUBSCRIBED AND SWORN TO before me, on this ___4___ day of __December__, 20_06_, to certify which witness my hand and seal of office.

_Jerry Hill_
Notary Public, State of Texas

JERRY G. HILL
MY COMMISSION EXPIRES
MARCH 2, 2008

AFFIDAVIT OF ANY FACT                                    Page _2_ of _2_

Dec 16 06 11:49p    Jack Woodard      972-203-9458      p.19





# GW EQUITY
*Mergers & Acquisitions*

### Intellectual Property & Confidentiality Agreement

I, DICKSON WOODARD, residing at _5317 ANCHOR DR_   BAT GARLAND TX, 75043 acknowledge that GW Equity, LLC, a Delaware limited liability company, is extending an offer of employment to me so that I may work for a provide services to GW Equity, LLC and or its affiliated and associated entities, whether direct or indirect (collectively "GW Equity" or "Company").

Employee in consideration of the specialized training, and confidential information (provided to Employee concurrently with this Agreement and continuously thereafter), his/her employment, engagement or continued employment (collectively "employment") by GW Equity and the wages and/or other compensation paid during such employment, agrees as follows:

1.   **Definitions.** The following defined terms are incorporated in this Agreement:
   a.   "Seminar" is defined as any seminar, oral presentation, or audio-visual presentation that Company, its employees or its agents conducts or presents to business people and other attendees.
   b.   "Client" is defined as any Seminar attendee, any person identified by Company as prospective client or a prospective Seminar attendee, and any person who has purchased services of any kind from Company at any time.
   c.   "GW Equity Advantage" is defined as the evaluation and consulting services provided by Company.
   d.   "Information" is defined as any information about Company or any aspect of its business. Its industry or its Clients, or any information obtained from Company, that is not known to the general public, and is the subject of reasonable efforts by the Company to maintain its secrecy. The information is of substantial value and highly confidential, constitutes the trade secrets of Company, and is made available to Employee solely for use in connection with the Purpose. The following is a non-exhaustive list of items to be considered information:

   (1)   the GW Equity Advantage, instructional materials for Seminars, instructional techniques for Seminars, training materials, and the method of presenting materials to trainees or clients;
   (2)   information about Clients' finances, business structures, practices, techniques, operations, or sales, lists of Clients and their representatives, lists of Clients who have purchased GW Equity Advantage, lists of Clients who have attended Seminars, but who have not yet purchased GW Equity Advantage. Client contracts, information about the Seminar attendance patterns, and techniques and materials used to evaluate Clients' businesses;
   (3)   all information regarding Company's past, current, and future marketing activities, all mailing lists and mailing programs, strategic, marketing, and development plans. Client service materials, forecasts, future plans, strategies, and potential strategies;
   (4)   pending Company projects or proposals and Company business plans and projections;
   (5)   salaries, contracts and wage information;
   (6)   Company's financial information, price and cost objectives, price-lists, pricing policies and procedures, and quoting policies and procedures; and
   (7)   such other confidential and proprietary information of Company.

2.   **Inventions.** I will promptly disclose in writing to GW Equity and others it may designate all inventions, discoveries, developments, improvements, innovations, formulas, designs, computer programs and the like, whether patentable or not (collectively "Inventions"), conceived or made by me, either solely or with others, during my employment with GW Equity or during any other period which I provided services to GW Equity (either on company time or during off-duty time) which: (i) relate in any manner to the existing or contemplated business or research activities of GW Equity, (ii) are suggested by or result from my work at GW Equity, or (iii) result from the use of GW Equity's time, materials, or facilities. I acknowledge and agree that my obligations under the foregoing include, if applicable, Inventions conceived by me before the effective date of this agreement if I conceived those Inventions while providing services to GW Equity whether or not as a GW Equity employee.

   I hereby assign to GW Equity my entire right, title, or interest to all such Inventions and all related patent applications and patents. I will, at GW Equity's request and expense, execute specific assignments to any such Inventions, patent applications, and patents and execute such other documents and take such further action as may be considered advisable by GW Equity at any time during or after my employment by GW Equity to vest all right, title, and interest in such Inventions, patent applications, and patents in GW Equity or its assigns, and/or to permit GW Equity to obtain and defend letters patent in any and all countries.

   If, within six months following the period of my employment by GW Equity, I disclose to a third party any Invention conceived or made by me, or a patent application is filed by me or on my behalf, and if the Invention in question relates to the business of GW Equity, then the Invention will be rebuttably presumed to have been conceived by or made by me during the period of my employment by GW Equity and, absent a showing to the contrary, is assignable to GW Equity.

3.   **Copyrights.** I will promptly disclose to GW Equity and others it may designate all original works of authorship, computer programs, manuals, writings, pictorial, audio works, audiovisual works and the like, whether copyrightable or not (collectively, "Works"), and whether authored or made by me, either solely or with others, during my employment with GW Equity or during any other period which I provided services to GW Equity (either on company time or during off-duty time) which: (i) relate in any manner to the existing or contemplated business or research activities of GW Equity, (ii) are suggested by or result from my work at GW Equity, or (iii) result from the use of GW Equity's time, materials, or facilities. I acknowledge and agree that my obligations under the foregoing include, if applicable, Works authored or made by me before the effective date of this Agreement if I authored or made those Works while providing services to GW Equity - whether or not as a GW Equity employee.

G W Equity Intellectual Property & Confidentiality Agreement - Page 1 of 3

Def. Appx. 0062

I understand that all the rights in copyright to such Works will be owned by GW Equity as Works made for hire, and to the extent any such Work is not considered a work for hire, I hereby agree to assign and do assign to GW Equity my entire right and interest in the copyright in any such Works made by me. I will, at GW Equity's request and expense, execute specific assignments to any such Works, copyright applications, and copyrights and execute such other documents and take such further action as may be considered advisable by GW Equity at any time during, or after my employment for GW Equity to vest all right, title, and interest in such Works, copyright applications, and copyrights in GW Equity or its assigns, and/or to permit GW Equity to obtain and defend copyright registrations in any and all countries.

4.     **Confidential Information.** I recognize and acknowledge that as an employee, GW Equity and/or its affiliated and associated entities has already and/or will, concurrently with the execution of this Agreement, and on a daily basis thereafter, provide me with very sensitive, confidential, secret, proprietary, and trade secret information ("Confidential Information") which, if disclosed to third parties, could irreparably harm GW Equity. Such Confidential Information includes, without limitation, Information and /or matter contained on and/or in databases, electronic storage media, records, lists, and knowledge of the Company, its subsidiaries, customers, clients, and /or investors and/or any other secret or confidential matters: (a) of a technical nature, such as methods, know-how, formulae, compositions, processes, discoveries, machines, inventions, computer data or software (whether stored on computer or in paper form), and research and development activities, (b) of a business nature, including without limitation items such as information about pricing, product or service costs (including cost of materials, labor and overhead), purchasing, profits, markets, sales or customers, investors, types of investments, methods and sources of financing and/or trading strategies, methods of operation, processes, trade secrets, methods of determination of prices, financial condition, net income, and/or indebtedness, and (c) pertaining to future developments, such as research and development, future marketing and expansion plans. I agree that I will not, during or after my employment with GW Equity, use for myself or for others, or communicate or disclose to others, any such Confidential Information.

Upon termination of my duties with GW Equity, or at any other time at GW Equity's request, I agree to deliver within twenty-four (24) hours to GW Equity all manuals, letters, notes, notebooks, reports, sketches, formulae, computer programs, memoranda, customer and/or client lists, files and all other materials and all copies thereof relating in any way to GW Equity's business which are in my possession or under my control or access. I also agree not to make or retain any copies of any of the foregoing and will, at GW Equity's request, so represent in writing upon or after termination of my duties with GW Equity.

5.     **Notification.** GW Equity may notify anyone who employs me in the future or evidences an intention to employ me as to the existence and provisions of this Agreement.

If I breach or threaten to breach any provision of this Agreement, GW Equity will have the right to have this Agreement specifically enforced by any court having jurisdiction, without being required to post bond or other security, and without having to prove the inadequacy of the available remedies under law. I also recognize and agree that any such breach or threatened breach will cause irreparable injury to GW Equity or its customers, and that money damages alone will not provide an adequate remedy to GW Equity and therefore, by this Agreement, I acknowledge and agree that GW Equity will have the right, even over my objections, to an injunction requiring my compliance with this Agreement and will have the right to seek and receive an *ex parte* temporary restraining order, to be followed by a hearing on temporary injunction, with regard to the promises I have made herein. In addition, I understand and agree that GW Equity may take all such other actions and remedies available to it under law or in equity. In the event of such breach or threatened breach by me, I also agree to indemnify GW Equity for any costs, damages, losses, or other expenditures, including legal costs and fees, expended by GW Equity to enforce its rights under this Agreement.

6.     **Employment at Will.** I understand that this Agreement is not a contract or other guarantee of employment. I further understand that I am an employee-at-will, meaning that GW Equity may terminate my employment at any time, with or without notice, and with or without cause. Neither the termination of my employment by GW Equity nor the termination of my duties with GW Equity will affect my obligations under this Agreement.

7.     **Successors in Interest.** This Agreement will inure to the benefit of and may be enforced by GW Equity, its successors and/or assigns, and will be binding upon Employee, the Employee's executors, administrators, legatees, distributees, and other successors in interest and may not be changed or waived except in a writing signed by the Employee and a duly-authorized office of GW Equity.

8.     **Governing Law.** This Agreement shall be construed and governed by the laws of the State of Texas, such that the venue for any suit regarding or relating to this Agreement shall be Dallas County, Texas. Further, this Agreement is to be construed in accordance with the substantive laws (but not the conflicts laws) of the State of Texas. This Agreement is performable in whole and in part by both parties in Dallas County, Texas.

9.     **Entire Agreement.** This Agreement represents and contains the entire agreement and understanding among the Parties with respect to the subject matter of this Agreement. It supersedes any and all prior oral or written agreements, proposals, and understandings. The Parties shall rely upon no representation, warranty, condition, understanding, or agreement of any kind with respect to the subject matter of this Agreement unless incorporated in this Agreement. This Agreement may not be modified except by an agreement in writing approved by Employee and a duly-authorized officer of GW Equity.

