factors that other business opportunity brokers do not. These misrepresentation of material facts tend to mislead or deceive the client due to the failure of Defendants to disclose other relevant information such as Defendants use the same methods of economic valuation commonly used by numerous, if not most, other business opportunity brokers, and that Defendants' valuation product is primarily a standard economic-based valuation that could be obtained in the open market for a fraction of the "commitment fee";

(e)    At the seminars, clients are led to believe that clients will obtain highest possible amount for the sales of their business due to the valuation methods utilized by Defendants and the expertise of Defendants, as the self-proclaimed "nation's leading middle-market mergers and acquisitions company", in handling the sale of a business thru the twelve (12) step process. Defendants also represent that they are obligated to attempt to sell the client's business for a period of five (5) years. These misrepresentations of material facts tend to mislead or deceive the client due to the failure of Defendants to disclose other relevant information such as (i) the low percentage of clients who actually are satisfied with their valuation and choose to engage Defendants thru the remainder of the sale process (even though almost all of the clients who engaged Defendants did so for the exclusive purpose of having Defendants sell their business); and (ii) Defendants typically do not handle the sale of businesses with values of approximately Five Million Dollars ($5,000,000) or less, and instead have other local business opportunity brokers, who are not part of the "nation's leading middle-market mergers and acquisitions company" that the clients engage, to handle the sale. In essence, Defendants' business practices implement this "bait and switch" or "bait and abandon" approach. Moreover, Defendants retain the full "commitment fee" for Defendants' own use even when clients are forwarded to other local business opportunity brokers for actual marketing;

////
////

E:\EL\General\Complaint\amendedcomplaint        12        FIRST AMENDED COMPLAINT

(f). In their promotional materials and at the seminars and thereafter, clients and prospective clients are told by Defendants, through their employees, agents and representatives, that Defendants, through their employees, agents and representatives, will *"build value"* to clients businesses. This misrepresentation of material fact tends to mislead or deceive the client due to the failure of Defendants to disclose other relevant information such as that Defendants offer a special program to certain select or "cherry picked" clients whose businesses meet their requirements, previously referred to as the "Blueprint Process" and now often termed the "Priority Program". This program claims to offer these special clients the ability to *"build value"*. Clients of Defendants pay the same amount of money for the services of Defendants as do the "cherry picked" clients who qualify for the Priority Program. The "cherry picked" clients provide to Defendants a much greater opportunity for profit and that screening process is withheld from the other regular clients.

(g) At the seminars and thereafter, clients and prospective clients are told by Defendants, through their employees, agents and representatives, that Defendants maintain a proprietary data base of "premium buyers". Defendants also represent that they have identified a specific number of "buyers" for a client's business - such representation sometimes consisting of hundreds of potential "buyers." In addition, Defendants represent that Defendants have no problem finding buyers and that the only problem is finding "suitable" sellers. These misrepresentations of material facts tend to mislead or deceive the client due to the failure of Defendants to disclose other relevant information such as (i) Defendants' proprietary data base does not consist of "premium buyers" but instead is a data base composed of entities who have only made inquiries to Defendants; (ii) the specific "buyers" purportedly identified by Defendants is nothing more than a compilation of entities derived by querying the data base for the same, or related "standard industry classification" codes as that of the client; and (iii) Defendants have difficulties finding buyers for the clients as reflected by the percentage of businesses that are actually sold by Defendants.

31. The misrepresentations set forth in Paragraph 30 above materially tend to mislead consumers and members of the general public and constitute deceptive advertising, as well as "bait and abandonment" as to the initial $37,000 "commitment fee". Said practices tend to mislead persons into thinking that the $37,000 "commitment" purchases a realistic opportunity to sale their business for the maximum profit. The general public subject to such representations are misled about the actual prospects for the sale of their respective businesses, which may represent a lifetime of work and family investment.

32. Each of the practices as described hereinabove are uniformly followed by Defendants, and each of them. Such practices constitute the normal pattern and practice of sales methodology, and have been so reflected from at least October 1995 to the present and continue to be practiced by Defendants. Said practices are reflected in the sales materials produced by Defendants, in materials guiding presentations, in sales presentations to groups and to individual clients. Said practices are joined in by all Defendants as a common combination, and each aid, profit from, and assist to effectuate the common result as alleged herein.