10.    Severability.  In the even that one or more of the provisions of this Agreement is determined to be illegal or unenforceable; the remainder of this Agreement shall not be affected thereby.  Each remaining provision shall continue to be valid and effective and shall be enforceable to the fullest extent permitted by law.

11.    Restrictive Covenants.

a.    Business Relationships and Goodwill.  Employee acknowledges and agrees that, concurrently with the execution of this Agreement and on a daily basis thereafter, GW Equity will provide them specialized training, and Confidential Information.  Employee acknowledges and agrees that this creates a special relationship of trust and confidence between the Company, Employee and the Company's current and prospective customers and clients.  Employee further acknowledges and agrees that there is a high risk of opportunity for any person given such responsibility, specialized training, and Confidential Information, to misappropriate the relationship and goodwill existing between the Company, and the Company's current and prospective customers and clients, and broker. Consequently, Employee agrees to the restrictive covenants contained in this section 10.

b.    Non-Competition Obligations.  Employee acknowledges and agrees that the period of two (2) years from the date of termination of employment for any reason will constitute the non-compete, non-solicit and non-divert period (the "Non-Interference Period").  During the term of and following the termination of this Agreement for any reason, Employee will not engage in duties or provide services to a Competitor which are substantially similar to those Employee provided to the Company, in any capacity, within the Continental United States.  The parties acknowledge that the Company's business and the Employee's duties and responsibilities including without limitation, the scheduling of Seminars, will be national in scope, and the Company pursues a national market for its GW Equity Advantage services.  The term "Competitor" means  a company that provides the same or substantially similar products and/or services as those provided by GW Equity, including without limitation, the products and services set forth in the GW Equity Advantage and the educational seminars conducted by GW Equity to its Clients.

c.    Non-Solicitation.  Employee further agrees that during the Non-Interference Period after the termination of employment, he or she will not directly or indirectly: (a) solicit, entice, persuade or induce any employee, Independent Contractor, agent or representative of the Company to terminate such person's relationship with the Company or to become employed by any business or person other than the Company; (b) approach any such person for any of the foregoing purposes; (c) authorize, solicit or assist in the taking of such actions by any third party; or (d) hire or retain any such person.

d.    Non-Diversion of Business.  Employee agrees that he or she shall not at any time during the term of this Agreement divert away or attempt to divert away any business from the Company to another company, business, or individual.  Additionally, Employee shall not, during the Non-Interference Period, following the termination of this Agreement, contact, solicit, attempt to solicit, divert away, or attempt to divert away business, either directly or indirectly, from any client or "Company Customer."  Company Customer is defined as any person, company, or business that is or was an investor, prospective investor, Customer or Client of the Company prior to and subsequent to both parties executing this Agreement and who Employee contacted, solicited, serviced, or had access to Confidential Information about.

e.    Acknowledgement.  Employee acknowledges that the specialized training, and the Confidential Information provided to Employee pursuant to this Agreement, gives rise to the Company's interest in restraining Employee from diverting business and soliciting employees of the Company, that the non-competition, non-solicitation and non-diversion covenants are designed to enforce such consideration and that any limitations as to time and scope of activity to be restrained defined herein are reasonable and do not impose a greater restraint than necessary to protect the goodwill or other business interests of the Company.

f.    Restoration.  As additional consideration for the restrictive covenants herein, Employee shall receive $4,000.00 annualized and paid in accordance with Company's current payroll system..  If any part of the restrictive covenants in section 10 herein are found to be invalid or unenforceable by a court of competent jurisdiction, Employee shall return the $4,000.00 to GW Equity within ten (10) days of such finding.

AGREED, ACKNOWLEDGED, AND ACCEPTED,

EMPLOYEE:

Date:  9/11/06                    Signature:  D E Woodard

Printed Name: DICKSON WOODARD

GW EQUITY, LLC

Date:  9/11/06                    Signature:  _____

Printed Name: STEVE SCHREIBER

Title:    VICE PRESIDENT, BUSINESS DEVELOPMENT

G W Equity Intellectual Property & Confidentiality Agreement – Page 3 of 5

Def. Appx. 0064

# Exhibit I

Def. Appx. 0065

**From:** Kristen Pannell [mailto:kpannell@mccrearylaw.com]
**Sent:** Friday, January 05, 2007 2:34 PM
**To:** editor@ripoffreport.com
**Subject:** Agreed Temporary Order

Mr. Magedson:

Attached please find a copy of a recent Agreed Order which was signed by the Honorable Judge Frost of the 116th Judicial District Court in Dallas, Texas. Pursuant to this order, it is imperative that the list of postings about my client, GW Equity, be removed, regardless of who published them. It has already been brought to your attention that these statements are defamatory, disparaging, false, and misleading. It is my hope that you will not intentionally interfere with the court order by refusing to remove these postings, especially in light of the fact that Dickson Woodard has already requested that you remove the same.

If you have any further questions or concerns, please contact me at 214-291-0800 or via email. I appreciate your assistance in this matter.


Kristen M. Pannell
Attorney at Law

McCreary & Stockford LP
18333 Preston Road, Suite 150
Dallas, Texas 75252
Office 214-291-0800
Fax 214-291-0801
E-mail kpannell@mccrearylaw.com


CONFIDENTIALITY NOTICE: This electronic mail transmission has been sent by a law firm. It may contain information that is confidential, privileged, proprietary, or otherwise legally exempt from disclosure. If you are not the intended recipient, you are hereby notified that you are not authorized to read, print, retain, copy or disseminate this message, or any part of it, or any attachments. If you have received this message in error, please delete this message and any attachments from your system without reading the content and notify the sender immediately of the inadvertent transmission. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Thank you for your cooperation.

# Exhibit J

Def. Appx. 0067

CAUSE NO. 06-12231

| | | |
|---|---|---|
| GW EQUITY, LLC,<br>  Plaintiff | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | 116th JUDICIAL DISTRICT |
| DICKSON WOODARD,<br>  Defendant | §<br>§ | DALLAS COUNTY, TEXAS |

## AGREED ORDER GRANTING PLAINTIFF'S PETITION FOR
## TEMPORARY INJUNCTION

On the 20th day of December 2006, there was presented to this Court a petition for temporary restraining order, temporary injunction, and permanent injunction with respect to the above-referenced matter. At that time, the parties reached an agreement for a temporary injunction which was read unto the record of the 116th Judicial District Court. The agreed order for temporary injunction stipulated as follows:

IT IS ORDERED THAT Defendant Woodard shall send to Ed Magedson, owner of www.ripoffreport, a written demand that any and all publications made by Defendant Woodard or published at Defendant Woodard's direction be removed from www.ripoffreport.com within 5 days of the signing of this order.

IT IS FURTHER ORDERED that this demand to Ed Magedson by Defendant Woodard shall be made via email and certified letter return receipt requested.

IT IS FURTHER ORDERED that, without stating affirmatively that the following postings were published by Defendant Woodard or published at Defendant Woodard's direction, that the following postings relating to Plaintiff are ordered to be removed from the website www.ripoffreport.com:

- Jim from St. Paul, MN;
- Greg from Rockwall, TX;
- Dave from Rockford, MN;
- Greg from NY, NY; and
- Tracy from Dallas, TX.

IT IS FURTHER ORDERED that a temporary injunction be issued against Defendant Woodard, restraining Defendant Woodard, his agents, servants and employees from any and all attempts to misappropriate confidential information, proprietary information, and any trade secrets of the Plaintiff.

Agreed Temporary Injunction
*GW Equity v. Woodard*
Page 1 of 2

IT IS FURTHER ORDERED that a temporary injunction be issued against Defendant Woodard, restraining Defendant Woodard from any and all contact with present employees, officers, directors, managers, and corporate counsel in an attempt to obtain proprietary information, trade secrets, or other confidential information regarding Plaintiff and its business.

IT IS FURTHER ORDERED that a temporary injunction be issued against Defendant Woodard, restraining Defendant Woodard from misappropriation, publication, or other utilization of confidential propriety information obtained during his employment or after his employment ceased. This does not limit Defendant Woodard's right to speak to independent counsel and/or law enforcement personnel.

IT IS FURTHER ORDERED that a temporary injunction be issued against Defendant Woodard, restraining Defendant Woodard from coming within 500 feet of any of Plaintiff's business offices.

IT IS FURTHER ORDERED that Plaintiff's $1,000.00 bond be refunded to Plaintiff.


SIGNED ON THIS 21st day of December, 2006 at 4:00 o'clock A.M./P.M.

Robert H. Frost

_____
JUDGE PRESIDING


Agreed Temporary Injunction
*GW Equity v. Woodard*
Page 2 of 2

Def. Appx. 0069

Exhibit K



Jaburg
& Wilk, p.c.
ATTORNEYS AT LAW

David S. Gingras

dsg@jaburgwilk.com
Direct Line 602/248-1000
Main Fax 602/248-0522

January 12, 2007

3200 N. Central Ave.,
Suite 2000
Phoenix, AZ 85012

Tel 602/248-1000
Fax 602/248-0522

www.jaburgwilk.com

Gary J. Jaburg
Lawrence E. Wilk
Roger L. Cohen
Randy Nussbaum
Mitchell Reichman
Beth S. Cohn
Kraig J. Marton
Scott J. Richardson
Kathi M. Sandweiss
Mervyn T. Braude
Lauren L. Garner
Maria Crimi Speth
Michelle C. Lombino
Neal H. Bookspan
Ronald M. Horwitz
Gregory P. Gillis
Peter M. Gennrich
Janessa E. Koenig
Mark D. Bogard
Kelly Brown
Jonathan Rosen
Kevin J. Rattay
David S. Gingras
Adam S. Kunz
David N. Farren
Daniel L. Hulszer
Jill M. Hulszer
Thomas A. Connelly
Laurence B. Hirsch
Valerie L. Marciano

Of Counsel
Arly Richau

**VIA FAX: 214-291-0801**
**Email: kpannell@mccrearylaw.com**
**& U.S. Mail**

Kristen M. Pannell, Esq.
McCreary & Stockford LP
18333 Preston Road, Suite 150
Dallas, Texas 75252

  *Re:*  *GW EQUITY, LLC v. Woodard*; RipOffReport.com

Dear Ms. Pannell:

  This firm is litigation and intellectual property counsel to Xcentric Ventures, L.L.C. ("Xcentric") and Ed Magedson. I have recently received a copy of an email from you to Mr. Magedson which included an attached document styled: "Agreed Order Granting Plaintiff's Petition for Temporary Injunction". This order/injunction purported to order that certain material be removed from www.RipoffReport.com.