### ADVANCE FEE ARRANGEMENTS

33. The specifics of the unfair practices and misleading statements set forth in Paragraph 30 above include the following common practices:

(a) During the marketing process, and primarily at the seminars and thereafter, Defendants, through their employees, agents and representatives, market their services to potential clients of Defendants who are told that Defendants require a substantial "commitment fee" or "investment fee" prior to Defendants undertaking "the process" of selling a client's business for the most value. Plaintiff is informed and believes and thereon alleges that, at present, this "commitment fee" or "investment fee" is the sum of $37,000.00. Clients are informed that this "commitment fee" is required in order to demonstrate seller's commitment to Defendants and to potential buyers that the client is a "serious seller." At the seminar, Defendants also represent that the cost to take a client "through the process" is approximately $100,000.00, and the implication is that this "commitment fee" will be used as an advance against those anticipated costs.

(b) Prior to engaging Defendants, clients often meet with Defendants, through their employees, agents and representatives, where the clients are provided with two (2) agreements. These agreements are, or were, commonly known as the "Advantage Agreement" and the "Fee Letter." These agreements are presented to potential clients simultaneously and the client is asked to sign these agreements on the same day.

(c) The "Advantage Agreement" purports only to obligate Defendants to perform an evaluation of the client's business and render two reports - an Evaluation Report and a Confidential Business Review. Furthermore, the "Advantage Agreement" contains purported disclaimer language which states:

> "This Is Not An Agreement To Undertake The Sale Of Client's Business And/Or To Arrange Financing Or Funding, And Client Acknowledges That No Representations, Express Or Implied, Have Been Made That Client's Business Will Be Sold Or That Financing Or Funding Will Occur By Virtue Of The Services Contemplated To Be Rendered Under This Agreement."

However, Defendants, through their employees, agents and representatives, represent to clients that purpose of the disclaimer language is to allow the clients the opportunity to deduct the $37,000 fee as a consulting fee as an immediate tax deduction, even though the client simultaneously executes the "Fee Letter", which is the client's assurance that Defendants were committed to market the client's business, as alleged herein.

(d) In the Fee Letter, the client is assured that Defendants will take the client to market at the client's option, thereby giving the client the assurance that Defendants will market the client's business. Moreover, the "commitment fee" or "investment fee" is specifically offset from the "Success Fee," or sales commission, once the client's business is sold.

(e) Although Defendants attempt to contractually limit the payment of the "commitment fee" to the evaluation only - an artifice that, in light of repeated representations that the "commitment fee" is for the entire twelve (12) step process and to demonstrate that the seller is serious, is deceptive and misleading to Defendants' clients - the fact remains

that the transaction contemplated is represented and solicited in a series of contracts which must be interpreted together. Seminar attendees are told that the "commitment fee" will be deducted from the Success Fee when the client business is sold, and this representation is reflected in the "Fee Letter" and the Engagement Agreement. As a result, clients are told, and through Defendants' actions led to believe that the "commitment fee", or advance fee, is just that, and not merely an evaluation fee.

(f) This arrangement is an advance fee arrangement, and business opportunity brokers who solicit and accept advance fees are required to be licensed by, and report the advance fee arrangement, to an appropriate licensing agency, including the California Department of Real Estate. For a number of years, up to February 1, 2001, Defendants were not appropriately licensed, either under the DRE licensing scheme or under the appropriate securities laws, nor did Defendants abide by the rules and regulations governing advance fees and advance fee agreements.

34. Plaintiff is informed and believes and thereon alleges that, prior to February 1, 2001, Defendants, and each of them, have violated the provisions of, inter alia, the California Business and Professions Code and the California Administrative Code, which requires advance fees to be deposited into a trust account, and reported in compliance with the requirements established by the California Real Estate Commissioner. Plaintiff is further informed and believes that Defendants, and each of them, do not have any trust accounts for advance fees.

35. Plaintiff is further informed and believes and thereon alleges that said scheme or arrangement, as alleged hereinabove, is still implemented by Defendants so that, among other things, Defendants have a basis to deny giving any clients a refund in the event that the client decides, based upon a low evaluation or for other reasons, to not continue the sale process and go to market. This purpose is not disclosed to the clients.