  I am writing for several reasons. First, this order incorrectly states that Ed Magedson is the owner of www.RipoffReport.com. That statement is not accurate; Mr. Magedson is not the owner of this website.

  Second, www.RipoffReport.com is operated by Xcentric Ventures, L.L.C., which is an Arizona limited liability company. Xcentric has no contacts with the State of Texas, does no business in Texas, has not availed itself of Texas law, and is otherwise not subject to personal jurisdiction in Texas. The same applies to Mr. Magedson who is an Arizona resident.

  Third, although the order is somewhat vague, it appears that Mr. Dickson Woodard has made an agreement with your client, GW Equity, L.L.C., to remove, or to demand the removal of, certain material authored by Mr. Woodard which he posted on the Rip-Off Report website. The injunction appears to require Mr. Dickson to make precisely this demand upon Mr. Magedson, but then it also indicates that Mr. Dickson is not admitting that he actually authored anything.

www.jaburgwilk.com
*Offices also in Scottsdale*
14500 N. Northsight Blvd., Suite 116 • Scottsdale, AZ 85260 • Tel 480/609-0011 • Fax 480/609-0016

Def. Appx. 0071

**Jaburg**
**& Wilk, p.c.**
ATTORNEYS AT LAW

Kristen M. Pannell, Esq.
January 12, 2007
Page 2

Whatever the nature of this agreement may be, you should be aware that any time a user of the Rip-Off Report website submits material for publication, they are required to agree to the following terms:

> **Submit your Rip off Report**
> By posting this report/rebuttal, I attest this report is valid. I am giving Ripoff Report irrevocable rights to post it on this web site. I acknowledge that once I post my report, it will not be removed, even at my request. Of course, I can always update my report to reflect new developments by clicking on UPDATE. Further, I agree that by posting this report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes between me and the operators of Ripoff Report arising out of this posting.

If a user does not agree to these terms, their report will not be published. As such, despite any subsequent promises that Mr. Woodard may have made to your client, Xcentric will not agree to remove any material he authored because Xcentric has been granted irrevocable rights to publish all submissions and all users are informed that submissions will not be removed, even upon request (again, I note that the order I received contains conflicting statements in that the second paragraph refers to "publications made by Defendant Woodard or published at Defendant Woodard's direction ..." while the fourth paragraph attempts to disclaim any authorship by Mr. Woodard; these conflicting recitals are entirely inconsistent and render the order inherently ambiguous/inconsistent).

Fourth, please note that unless you have affirmative proof that any false and defamatory material has been personally created by Xcentric and/or Mr. Magedson, pursuant to the Communications Decency Act, 47 U.S.C. § 230 (the "CDA") they are not liable as a matter of law merely for publishing such material:

> [The CDA's] provisions set up a complete shield from a defamation suit for an online service provider, <u>absent an affirmative showing that the service was the actual author of the defamatory content.</u> Accordingly, a number of courts have ruled that the ISP was immune from liability for defamation where allegedly libelous statements were made available by third parties through an ISP or were posted by third parties on the server's billboards, as the ISP fell within the scope of 47 U.S.C.A. § 230.

Jay M. Zitter, J.D., Annotation—*Liability of Internet Service Provider for Internet or E-mail Defamation* § 2, 84 A.L.R.5[th] 169 (2000) (emphasis added) (citing Pantazis, Note, *Zeran v America Online, Inc.: Insulating Internet Service Providers From Defamation Liability*, 34 Wake Forest L. Rev. 531 (1999)); *see also Batzel v. Smith*, 333 F.3d 1018, 1027–28 (9th Cir. 2003); *Blumenthal v. Drudge*, 992 F.Supp. 44, 51 (D.D.C. 1998); *Ben Ezra, Weinstein, and Co., Inc. v. America Online, Inc.*, 206 F.3d 980, 986 (10th Cir. 2000); *Morrison v. America Online, Inc.*, 153 F.Supp.2d 930, 933–

Phoenix Office:
3200 N. Central Ave.,
Suite 2000
Phoenix, AZ 85012

Tel 602/248-1000
Fax 602/248-0522

Scottsdale Office:
14500 N. Northsight Blvd.,
Suite 116
Scottsdale, Arizona 85260

Tel 480/609-0011
Fax 480/609-0016

10297-1/DSG/DSG/565534_v1

Jaburg
& Wilk, p.c.
ATTORNEYS AT LAW

Kristen M. Pannell, Esq.
January 12, 2007
Page 3 _____

Phoenix Office:
3200 N. Central Ave.,
Suite 2000
Phoenix, AZ 85012

Tel 602/248-1000
Fax 602/248-0522

Scottsdale Office:
14500 N. Northsight Blvd.,
Suite 116
Scottsdale, Arizona 85260

Tel 480/609-0011
Fax 480/609-0016

934 (N.D.Ind. 2001); *PatentWizard, Inc. v. Kinko's, Inc.* 163 F.Supp.2d 1069, 1071 (D.S.D. 2001); *Green v. America Online,* 318 F.3d 465, 470-471 (3rd Cir. 2003); *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1123-1124 (9th Cir. 2003); *Doe One v. Oliver,* 755 A.2d 1000, 1003-1004 (Conn.Super.Ct. 2000); *Doe v. America Online, Inc.,* 783 So.2d 1010, 1013-1017 (Fla. 2001); *Schneider v. Amazon.com, Inc.,* 31 P.3d 37, 40-42 (Wn.App. 2001); *Barrett v. Fonorow* 799 N.E.2d 916, 923-925 (Ill.App.Ct. 2003); *Donato v. Moldow* 865 A.2d 711, 720-727 (N.J. Super.Ct. App.Div. 2005); *Austin v. CrystalTech Web Hosting,* 125 P.3d 389, 392-394 (Ariz.App. 2005)).

Moreover, the CDA also prohibits the imposition of injunctive relief against Xcentric and Mr. Magedson. *See Kathleen R. et al v. City of Livermore,* 87 Cal App.4th 684, 697-98, 104 Cal.Rptr.2d 772, 780-81 (2001); *Ben Ezra, Weinstein, & Co.,* 206 F.3d at 983-84.

Fifth, it is well-settled that non-parties to a proceeding are not bound by the terms of an injunction unless they actively assist a party's contumacious conduct. Neither Xcentric nor Mr. Magedson have any relationship with Mr. Woodard and are not agents of Mr. Woodard in any capacity whatsoever. As such, all other issues notwithstanding, Mr. Magedson and Xcentric are not bound by the terms of the injunction against Mr. Woodard.

Finally, in the event you are considering joining Mr. Magedson and/or Xcentric as parties to your litigation, please note that because they are not subject to liability as a result of the Communications Decency Act, any such suit would be frivolous and could expose you, your firm, and/or your client to severe personal liability in Arizona for wrongful use of civil proceedings. *See* Restatement (Second) of Torts § 674. If you have conducted a reasonable inquiry into the facts and legal issues and still contend that your client has colorable claims, you may, of course, pursue them. However, any litigation which is commenced in bad faith, without probable cause and for an improper purpose will be vigorously defended and will result in Xcentric and Magedson pursuing any and all available remedies to the maximum extent permitted by law.

If you have any questions, please feel free to contact me or Maria Crimi Speth at (602) 248-1000 or via email at: DSG@JABURGWILK.COM and/or MCS@JABURGWILK.COM.

Very truly yours,

JABURG & WILK, P.C.

David S. Gingras

10297-1/DSG/DSG/565534_v1

## David S. Gingras

| | |
|---|---|
| **From:** | David S. Gingras |
| **Sent:** | Friday, January 12, 2007 11:32 AM |
| **To:** | 'kpannell@mccrearylaw.com' |
| **Cc:** | Laura A. Rogal; Maria Crimi Speth |
| **Subject:** | Rip-Off Report.com |
| **Attachments:** | Pannell.pdf |

Ms. Pannell,

Please review the attached letter which is in response to your email below.  Copies will also follow via fax and U.S. Mail.

Let me know if you have any questions.

David S. Gingras, Esq.
*Jaburg & Wilk, P.C.*
3200 North Central Avenue, Suite 2000
Phoenix, AZ 85012
Phone: (602) 248-1000
Fax: (602) 248-0522

This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. Dissemination, distribution, or copying of this communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone at (602) 248-1000, or via e-mail, and delete this message and all attachments thereto.

*IRS Circular 230 Disclosure*

*IRS regulations require us to notify you that this communication was not intended or written to be used, and cannot be used, by you as the taxpayer, for the purpose of avoiding penalties that the IRS might impose on you.*

**From:** Kristen Pannell [mailto:kpannell@mccrearylaw.com]
**Sent:** Friday, January 05, 2007 2:34 PM
**To:** editor@ripoffreport.com
**Subject:** Agreed Temporary Order

Mr. Magedson:

Attached please find a copy of a recent Agreed Order which was signed by the Honorable Judge Frost of the 116th Judicial District Court in Dallas, Texas. Pursuant to this order, it is imperative that the list of postings about my client, GW Equity, be removed, regardless of who published them. It has already been brought to your attention that these statements are defamatory, disparaging, false, and misleading. It is my hope that you will not intentionally interfere with the court order by refusing to remove these postings, especially in light of the fact that Dickson Woodard has already requested that you remove the same.

If you have any further questions or concerns, please contact me at 214-291-0800 or via email. I appreciate your

6/11/2007

assistance in this matter.