36. Each of these practices as alleged hereinabove are uniformly followed by Defendants as described above. Such practices constitute the normal pattern and practice of sales methodology, and have been so reflected from at least October 1995 to the present and continue to be practiced. Said practices are reflected in the sales materials produced by Defendants, in materials guiding presentations,

in sales presentations to groups and to individual clients. Said practices are joined in by all Defendants as a common combination, and each aid, profit from, and assist to effectuate the common result as alleged herein.

### UNFAIR MARKETING WITHOUT PROPER LICENSURE

37. In addition to those substantive unfair acts of competition hereinabove alleged, Defendants, and each of them, committed unlawful acts to avoid the regulatory system designed to prevent such practices. To wit, Defendants, and each of them, have combined, assisted, profited from, aided and abetted or arranged the marketing of business opportunities and similar activities within the defined scope of activities requiring state licensure, while unlawfully failing properly to obtain such licensure in violation of section 17200 of the Business and Professions Code.

38. Plaintiff is informed and believes and thereon alleges that after preparation of a Confidential Business Evaluation, and if a client decides to exercise the "option" to have Defendants market the client's business, the client and one of the Geneva Entities enter into a document formerly entitled "Exclusive Engagement Agreement." Plaintiff is informed and believes and thereon alleges that a material portion of the "Exclusive Engagement Agreement", or its equivalent, in essence, states that one of the Geneva Defendants will act "as consultant, and the sole and exclusive finder, in an effort to locate a purchaser of, and effect the Sale or other disposition of, seller's business."

39. Plaintiff is informed and believes and thereon alleges that Defendants engage in further unlawful, unfair, deceptive and misleading business practices which includes, but is not limited to, the following:

    (a) Use of the "Exclusive Engagement Agreement" is deceptive and misleading in that, after promoting themselves as "business opportunity brokers" and "the nation's leading specialist in mergers, acquisitions, and divestitures of privately held businesses," Defendants, and each of them, attempt to contractually define the scope of their services as those of a "finder," for which licensing is not required under the California Business and Professions Code, except for advance fee operators, for which licensing is in fact required.

////

1  (b). Use of the "Exclusive Engagement Agreement" is deceptive and misleading upon the general public and various governmental agencies charged with regulating "business opportunity brokers", as the term is commonly used under California law, because the activities of Defendants, and each of them, are beyond the limited scope of a "finder";

- Businesses that are worth less than Five Million Dollars ($5,000,000) are typically directed to local business opportunity brokers to sell, without the advance knowledge of Defendants' clients, although Defendants retain the entire "commitment fee".

40. After execution of the "Exclusive Engagement Agreement", or its equivalent, Defendants, and each of them, proceed to market, negotiate and sell a client's business. In particular, Defendants, and each of them, adapt the Confidential Business Evaluation into a "Confidential Business Report", which Defendants, and each of them, use as the primary tool in marketing a client's business and this activity requires a license.

41. Furthermore, Defendants, and each of them, are involved in virtually every aspect of the marketing and sale of a client's business - such activities which are in excess of the acts permitted of a "finder" and which require licensing. For example, and depending upon the particular circumstances of each transaction, Defendants, and each of them, entertain and screen offers, are involved in preparing and submitting counteroffers, assist the client and/or a potential buyer in obtaining information necessary or desirable in submitting offers or counteroffers, screen potential buyers, assist in preparing agreeable letters of intent, assist in the due diligence process, and assist in the closing of the transaction. In sum, Defendants, and each of them, perform the acts required of a business opportunity broker, as advertised in the seminars conducted by Defendants, and each of them, as well as in their seminars, advertising, and promotional information - and for which a license is required.

42. In doing the acts as above-alleged, and in particular in performing acts in excess of acts permitted mere "finders" under California Statutory and common law, including acts of negotiation, Defendants, and each of them, have acted as "business opportunity brokers" for which a license is required.