Kristen M. Pannell
Attorney at Law

McCreary & Stockford LP
18333 Preston Road, Suite 150
Dallas, Texas 75252
Office 214-291-0800
Fax 214-291-0801
E-mail kpannell@mccrearylaw.com

6/11/2007

Def. Appx. 0075

Exhibit L

Def. Appx. 0076

Re: RsmEquico Rsm Equico Equico What a Scam.. Any other thoughts??    Page 1 of 7

This is G o o g l e's cache of http://www.cheap56k.com/forums/showthread.php?
s=76185cbaac16fde88f4b82370ee05dcb&t=22201&page=4&pp=10 as retrieved on Apr 29, 2007 21:43:54 GMT.
G o o g l e's cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: `http://www.google.com/search?`
`q=cache:cLAP4ED8fNYJ:www.cheap56k.com/forums/showthread.php%3Fs%3D76185cbaac16fde88f4b82370ee05dcb%26t%3D22201%`
`26page%5D4%26pp%3D10+%22gw+equity%22+misleading&hl=en&ct=clnk&cd=12&gl=us`

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **gw equity misleading**



Def. Appx. 0077

I don't really know much about **GW Equity**, but from what I can gather, they have a similar business model to RSM Equico's, and therefore Geneva. Bottom line, is that unless you have significant revenues, strong and consistent cash flows, higher than average margins, or proprietary patents or technology, you really would be better served going to a business broker, than by these guys.

The up front fee is excessive, and although the valuation is honestly a good value, to an unmotivated non-strategic and non-synergistic buyer, it's a back door valuation none-the-less.

A back door valuation, simply put, is looking at the EBITDA, looking at the multiples of comps, multiplying the appropriate multiple to the EBITDA, and and working the WACC, to make the DCF equal whatever value you need it to equal to. Every value is calculated this way by these firms, but the sad fact is, they are usually right on the money.

You think your trucking company with significant geographic and customer concentration is worth 10x because you and the director at Ford are good buddies and have a verbal contract and a long standing business relationship? You're a dime a dozen, and just because you call your self a logistics company, does not mean you're worth a premium. Besides, you're a liquidation anyway, so what's the point of even doing a valuation.

Bottom line, if you are a small company, and let's face it, most of the companies RSM, Geneva and GW work with are, the costs far outweigh the benefits. Find a business broker, or go through your lawyer or accountant. Hell, go to Ebay, at least it's free.

---

☐ 09-27-2005, 12:04 PM                                                                              #33

St. Louis                                                                                    Posts: n/a
Guest

Has anyone actually obtained at least a partial refund of their commitment fee?

We signed up with RSM last Spring, enticed by glowing reports of how much undiscovered value there is in companies, the tremendous interest among European buyers, and (I'm embarrassed to say I fell for it) that recent company earnings are not really that significant a factor to the buyer in regards to what he's willing to pay. We made it clear the range that we needed to get in selling the company, we popped the $49,500 and when we got our book, found that it's valuation was WAY below that. It is our view that they had an obligation to temper the expectations which they created.

I would be very interested among anyone who has sought a refund, to hear about what works.

---

☐ 10-13-2005, 05:26 PM                                                                              #34

Unregistered                                                                                 Posts: n/a
Guest

In response to the request (below) about info on **GW Equity**:

Recently, I was put in the position of having to perform due diligence on **GW Equity**. I've made a habit of researching companies, which is now much more simplified via the Internet, before I spend hard earned money. I started with a search on the company's address in Dallas, TX. I was able to uncover the following:

In 1985, a company called "Great Western Business Services" was incorporated in TX. (See Texas Comptroller web site) http://ecpa.cpa.state.tx.us/coa/ser.....ID=17520503594

There is no corporate registration for any other company at this address, including "**GW Equity**" or "GW Merger". All three companies show the same company address, have their own web sites and have the same owner. I wondered why the two unregistered company names are now being used instead of, or in addition to, the name "Great Western Business Services". I found out.

For years, Great Western Business Services, a family run company, billed itself as a FSBO (For Sale By Owner) advertising company that brought buyers and sellers of businesses together. Their selling point was that they DID NOT sell companies but relied on the owners to sell their own. Their business plan was to gain a lot of up-front cash flow by offering a lower cost approach to replace a solid way of accomplishing the task of selling companies. In doing so, they limited overhead by using non-employed reps (Independent Contractors) to sell advertising and perform valuations.

As all business owners know, you save a lot of money by using non-employees (IC's) but retain no control over what they say or do. Unfortunately, since we all get what we pay for, this approach proved to be unsuccessful for business owners who wanted to sell, but it did raise a lot of up-front cash for Great Western.

Def. Appx. 0078

Re: RsmEquico Rsm Equico Equico What a Scam.. Any other thoughts??                    Page 3 of 7

Many years of mounting BBB complaints and bad press, including a damaging article that appeared in Inc. Magazine, caused potential clients (and sales reps) to look elsewhere.

The "Inc Magazine" article appears at:
http://www.inc.com/magazine/20011101/23612.html

Excerpts from the article include:
...........Before (the client) signed his agreement, his wife had called the Better Business Bureau of Metropolitan Dallas to check into Great Western's record. The bureau's recorded telephone report on the company, however, didn't allude to Great Western's 1997 expulsion from membership owing to complaints of misleading sales practices and slowness in resolving complaints.
...........So what, after all, is Great Western's record on businesses sold? Given that last year the company had about 3,000 customers and $15 million in revenues, and given that it collects a $5,000 deposit on average from each customer who signs on, simple arithmetic suggests an answer. Based on Great Western's own numbers, it appears that the company derived its $15 million in revenues entirely from deposits -- and none from sales. The company did not respond to a request for comment on that line of reasoning.
........Great Western is one of a handful of so-called co-op advertising companies, which rank below business brokers in the business-matchmaking hierarchy and act as a kind of dating service for buyers and sellers of small and midsize businesses. Like business brokers, the matchmakers are unregulated or, at most, loosely regulated. In at least three states (California, Minnesota, and South Dakota), for example, regulatory boards have ruled that Great Western must have a real estate license to do business, although the Dallas-based company has continued to operate in all three states without one.

California's Cease and Desist order appears at:
http://secure.dre.ca.gov/publicasp/...NR.asp?RowID=79
Minnesota's order to Cease and Desist appears at: http://www.oah.state.mn.us/aljBase/100512989.fdgs.htm

Subsequently, most of the Great Western reps left to go with other more reputable companies, like RSM Equico. This mass exit was devastating to Great Western. It became evident that if they were going to stay alive, GW had to copy the business plan of the likes of RSM Equico and Geneva. (Geneva no longer conducts M and A seminars).

In keeping with Great Western's history of business philosophy, the company's plan was to again compete by offering "similar" services for much less money, gain a lot of "up front cash flow", and not be overly concerned about the successful outcome of business owners. Since the company is privately owned, claims of success (and company start dates) are not monitored by the likes of the SEC, etc. The red flags were starting to wave.

In an effort to bypass the BBB complaints and references to bad press, Great Western Business Services changed their address and created "GW Merger" and "GW Equity". GW Merger continued with the Great Western advertising program but under a different name. GW Equity was created in an effort to steal potential clients and reps from the likes of RSM Equico. GW Equity copied every possible aspect of RSM Equico's business model, including using similar documents, seminars, materials, corporate titles, etc. Then they went out to offer "similar" services for less money in an effort to increase up-front cash flow without having credentialed dealmakers in place to actually sell the companies. Sound familiar?

Establishing and maintaining a successful company the size and scope of RSM Equico takes enormous resources, which GW Equity, GW Merger and/or GWBS does not appear to have. In an effort to have the public "perceive" they are similar in nature, GW Equity established "alliances" with a network of independent business brokers (not employed dealmakers) and pawn the network off as their own. The scenario is similar to a local ReMax Real Estate Broker setting up an office and immediately saying he has "thousands" of agents working for their office because they belong to a "multi-listing" group, then taking credit for all of the independent agents' sales. It's easy for anyone to see through such claims, if they look.

By this point, the red flags were waving furiously.

Interesting enough is GW's owner, who according to his on-line bio, received degrees in Ministry. His bio states he founded GW Equity in 1987. The Inc. Magazine article shows that the owner bought "Great Western Business Services" back then, but certainly not GW Equity. It's pretty obvious there was no "GW Equity" until recently and, according to the State of Texas, still isn't. This company name was recently created for the purposes described above.

Another search uncovered GW Equity ads stating the company started in 1983, not 1987! It seems they can't even get their start dates straight.

See one of the ads at:
http://hotjobs.yahoo.com/jobs/TX/Irving/Sales/J468749WE

As the Inc. Magazine story points out, when you are privately owned, you can make just about any claim with no one to hold you accountable. When you are part of a Fortune 500 company (RSM Equico is owned by H and R Block, Geneva is owned by Citigroup) and licensed by the SEC, your claims are monitored and you are accountable.

You can imagine how the red flags were flying by this time I hate being fooled by imposters. I'm willing to pay to get "The Real Thing" and get the job done right.

After I performed this research, I went with RSM Equico and had them do important work for me. I was extremely happy with the results. The team I worked with were made up of the utmost professionals with solid backgrounds. But, of course, you get what you pay for.

Def. Appx. 0079

Re: RsmEquico Rsm Equico Equico What a Scam.. Any other thoughts??          Page 4 of 7

I simply wouldn't trust selling my business unless it was in the hands of a regulated entity with employees licensed by the SEC and the resources of a substantial, non-family owned company. I need a lot more credentials than someone who ...."holds the designation of Certified Business Intermediary from the IBBA", which can be obtained by almost anyone who does little more than pay a fee. (See the **GW Equity** General Manager's bio, who happens to be the owner's Son).

Certainly, I would run from a company that is trying to mask its past by changing their name and address. But that's just me.

☐ 10-23-2005, 01:12 PM                                                             #35

Unregistered                                                                   Posts: n/a
Guest

Well everyone I'd like to start off my saying I am a sales rep with rsm. I have not been there that long yet to pass any sort of extreme judgement. First off to the sellers I would like to say we meaning sales reps were told that if they cannot sell your business they will give you all your money. Secondly, when you attend the seminar we select you also. There are some companies they dont want to work with for whatever reason. I think of it like this yes it does sound almost to good to be true but if it is true isnt it worth the the try it they will refund your money. Secondly, even if you are not thinking of selling soon you can alway prepare yourself. 145 to prepare yourself is nothing and if it is that says a lot about how your business must be doing with all due respect, Also we are told (as sales reps) that if you dont like the seminar we will give you your money back. I have attended a seminar and I feel it would be very helpful as a business owner.