////

43. Plaintiff is informed and believes and thereon alleges that despite the fact that Defendants, and each of them, are required to be licensed, Defendants, and each of them, permit, allow and/or encourage unlicensed employees and agents to perform services on behalf of Defendants, and each of them, for which a license is required and Defendants, and each of them, pay commissions to employees for activities which require a license. Furthermore, Plaintiff is informed and believes and thereon alleges that, to the extent that any Defendant may possess a valid license, Defendants, and each of them, fail to adequately supervise the activities of its employees and agents for which a license is required and, in essence, permit licensed activities to be performed by unlicensed persons.

44. Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, have further committed, and continue to commit, an unfair and unlawful business practice in that Defendants, and each of them, pursue legal claims, either in a court of law or in arbitration, by alleging that they are "finders" when, in fact, Defendants, and each of them, were unlicensed "business opportunity brokers" and therefore not entitled to resort to courts of law or arbitration for payment of commissions.

45. Prior to February 1, 2001, the OLD GENEVA ENTITIES were not properly licensed and that there were members of the general public who were solicited for business opportunity listings by the OLD GENEVA ENTITIES, and for whom the OLD GENEVA ENTITIES provided services, without being licensed either by the Department of Real Estate or under securities laws.

46. Plaintiff is informed and believes and thereon alleges that, sometime after February 1, 2001, NEW GENEVA became licensed to provide the services of a business opportunity broker. Sometime after February 1, 2001, some of the employees of Defendants, including NEW GENEVA, obtained licensing under securities laws and/or the California Department of Real Estate. Nevertheless, not all of the employees and agents of Defendants, including NEW GENEVA, who are required to be licensed actually possess the requisite licenses. These employees and agents who still lack licensure include, but are not limited to, the individuals who speak at Geneva seminars in an effort to solicit business opportunities. Therefore, many transactions conducted by NEW GENEVA were, and continue to be, conducted by NEW GENEVA in violation of law and without the required licensure.

////

47. Plaintiff is informed and believes and thereon alleges that Defendants' principal place of business is in the County of Orange, State of California and Defendants' business practices were conducted primarily in California, principally in Orange County; that most, if not all, of its marketing efforts from the State of California; that Defendants performed most of its services in the State of California; and that payments for services were made to the California offices. In addition, Defendants utilize contracts which apply California law and require that disputes be litigated in California.

48. Plaintiff is informed and believes and thereon alleges that these violations have injured members of the general public and fair and lawful competition. The unfair business practices of Defendants have also unjustly enriched Defendants. Plaintiff and the general public are entitled to injunction, restitution, disgorgement and other equitable relief.

49. These acts of unlawful, unfair, deceptive and misleading business practices by Defendants, and each of them, as alleged in this Complaint, presents a continuing threat to members of the general public in that this conduct is repeated in each seminar conducted, each client retained, each client "brought to market," and each civil action and/or arbitration for payment of commission initiated by Defendants, and each of them. Consequently, members of the general public have no adequate remedy at law.

50. Plaintiff is informed and believes and thereon alleges that the acts complained of in each of the preceding paragraphs of this Complaint, and each of them, constitute unfair and/or unlawful acts in competition in violation of section 17200, et seq. of the California Business and Professions Code.

51. Plaintiff is informed and believes and thereon alleges that the acts complained of in each of the preceding paragraphs of this Complaint, and each of them, constitute false and misleading advertising in violation of section 17500 of the California Business and Professions Code. Such acts and violations have not abated and will continue to occur unless enjoined.

////
////
////
////
////

WHEREFORE Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For equitable relief for violations of section 17200 and section 17500 of the Business and Professions Code as herein above alleged including injunctive relief to halt prior violations of law and to assure fair and lawful competition, including court orders regulating advertising and marketing practices and restitution to the general public who have been injured or otherwise disadvantaged by Defendants' unlawful, unfair, deceptive and misleading acts in competition and for false and misleading advertising;

2. For attorneys' fees pursuant to section 1021.5 of the Code of Civil Procedure and/or pursuant to the "common fund" doctrine and/or pursuant to equitable principles of contribution;

3. For costs of suit incurred herein.

4. For such other and further relief as this Court deems equitable, just and proper.

DATED: November 15, 2001

LERNER & McDONALD

By: _____
MARK G. LERNER

-and for-

ROBINSON, CALCAGNIE & ROBINSON

Attorneys for Plaintiff
EREBA CORPORATION