☐ 11-03-2005, 01:57 PM                                                             #36

Unregistered                                                                   Posts: n/a
Guest

    Quote:    Originally Posted by **Unregistered**
    *Well everyone I'd like to start off my saying I am a sales rep with rsm. I have not been there that long yet to pass*
    *any sort of extreme judgement. First off to the sellers I would like to say we meaning sales reps were told that if*
    *they cannot sell your business they will give you all your money. Secondly, when you attend the seminar we select*
    *you also. There are some companies they dont want to work with for whatever reason. I think of it like this yes it*
    *does sound almost to good to be true but if it is true isnt it worth the the try it they will refund your money.*
    *Secondly, even if you are not thinking of selling soon you can alway prepare yourself. 145 to prepare yourself is*
    *nothing and if it is that says a lot about how your business must be doing with all due respect, Also we are told (as*
    *sales reps) that if you dont like the seminar we will give you your money back. I have attended a seminar and I feel*
    *it would be very helpful as a business owner.*

You are a moron

☐ 11-03-2005, 03:11 PM                                                             #37

Unregistered                                                                   Posts: n/a
Guest

    Quote:    Originally Posted by **Unregistered**
    *You are a moron*

its a scam you fool!

☐ 12-20-2005, 10:30 AM                                                             #38

Def. Appx. 0080

Re: RsmEquico Rsm Equico Equico What a Scam.. Any other thoughts??                    Page 5 of 7

Unregistered
Guest

Posts: n/a

Has anyone complained to the attorney generals office? are the scammed individuals just turning their cheeks? Someone please tell me they have at least contacted the BBB.


I worked for RSM Equico as a member of their management team and recently resigned because of their fraudulent business model.

I can attest with a great degree of accuracy that the Company has a fraudulent business model. Less than 1% of the deals that come to the table end up in capital markets. When clients ask us about the percentage of incoming deals that end up closing in capital markets, we are forced to lie and mislead them.

Front End: I attended well over 10 seminars over the course of my work at RSM. They are indeed led by experienced cowboys who worked in Wall Street and are equipped with a sharp tongue that impresses those small business owners who are dying of taking the exit with extra cash and pride. In this sense, RSM EquiCo does a great job at **misleading** clients and promising them that there is a strategic buyer waiting to hand them a fat check.

Back End: When Mr. Smith hands in his $50K check to the seminar leader, he is of course so excited to sell his business and even starts making dream plans. He is then shifted to RSM EquiCo's back end composed of unexperienced recent college grads from local colleges and universities who accept to be slaved for a year or two. The back end is divided into industry groups but the reality is that there is no expertize in any given industry. Recent grads join the "Industry Group" and are assigned their first deal after only a few weeks month or so, if that. In comparison to Wall Street and other respectable small IB firms that spend millions of dollars at hiring and training talented and intelligent people, RSM EquiCo spends very very little time at recruiting the best candidates. Put it simply, when a new analyst is brought in, he has very little time to disgest the material and if you were to ask him to provide the algebra and math behind the valuation model, he would not know a dam thing!!!

Amongst all the unfortunate clients that RSM EquiCo brings, roughly about 1 client out of 10 ends up asking for their money back. Then, RSM would negotiate a settlement in the form of a reimbursement equals to a percentage of the $50K fee. Most of them unfortunately would opt for this option because it is less risky in light of attorney's costs and court process. It becomes a function of how much you can reduce the damage. In most instances, the damage is not detected and most clients end up waiting and hoping during the next 5 years that Mr. Europe will come in to hand them a check worth 50 times EBITDA. Unfortunately, Mr. Europe will never show up and RSM EquiCo moves on and uses some of the cash to bring in the next victims.

Hiring: I participated in the hiring process and it was the worse I have ever seen. HR, composed of dummies and fat asses, is given the task of screening "best" candidates. How can they do that when they have no freakening clue about corporate finance. They cannot even write a correct sentence in English and all the sudden they decide who they should bring in for an interview. Amazing, isn't? I once interviewed a candidate and asked him to give me an estimate of the current world's population. I was also very clear that I was more interested in the reasoning behind the answer. He had no explanation for the answer he gave me that "the world's population size is 100 Billion". This gives everyone an idea of who works and stays at RSM, only the dummies!!

Turnover: roughly you are looking at well over 50% turnover of first year employees who end up leaving because of: 1) lack of training and management support, 2) complaints and insults coming from those unfortunate unhappy clients, 3) Lack of Adequate compensation package which is well below the market rates (RSM EquiCo once hired a Consulting firm to research their compensation package and once the Company discovered that the Firm was paying well below market rates, they were told to go back and change the numbers and make them look what RSM was willing to pay. They basically paid the fee to a third party to come lie about the reality. In the long run, it becomes only a matter of time before even the dummies wake up and end up leaving.


RSM EquiCo needs to be brought to Justice and they need to be punished for their evil business practices. Anyone interested?????

Any seller who thinks and believes that RSM could sell his or her business should seek mental help immediately.[/QUOTE]

01-17-2006, 04:48 PM                                                                 #39

Unregistered
Guest

Posts: n/a

I got caught on the phone with one of RSM EquiCo's sales reps trying to get me to a seminar. Breakfast served at one of Toronto's nicer Hotels, day long schmoozing with '12 public companies looking to buy up small companies for diversification'. I smelled something from the get-go. I just bought my company and am still getting the hang of these finer points of business scams. My trusted Administrative Assistant looked them up on the web while I was getting the deal on how someone would be willing to pay up to 6X the gross sales of my company. After finding this out, I need to give my assistant a raise....

Def. Appx. 0081

Re: RsmEquico Rsm Equico Equico What a Scam.. Any other thoughts??

I put this woman off a week and as soon as I hung up I was handed a printout of how this company is burning small business of over $45,000 for a fancy bound book that essentially says the same thing I already knew when I did my due diligence buying my company.

Word of advice. Ask them for references. They'll run scared and hide behind 'privacy issues'. Don't waste your time. Don't even be polite.

‥…‥

☐ 01-26-2006, 04:35 PM                                                                                   #40

Unregistered                                                                                       Posts: n/a
Guest

My husband went to one of their seminars and was very excited when he came home. He told me about it and the great things they talked about. It seemed to good to be true so I have been doing some research and not liking some of what I am finding. I would like to hear more from any one else who was tempted to get involved in their promises for $49,500.

…‥

Page 4 of 36  « First  ≤  2  3  4  5  6  >  Last »

| Tools | Search |
|---|---|
| ⤳ Show Printable Version | **Search:** |
| Email this Page | [Go] |
| Add a Poll to this Thread | Advanced Search |
| **Display Modes** | **Rate This Thread** |
| Linear Mode | **Rate This Thread:** |
| Switch to Hybrid Mode | 5 : Excellent   [Go] |
| Switch to Threaded Mode | |

**Posting Rules**                                            ⊟

You may post new threads
You may post replies                                        Online Fraud Prevention
You may not post attachments
You may edit your posts

vB code is On
Smilies are On
[IMG] code is On
HTML code is On

**Similar Threads**                                                       ⊟

| Thread | Thread Starter | Forum | Replies | Last Post |
|---|---|---|---|---|
| Hire Bug Hirebug.com Employment and Francisce Scam | Simon | Online Fraud Prevention | 5 | 11-02-2004 01:07 AM |

All times are GMT -5. The time now is 04:43 PM.

Powered by: vBulletin Version 3.0.9

Def. Appx. 0082

Re: RsmEquico Rsm Equico Equico What a Scam.. Any other thoughts??          Page 7 of 7

-- Blue Dreams          Copyright ©2000 - 2007, Jelsoft Enterprises
                                                          Ltd.

ISP Directory   |   ISP Search   |   ISP Forums   |   Forum Archives   |   ISP Reviews
ISP Login   |   ISP Advertising   |   Contacts   |   Link to Us   |   Add ISP

ISP History: what we know it as today. Mosaic was the first graphical Web browser - it allowed text, graphics, sounds and other multimedia to be viewed in one. This revolutionised the Web and brought its potential to the attention of the rest of the world. The WWW is based on the concept of hypertext. The word hypertext in 1965 by Ted Nelson. Hypertext is text that contains links -
best isp low cost isp isp directory isp directory
ISP Search: find internet access service provider isp search list of isp faster web connection dial up internet connection isp list local isps web access dial up internet free isp directory v92 providers hispeed isp internet service providers directory dial up service provider national access local iso directory isp providers isp providers access nat providers broadband news dial up internet access list isp high-speed internet isp discussion broadband broadband guide dial up isp dial up account service internet service providers guide internet access list home isp internet access plans access providers business isp find a isp dialup internet provider list a directories isp news isp residential dial up nationwide access isp reviews residential internet service providers hi speed dialup find isp rating dial up list of internet providers
ISP Forums: All ISP Forums Sto or Less Providers scams dcom telecom feedback and suggestions Free ISP Exchange General Discussion Help and Trouble Internet Discussion ISP Discussion ISP-Related News Online Fraud Prevention Ranking System Recent News and Additions Special Offers Top 10 Best ISPs ISPs
Area Codes: Free Area Code Listings Free 303 ISPs Free 315 ISPs Free 781 ISPs Free 760 ISPs Free 832 ISPs
DUN Error Codes: DUN Error Codes Error 472 Error 674 Error 465 Error 715 Error 540
Glossary: Free ISP Glossary Free gmta Free Manufacturing Free Novell Directory Services Free Force Firewall
ISP Reviews: Free wonderurs net Free ncani net Free casher com Free rsmore com Free sonso com Free 4clusanet Free cmsinter.net Free phreeqc.com Free mayzok com discuss internet service providers discuss isps internet access talk isp message board internet access discussion isp talk isp forum isp mess internet access chat isp chat

Def. Appx. 0083

# Exhibit M

Def. Appx. 0084

# For Sale: The American Dream

By: **Joseph Rosenbloom**

**Need help selling your company? Lots of folks out there claim they can help you get the most for your business. Don't believe everything you hear.**

**So, you quit your job and started your own company. Maybe -- a big maybe -- you'll be able to sell the business when it comes time to cash out.**

Cal Brown is a salesman to the core of his New England bones. As a Sears employee for 21 years, he sold power tools, batteries, and fences. At Sears in 1981 he ranked among the top industrial-products salespeople in the whole United States. Brown, who is 55 years old, has a husky voice, a genial manner, and earnest blue eyes. His stock of wry stories is as much a part of his persona as his metal-frame glasses, which he tends to perch midway down the bridge of his nose. One of his stories is about a former coworker at Sears who hung a quotation on his office wall. "If you can't dazzle them with your brilliance," the quotation read, "baffle them with your bullshit."

During the 1980s, changes at Sears turned Brown (his given name is Calvin, but everyone calls him Cal) into an entrepreneur. In 1984, Sears halted the commercial sale of two of Brown's bread-and-butter products, batteries and fences, and his commission-based income plummeted. To moonlight for extra money, Brown started his own fence-installation business, the C&G Fence Co. He left Sears six years later to run C&G full-time -- and to pursue his own version of the entrepreneur's proverbial dream. He looked forward to earning more income on his own while creating equity in his business and being his own boss. "Just a happier life," he says, recalling his aspirations, "and I'd be more in charge of my own destiny."

As part of the evolution from employee to owner, Brown built an office next to his white Cape-style house in rural Litchfield, Maine. Within a decade C&G was selling $1.4 million worth of wooden, chain-link, and other kinds of fences annually, and Brown had eight people on the payroll year-round, plus a dozen reinforcements during the hectic summer season. But the more he thought about his company and his life -- the grueling 12-hour workdays in the summer, the strain of managing a growing business, and the cancer scares that both he and his wife had experienced within a few months of each other -- the more he wanted out.

"I'm not a businessperson," he says bluntly. "I'm a salesman. I don't like the day-to-day business operation."

His ticket out suddenly seemed at hand one day in December 1999, when another salesman, Brian Granger, called on Brown in Litchfield. Granger, who lives in upstate New York, was representing a Dallas-based company, Great Western Business Services Inc. "Very smooth, very credible," Brown would later say about Granger, who reminded Brown of John Travolta.

Def. Appx. 0085

TICKET OUT: Eager to sell his fence-installation company, Cal Brown signed up with Great Western Business Services.

Great Western, as Granger explained, was not a business broker but a marketing service. To aid sellers of small businesses, it placed generic ads seeking buyers. Granger showed Brown some sample classified ads with this header: "OVER THREE BILLION $ WORTH OF BUSINESSES FOR SALE BY OWNERS." Great Western could match Brown with buyers that were hunting particularly for a business like C&G, Granger said.

Of course, before putting C&G on the market, Brown would want to know how much to ask for it. Granger offered to estimate C&G's market value on the spot. In addition, if Brown purchased Great Western's services, the company would perform a comprehensive evaluation of C&G as part of the deal. Never having sold a company or, for that matter, bought one, and not sure how much to ask for C&G, Brown was intrigued.

Granger did some quick calculations, plugging some financial data supplied by Brown into a series of Great Western formulas. C&G might fetch almost $1,175,000, Granger said. Looking back at the moment when the fullness of that figure dawned on him, Brown remembers having one thought. "I was thinking of getting rich quick," he recalls with a lopsided grin.

Despite the flush of excitement, Brown didn't pay the $8,975 fee Granger sought that day. When Granger returned to Litchfield in May of last year, however, Brown signed a Great Western contract and did write a check for that amount. Taking a deep breath, he set the asking price for C&G at $1,250,000.

As it turned out, though, Brown didn't get rich quick. Instead, he was greatly disappointed by what Great Western did -- or didn't do -- in return for his $8,975. Great Western supplied him with the names of four prospects, but Brown says he could reach only three of the prospects, and none was "remotely" interested in buying his business. Great Western also sent him a 28-page evaluation of C&G, which he found to be of little value.

That a veteran salesman like Brown would pay an up-front fee for the services that Great Western promised to provide is understandable, particularly considering the business-brokerage alternative. Five years ago up-front fees were virtually unknown in the realm of small-business brokerage, according to Tom West, author of *The Business Reference Guide*, which is published by the Business Brokerage Press, based in Concord, Mass. But in a survey this year of business brokers nationwide, West found that 35% were collecting such fees from their customers.

Advance fees have long been a fixture on Wall Street, at least at the top-of-the-line tier of the mergers-and-acquisitions world. The Wall Street deals, which produce the big headlines, are engineered by the likes of Morgan Stanley and Goldman Sachs and typically provide sellers with a menu of prospective buyers. Those deals totaled a mere 2,245 last year, according to Mergerstat, an M&A research company based in Los Angeles.

6/11/2007

Def. Appx. 0086

AGGRIEVED: Cal Brown demanded the refund of his $8,975 payment.

In contrast, 1.57 million small companies were offered for sale in 2000, according to West. Of those, 250,000 actually got sold. About a third of those sales were handled by business brokers, a mostly unregulated group with varying levels of sophistication and competence. And the remaining 1.32 million companies? They were probably turned over to family members, says West, or they just closed their doors. Given those odds, small-business owners who are looking to sell crave any kind of assistance and are vulnerable to any offer that has an air of legitimacy and a seemingly reasonable promise of success. Most owners, like Brown, have no previous experience selling a company and have little idea where to begin.

Great Western is one of a handful of so-called co-op advertising companies, which rank below business brokers in the business-matchmaking hierarchy and act as a kind of dating service for buyers and sellers of small and midsize businesses. By its own reckoning, Great Western is the largest such company (with the possible exception of Internet-based competitors), having signed up about 3,000 small-business sellers last year and garnered $15 million in revenues. Like business brokers, the matchmakers are unregulated or, at most, loosely regulated. In at least three states (California, Minnesota, and South Dakota), for example, regulatory boards have ruled that Great Western must have a real estate license to do business, although the Dallas-based company has continued to operate in all three states without one. (Great Western is now disputing the ruling in California, filing for "appropriate documentation" in Minnesota, and reviewing its options in South Dakota, according to the company.)

When Cal Brown was sizing up Granger and Great Western, he wasn't thinking about the niceties of regulations. What struck him at the time of Granger's visit was the sales representative's response -- or nonresponse -- to a question. "I asked, clearly, 'What percentage of people who sign the contract actually sell their business?' " Brown remembers. Granger never answered him directly, according to Brown, which troubled him.

Looking back, Brown realizes that he knew little about Great Western except what Granger had told him. "It could have been located in a phone booth," Brown says.

**The Company "Fills a Niche"**

Great Western's headquarters is located in a sleek, 10 story high-rise overlooking the busy Dallas North Tollway. Flanked by a recently vacated Mitsubishi auto dealership on one side and a prime-rib restaurant on the other, the building has a spacious, marbled lobby with a geyser-style fountain. Great Western's suite of green-carpeted offices on the sixth floor exudes the bland respectability of, say, an insurance agency. As it happens, insurance -- specifically, health insurance for small businesses -- is what company founder Stan Hazlewood sold before he created Great Western, in the early 1980s.

Def. Appx. 0087

Today its owner and president is John H. Binkley Jr., who joined Great Western as a salesman in 1984 and, within four years, bought Hazlewood out. When I called Binkley before visiting Great Western in May, he told me that he was mourning the death of his 35-year-old son, Hal — who'd been killed in a traffic accident in January -- and that he would not be available for an interview. Hal Binkley had been Great Western's vice-president of operations, his father said, and had been "basically running the business."

When I arrived at Great Western, the person who received me was the company's former lawyer, David McCreary, whom Binkley had named chief operating officer the week before. McCreary, wearing a red tie and a charcoal, chalk-striped suit, was clean-cut, with a choirboy face that belied his 33 years. Growing up in Plano, Tex., McCreary had been John Binkley's neighbor and a chum of his younger son, Ryan. Great Western is a family business, McCreary told me right away. Its 20-person home-office staff includes two of John Binkley's brothers, Hulon and Daniel.

Great Western, McCreary said, "fills a market niche for individuals who desire to sell their businesses themselves," which, for better or worse, is the route most small-company owners take. Great Western's service, he said, benefits sellers of companies whose small size or remote location results in their being "overlooked" by business brokers. Great Western, he continued, offers those sellers the means to market their business confidentially and nationally, even internationally. "We reach out to those small sellers," he said, "and provide them with the ability to reach out to a broader audience than Main Street, USA."

To reach sellers, the company sends out millions of pieces of direct mail a year. "CONFIDENTIAL. FREE FOR THE ASKING: Find Out What Your Business Is Worth NOW!" one such letter begins. To maintain its pool of 25,000 buyers, Great Western advertises by direct mail, in many newspapers and magazines (including *Inc*), and on the Internet. If a prospective seller responds, one of the company's 50-odd sales representatives (known as "field consultants") is likely to call the seller to make an appointment.

A field consultant who comes calling is ready to make a free estimate of a company's value, as Brian Granger did for Cal Brown. Great Western's field consultants must have at least five years of sales experience, but no business-valuation experience is required of them other than what's taught in a four-day training course, which emphasizes mastery of the company's sales presentation. For field consultants, it's do or die: they won't last long unless they make sales. Their commissions are based entirely on the contracts they sell, and they must cover traveling expenses.

In training they learn about the company's "trump card," as former Great Western senior executive vice-president Bob Elliott once told a class of trainees. He was referring to the business evaluation that Great Western offers to sellers who purchase its matchmaking service. If a business owner buys an equivalent evaluation elsewhere, it "can cost as much as $5,000 or more up front depending on the type of business," says the company's presentation guide for field consultants. In the late 1980s, after John Binkley instituted evaluations as a sweetener to the Great Western advertising contract, the company's sales shot up, according to Elliott. And why not? Few owners know the market value of their companies, and most would relish a professional valuation.

Like others who sign a Great Western advertising contract, Cal Brown initialed an eight-

Def. Appx. 0088

point statement in which he acknowledged that "there can be no accurate projection" regarding when Great Western would locate a buyer, "if ever." The Great Western fee structure nonetheless pointed to the possibility of a sale. The up-front fee was a "deposit." If a Great Western lead resulted in a sale, Brown learned, the seller would owe a larger fee, based on a sliding scale that varied with the asking price. In his own case Brown would have owed Great Western a balance of $26,525, in addition to his $8,975 deposit, if he had sold C&G to a buyer unearthed by Great Western.

"How often does Great Western receive full payment in the wake of a sale?" I asked McCreary. "We rely on the seller's voluntary compliance with his or her contractual obligation to notify us at the time of the sale," he said. "Do we get notifications? Sure. We get them every month. Do we get as many as we would like? No, because not everyone complies with their responsibility."

"How many notifications do you get a year?" I asked.

"We don't audit those," McCreary said. "We put them in a general fund." In other words, Great Western does not track the number of sales for which the company collects a full fee.

### A Seller in Kentucky Complains

If the thrust of Cal Brown's grievance is against Great Western's modus operandi, which he contends misled him, Dewayne Hutchens's anger is more personal. Much of his ire is focused on the salesmanship of Great Western field consultant John Persaud, which, Hutchens says, took advantage of his own trusting nature. "My style of doing business is everything open and honest, and you lay everything on the table," says the 30-year-old Hutchens, who's a self-taught businessman and a volunteer firefighter in the Louisville suburb of Fern Creek, Ky.

In many ways Hutchens's and Brown's stories are similar. When Persaud visited him in July 2000, Hutchens was eager to sell the storage facility that he and a business partner, Joe Jarles, had bought for $1.5 million in January 2000. Before meeting Persaud, Hutchens and Jarles had in mind an asking price of $1.9 million for the 269-unit Fern Creek Mini Storage. They had enhanced its value, they reckoned, by adding a U-Haul dealership and improving rent collection.

Persaud made his own calculations based on Great Western's formula and stated his estimate: $2.4 million. "I said, 'Wow, that's pretty good,'" Hutchens recalls.

When Persaud described Great Western's services -- particularly, how Fern Creek might in effect tap into its database of thousands of qualified buyers, including many from countries outside the United States -- the scenario also sounded good to Hutchens. "He was saying [Great Western] had a special group of buyers, basically a group of international buyers who wanted citizenship in the United States," which they could obtain by acquiring a business in this country, Hutchens says. "It was one of those I-can't-say-as-the-official-record type thing, but, hey, we've got the people who'll come in here and grab it in a week."

Most of all, Hutchens liked what Persaud told him about the comprehensive evaluation that Great Western could provide. A $10,205 fee would buy an evaluation that would be "within a

Def. Appx. 0089

couple of percent" of the preliminary $2.4-million estimate, Hutchens quotes the sales rep as saying. What's more, Hutchens recalls Persaud's saying that an unspecified "large, independent accounting" firm would perform the evaluation. Hutchens figured that an authoritative document of that kind would serve as an important tool in selling his business.

"We provide small sellers with the ability to reach out to a broader audience than Main Street, USA."

*--David Mccreary*

Persaud says that he quit Great Western in April, after 14 months as a sales rep for the company. He says he had become disenchanted with the company. What Persaud told his customers, he says, coincided with what he had learned in Great Western's training course, including a claim that "one-third of [the company's] buyers are located outside of the country." Persaud, however, denies Hutchens's allegations that he indicated Great Western would find a buyer for Hutchens within a week, that the formal evaluation would be within a couple of percentage points of the preliminary estimate, and that a large accounting firm would handle the evaluation.

On July 10, 2000, Hutchens and Jarles signed a Great Western contract, paying Persaud $10,205. "A very personable guy," Hutchens says of Persaud, remembering his first impression of the field consultant.

When Great Western's evaluation arrived in the mail, Hutchens didn't think it looked much better than the one Persaud had completed in short order, even though the second one valued Hutchens's company at $2,514,000, almost 5% higher than the first estimate. "Our banker looked at it," Hutchens recalls, "and it's like, 'What is *this*?' " In December, Hutchens filed a complaint with the Better Business Bureau of Metropolitan Dallas, terming the evaluation "worthless" and objecting to the "pitiful total" of four referrals that he had received by then from Great Western. When he tried to contact the prospective buyers, he discovered that two of their telephone numbers had been disconnected, and another two "had no interest," according to him. He demanded a refund.

"There must be some misunderstanding regarding our contractual obligations," John Binkley responded in a letter to the bureau. The letter defended the methodology followed by Great Western's "independent valuation companies." By initialing the eight-point disclaimer, Binkley's letter said, Hutchens had indicated that he understood the "scope of our services." No refund, the letter stated, would be forthcoming.

Great Western had the same answer for Cal Brown when, in April, he demanded a refund of his deposit. In an E-mail that he sent to Great Western, Brown cited, among other arguments, the paucity of leads that he had received, and he questioned whether the entity that performed his evaluation, the Fisher Business Group, functioned independently of Great Western. "We have fully and diligently complied with our contract," the company responded by letter. The letter didn't respond directly to Brown's question about the Fisher Business Group but said an accounting firm that performed an evaluation like the one done for him would "typically

Def. Appx. 0090

charge $3,000 or more." Even if Brown had taken his dispute to court -- which he decided not to do -- he concedes that the papers he signed or initialed might have doomed his chances of winning.

### Due Diligence Hits Snags

Why did Brown and Hutchens sign up with Great Western without knowing who would perform their business evaluation or what odds they faced in finding a buyer through Great Western? Both sellers say that the sales reps with whom they dealt had skillfully gained their confidence. As for the papers they signed or initialed, Brown and Hutchens say they didn't read every word. "It's kind of like a house closing," Hutchens says. "Do you read over every document you sign? If so, you're going to be there two or three weeks." Sure, Brown and Hutchens admit, they should have read their contracts more carefully -- or had lawyers do it for them.

And what about due diligence? Before signing a contract, Brown and Hutchens asked Great Western for references to satisfied customers. The answer they say they received seemed plausible enough. Just as Great Western would keep Hutchens's and Brown's names confidential, so too did it have to respect the confidentiality of its other customers. Lamentably, it wasn't possible to supply references.

Before Brown signed his agreement, his wife, Gale, had called the Better Business Bureau of Metropolitan Dallas to check into Great Western's record. The bureau's recorded telephone report on the company, however, didn't allude to Great Western's 1997 expulsion from membership owing to complaints of misleading sales practices and slowness in resolving complaints. What Gale Brown did hear was an evenhanded message stating that the bureau had fielded a "pattern" of complaints concerning Great Western but that the company had responded to them "by explaining that it has met the terms of its written contract or by offering adjustments, where appropriate." Then, speaking with a bureau staff member, Gale "got, basically, a reiteration of the recorded message," she recalls. She was reassured, and her husband went ahead with the Great Western contract.

But the information Gale had obtained from the Better Business Bureau only hinted, at best, at the number of complaints that had been brought *directly* by customers to the company. When I asked McCreary for that number, he said, "I want to be very candid with you. Our tracking system for complaints was not in the past what it is today."

### Evaluators Work at Home

For all their discontent with Great Western, Brown and Hutchens were pleased with the initial, on-the-spot estimates of their companies' value. After all, Brown and Hutchens hoped to cite the flattering numbers to potential buyers if the later, comprehensive evaluations indicated approximately the same values (as indeed they did).

Such alluring numbers apparently play an important role in Great Western's sales strategy. "In most cases you'll find that when you go out and perform a business evaluation, that the value of the business is substantially higher than what the owner originally indicated he was

willing to take," Great Western sales manager Randy Kamin says in a training audiotape for the company's field consultants. "And that's why," Kamin goes on to advise, "it's so important for you to find out right up front, even over the phone, how much this owner is wanting, minimally, for this business. Because if you get him committed, and now you perform this evaluation that shows the value is truly higher, it would be a lot easier to justify the deposit."

Small-business owners, such as Brown and Hutchens, are actually inclined to overestimate the value of their companies, industry experts say. "Ninety-nine percent of the sellers feel that their business is so good that it warrants a very high price," says West, author of *The Business Reference Guide*. He adds, "It is very seldom supportable."

Brown and Hutchens finally did become concerned when they received their blue-jacketed, bound evaluation reports from Great Western. Two people, James Fisher and Richard Bivins, perform the lion's share of what the company calls "comprehensive" evaluations. On the day of my visit to Great Western's headquarters, McCreary called Fisher and Bivins and listened in on his speakerphone while I interviewed them. Using the same software-based procedure specified by Great Western, each man works out of a home office -- Bivins in Grapevine, Tex., and Fisher in Forth Worth. Bivins operates under the name of MidAmerica Business Services. Fisher's corporate moniker is Fisher Business Group Inc.

"It's kind of like a house closing. Do you read over every document you sign? If so, you're going to be there two or three weeks."

*--Dewayne Hutchens*

Bivins and Fisher say they had no experience as business evaluators before Great Western hired them. Bivins, who has a law degree from Western State in Fullerton, Calif., has been doing Great Western evaluations for almost four years. Fisher, a Carleton College graduate, has worked, among other jobs, as a real estate manager and as a mineral-rights negotiator on behalf of oil companies. Bivins says he "easily" knocks off 20 evaluations a week. Fisher, who has been at it since 1989, says he does 16 to 18 in his four-day workweek.

The day after I visited with McCreary, I drove to Fisher's Spanish-style, buff-toned brick house in a Fort Worth subdivision. A soft-spoken man with thinning white hair, Fisher escorted me to his compact office, which looked out on an oak-shaded backyard swimming pool. On a desk sat his workhorse: a Solera personal computer. The software that he used in his work for Great Western, Fisher explained, was "Aardvark's Business Valuation with Graphics, Version 2.0." Fisher said he bought the software in 1988 -- the last year it was available for sale, I learned later.

Fisher turned on the computer and demonstrated how he enters figures from balance sheets and income statements into spreadsheets that pop onto the screen. For other information that he needs, Fisher said that he consults a book of Standard Industrial Classification codes and a Dun & Bradstreet compendium of key business ratios. Fisher said he can handle one evaluation an hour, on average. When he started doing evaluations for Great Western, 12

Def. Appx. 0092

years ago, the pay was $150 each, he said. The company cut the rate back to $75 a few years later, according to Fisher. When he agreed to add color charts to his reports, he said, Great Western hiked the rate to $100.

Among others who performed Great Western evaluations in recent years were owner John Binkley's son Hal and brother Daniel. In February 2001, Daniel Binkley became Great Western's vice-president of customer relations, a full-time position. Before that he had done the evaluations part-time while working in western Oklahoma, where he sold house siding, windows, and kitchen cabinets for Sears, according to his former supervisor, Cubby McMenamy. Fisher says that he "vehemently" objected to the two Binkleys' doing evaluations because "it destroys the credibility of third-party independence." Daniel ceased doing evaluations when he joined Great Western full-time, according to the company.

The method employed by Fisher and Bivins for Great Western differs from the standard business valuation in that they don't visit the company in question, usually don't talk with the owner, and don't research the local market and industry. I asked Glen Cooper, an experienced business broker in Portland, Maine, to look at the evaluation of C&G Fence Co. The Great Western approach "is not in accordance with anyone's accepted method of valuation," notes Cooper, who heads Maine Business Brokers' Network. For a full-fledged valuation, Cooper says, he charges between $5,000 and $10,000. McCreary, however, responds that Great Western clearly explains to its customers what they are getting for their money. "We believe 99.9% of our customers are happy with our service," he says.

Besides taking issue with Great Western's evaluations, Brown and Hutchens object to the number and quality of the leads for prospective buyers that the Great Western dragnet turned up for them. Instead of leads to prospects in foreign countries, as he expected, Hutchens received an eventual total of five referrals to buyers in Pennsylvania, Nebraska, Ohio, Illinois, and Iowa. Great Western makes much of its potential to generate referrals of interested buyers who live overseas; an application form for prospective buyers is even printed in Chinese. Yet a review by *Inc* of 98 leads referred to 10 Great Western sellers in recent years showed that only one prospective buyer was from outside the United States. That buyer was from Riyadh (which in the referral was misspelled *Rujadh*), Saudi Arabia.

So what, after all, *is* Great Western's record on businesses sold? Given that last year the company had about 3,000 customers and $15 million in revenues, and given that it collects a $5,000 deposit on average from each customer who signs on, simple arithmetic suggests an answer. Based on Great Western's own numbers, it appears that the company derived its $15 million in revenues entirely from deposits -- and none from sales. The company did not respond to a request for comment on that line of reasoning.

McCreary says that 90% of the sellers who enlist with the company for two years or more receive at least one referral to a prospective buyer. When pressed to say how many referrals lead to sales, McCreary recalls a conversation he says that he once had with Hal Binkley about a survey of Great Western's customers. The survey showed that "20% to 40%" of them succeeded in selling their businesses as a result of Great Western's matches, McCreary recalls Binkley saying. However, McCreary had no further details about the survey. When Hal Binkley died, in January, the company apparently lost its only possibility of documenting the survey results.

**Postscript**

Brown, who still has C&G Fence Co. on the market, hired an operations manager last year when it became apparent that his company wasn't going to sell quickly. The change has allowed Brown to hit the road three days a week as a salesman. "I'm getting a good percentage of the jobs I quote," he says. Brown took time off around the Fourth of July to be with five of his eight grandchildren at Rangeley Lake in western Maine -- the first weeklong summer vacation he has granted himself since he started C&G.

Disenchanted with Great Western, Dewayne Hutchens and Joe Jarles tried to sell Fern Creek Mini Storage themselves by contacting several ministorage chains. "They didn't think we were serious," Hutchens says. So he and Jarles listed their company with a business broker that specializes in marketing ministorage companies. That led to a deal in June, with a buyer agreeing to pay $1.75 million for the company. After *Inc* inquired about Hutchens's complaint, Great Western refunded Fern Creek's $10,205 fee.

Great Western has recently adopted a different kind of business-valuation software and is offering a new contract. Now customers pay an initial fee when they sign a contract but owe nothing more unless they're "100% satisfied" with the company's services, says McCreary. As for McCreary, his time as Great Western's chief operating officer lasted less than five months, and he has returned to his law practice, still representing the company. On August 27, McCreary's last day at Great Western, John Binkley brought his 33-year-old son, Ryan, aboard as senior vice-president.

**Joseph Rosenbloom is a senior editor at *Inc*.**

Please e-mail your comments to editors@inc.com.

Published November 2001

Copyright © 2007 Mansueto Ventures LLC. All rights reserved. Inc.com, 7 World Trade Center, New York, NY 10007-2195

Def. Appx. 0094

# Exhibit N

Def. Appx. 0095

7-1005-12989-2

STATE OF MINNESOTA
OFFICE OF ADMINISTRATIVE HEARINGS
FOR THE MINNESOTA DEPARTMENT OF COMMERCE

In the Matter of Great Western
Business Services, Inc.

FINDINGS OF FACT,
CONCLUSIONS AND
RECOMMENDATION

The above-entitled matter was heard by Richard C. Luis, Administrative Law Judge (ALJ), on August 16, 2000 at the Office of Administrative Hearings in Minneapolis.

Appearing on behalf of the Minnesota Department of Commerce (Department) was David M. Aafedt, Assistant Attorney General, NCL Tower, Suite 1200, 445 Minnesota Street, St. Paul, Minnesota 55101-2130.

There was no appearance by or on behalf of Great Western Business Services, Inc.

The record closed on September 1, 2000.

## NOTICE

Notice is hereby given that this Report is a recommendation, not a final decision. The Commissioner of the Department of Commerce will make the final decision after a review of the record. The Commissioner may adopt, reject or modify the Findings of Fact, Conclusions or Recommendation. Minn. Stat. § 14.61 provides that the final decision of the Commissioner shall not be made until this Report has been made available to the parties to the proceedings for at least 10 days. Any party adversely affected by this Report may file exceptions or present argument to the Commissioner. Parties should contact the office of James C. Bernstein, Commissioner, Minnesota Department of Commerce, 133 East 7th Street, St. Paul, MN 55101 regarding procedures for filing exceptions or presenting argument.

## STATEMENT OF ISSUE

Whether adverse action should be taken against Great Western Business Services, Inc. (Respondent) pursuant to Minn. Stat. §§ 45.027, subd. 5a and 80C.12, subds. 3 and 4 for acting as a real estate salesperson or real estate broker without a license and for offering or selling franchises within Minnesota without an effective registration statement on file in accordance with the provisions of Minn. Stat. Chapter 80C (unless the franchise or transaction is exempt under Minn. Stat. § 80C.03).

Based upon all of the proceedings herein, the Administrative Law Judge makes the following:

## FINDINGS OF FACT

1.    On July 12, 2000, a Notice of and Order for Hearing, Order for Prehearing Conference and Order to Show Cause was served on the Respondent by Federal Express addressed to the following persons at the addresses noted:

John H. Binkley, Jr.
Great Western Business Services, Inc.
14643 Dallas Parkway, Suite 650
Dallas, TX 75240

Ronald D. Kerridge
Attorney at Law
1717 Main Street, Suite 2800
Dallas, TX 75201

A Cease and Desist Order and Notice of Right to Hearing had been served successfully in January, 1998 on John H. Binkley, Jr. The address used for service on Mr. Binkley at that time was the same as the address noted above.

2.      The Notice of and Order for Hearing, Order for Prehearing Conference and Order to Show Cause issued on July 12, 2000 scheduled the prehearing conference in this matter for 1:30 p.m. on August 16, 2000. Neither the Respondent, nor anyone on its behalf, appeared at the prehearing conference on August 16, 2000. The Respondent did not contact the Department or the Administrative Law Judge to request a continuance. No Notice of Appearance was filed by the Respondent.

3.      The Notice of and Order for Hearing, Order for Prehearing Conference and Order to Show Cause mailed to Mr. Binkley and Mr. Kerridge contains the following statement, on page 6:

> "If Respondent fails to attend or otherwise appear at any prehearing conference, or settlement conference, or the hearing in this matter without the prior consent of the judge or fails to comply with any interlocutory order of the judge after having been served with a copy of this Order, Respondent shall be deemed in default and the allegations or issues set forth herein may be deemed proved, and the Cease and Desist Order may be issued and a civil penalty may be imposed against Respondent without further proceedings."

4.      The allegations set forth in the Notice of and Order for Hearing, Order for Prehearing Conference and Order to Show Cause are taken as true and deemed proved. The allegations are incorporated into these Findings by reference.

Based upon the foregoing Findings of Fact, the Administrative Law Judge makes the following:

## CONCLUSIONS

1.      The Administrative Law Judge and the Commissioner of Commerce have jurisdiction in this matter pursuant to Minn. Stat. §§ 14.50, 45.027, 80C.12 and 82.19.

2.      The Respondent was given timely and proper notice of the prehearing conference in this matter.

3.      The Minnesota Department of Commerce has complied with all relevant, substantive and procedural requirements of law and rule.

4.      Under Minn. Rule 1400.6000, the Respondent is in default as a result of its failure to appear at the scheduled prehearing conference. When a party defaults, the allegations and issues set out in the Notice of and Order for Hearing, Order for Prehearing Conference and Order to Show Cause may be taken as true and deemed proved. Therefore, those allegations and issues are taken as true and deemed proved. Based upon the facts set out in the Notice of and Order for Hearing, Order for Prehearing Conference and Order to Show Cause, and in the January, 1998 Cease and Desist Order and Notice of Right to Hearing, the Respondent has violated Minn. Stat. §§ 80C.02 and 82.19 subd. 1. No exemption under Minn. Stat. § 80C.03 has been demonstrated. As a result, the Respondent is subject to adverse action from the Commissioner of Commerce, including the possible imposition of a monetary penalty and the issuance of a Cease and Desist Order against it pursuant to Minn. Stat. §§ 45.027, subds. 5a and 6, 80C.12, subd. 3 and 80C.16.

5.      An order by the Commissioner of Commerce imposing appropriate action against the Respondent is in the public interest.

Based upon the foregoing Conclusions, the Administrative Law Judge makes the following:

Def. Appx. 0097

### RECOMMENDATION

IT IS RECOMMENDED that **ADVERSE ACTION** (issuance of a Cease and Desist Order and imposition of a monetary penalty) be taken against Great Western Business Services, Inc., under the authority of Minn. Stat. §§ 45.027, 80C.12 and 80C.16.

Dated this 5th day of September, 2000.


_____

RICHARD C. LUIS
Administrative Law Judge

Reported: Default


### NOTICE

Under Minn. Stat. § 14.62, subd. 1, the agency is required to serve its final decision upon each party and the Administrative Law Judge by first class mail or as otherwise provided by law.

Def. Appx. 0098