GW Equity LLC v. Xcentric Ventures LLC et al — Doc. 24 Att. 1
Case 3:07-cv-00976   Document 24-2   Filed 06/22/2007   Page 1 of 18
Case 2:03-cv-01992-JCL-MF   Document 29   Filed 01/23/2004   Page 1 of 35

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ALYON TECHNOLOGIES,

    Plaintiff,

vs.

BADBUSINESSBUREAU.COM, LLC.,

    Defendant.

CIVIL ACTION NO.: 03-1992 (JCL)

**MEMORANDUM AND ORDER**

**LIFLAND, District Judge**

This matter ultimately concerns the enforcement and domestication of a foreign judgment issued by the Eastern Carribean Supreme Court in the High Court of Justice, Federation of Saint Christopher and Nevis, Saint Christopher Circuit, for monetary damages in the approximate amount of ten million dollars and for permanent injunctive relief relating to the publishing of certain allegedly defamatory statements on an interactive website. Presently before the Court is a motion by Plaintiff Alyon Technologies ("Plaintiff" or "Alyon") for preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65 based upon an alleged improper transfer of assets by defendant Badbusinessbureau.com, LLC ("Defendant" or "Badbusinessbureau") to a new entity, which purportedly renders the foreign judgment issued against Badbusinessbureau ineffectual by frustrating Alyon's prospects of final recovery. Also before the Court is Badbusinessbureau's motion to dismiss for lack of personal jurisdiction. For the reasons set forth herein, Badbusinessbureau's motion to dismiss for lack of personal jurisdiction and Alyon's motion for preliminary injunctive relief will both be denied.



## BACKGROUND

Alyon is a Delaware corporation with its principal place of business in Secaucus, New Jersey. Alyon provides billing services that allow direct billing to end-users of websites on a per-minute or per-usage basis. This billing method is typically utilized in connection with the viewing of adult entertainment websites.

Badbusinessbureau is a Nevis, West Indies limited liability company with its principal place of business in Arizona. Badbusinessbureau has no assets, employees, or office in Nevis. At all relevant times, Badbusinessbureau owned and operated a website called the Rip-off Report, which mainly consists of reports filed by consumers about allegedly wrongful business practices of various companies. The Rip-off Report thus serves as a public forum for consumers to publish their opinions about and experiences with companies.

Badbusinessbureau's website is interactive. Consumers who wish to post a report select "file a report" on the website home page, fill out personal identification information, obtain a password, and then post their own report. The purpose of the password is to give the customer exclusive access to add updates to the report. These reports are searchable by company name, title, text, and city, state, or country in which the company is located. Through its website, Badbusinessbureau also organizes class actions by placing attorneys in contact with alleged victims.

Badbusinessbureau claims that it generally does not investigate or confirm the accuracy of any posting. Badbusinessbureau also claims that it does not add any content to any report posted by consumers. This latter contention, however, is contradicted by the record in this case, which shows a clear working relationship between Badbusinessbureau's founder and editor, Ed

Magedson ("Magedson"), and "consumer advocate" Gregory Strausbaugh ("Strausbaugh"). "Consumer Advocate" is a title utilized by Badbusinessbureau's staff and volunteers. Under the direction of Magedson, Strausbaugh not only made various postings about Alyon on the Rip-off Report, but also contacted various New Jersey public officials, community leaders, media personnel, and attorneys about Alyon's allegedly improper business practices. (See generally Second Supplemental Decl. of Ilaria Maggioni.).

Badbusinessbureau's website is also commercial in nature. Through the website, it offers Magedson's "Do-It-Yourself Guide: How to get Rip-Off Revenge and your money back too." It also solicits donations and sells advertising space. There are certain fees associated with the website as well. Badbusinessbureau has a policy of charging twenty dollars for certain rebuttals posted by companies, though it does not appear that it has actually ever charged a rebuttal fee. There is also a policy relating to promotional and collection fees. Finally, there is a fee for assisting companies in resolving disputes with customers. In at least one instance, Badbusinessbureau attempted to charge a company, which had been the target of numerous consumer reports, $50,000 for assisting it in reaching out to alleged victims and resolving consumer complaints posted on the Rip-off Report.

Alyon has been the subject of over 1300 reports posted by consumers who claim to have been victimized by Alyon's billing practices. In these reports, consumers claim they have been charged by Alyon for computer services which they did not request and did not agree to, and that illegal dial-ups have been placed by Alyon onto their computers without their permission.

Alyon has also been the target of numerous investigations by the offices of state Attorney Generals and the Federal Trade Commission. On May 13, 2003, the Federal Trade Commission

("FTC") filed a complaint against Alyon and its founder, Stephane Toubal, in the United States District Court for the Northern District of Georgia, alleging unfair and deceptive trade practices. It also alleges that Alyon has been unjustly enriched as a result of their unlawful practices. FTC has moved for a preliminary injunction, which the court has denied, being satisfied that Alyon has already implemented, on a nationwide basis, practices and procedures set forth in a Pennsylvania Assurance of Voluntary Compliance ("AVC"). Alyon, consequently, has consented to an order much like the AVC. Alyon has also agreed to provide refunds to customers who can prove they deserve refunds. This matter is still pending in the Georgia District Court.

Alyon alleges that Badbusinessbureau is publishing defamatory material on the Rip-off Report, thereby causing it severe economic and non-economic harm. On February 24, 2003, Alyon obtained a temporary order from the High Court of Justice, Federation of Saint Christopher and Nevis, Saint Christopher Circuit, directing that, *inter alia*, Badbusinessbureau not remove any of its assets that are in the Federation of Saint Christopher and Nevis, up to the value of ten million dollars, or otherwise dispose of or diminish the value of any its assets whether they are in or outside the jurisdiction until March 18, 2003, the scheduled date of the subsequent hearing. On February 25, 2003, Badbusinessbureau received its first notice of the matter pending in Saint Christopher. Because its attorneys in the United States were not licensed to practice in Saint Christopher or Nevis, Badbusinessbureau sought to retain a Nevis attorney to represent it in the Alyon matter. Magedson spoke with or left messages for more than six Nevis attorneys, none of whom returned his phone call or otherwise followed up. He did, however, successfully retain an attorney named Terence V. Byron ("Byron") just prior to the March 18

hearing. Badbusinessbureau sent Byron a $7500 retainer and copies of the relevant documents, but Byron did not appear at the March 18 hearing, apparently due to the late notice.

On March 20, 2003, the High Court of Justice issued a second order, extending the previous asset freeze order until March 28, 2003. A third order was then entered on March 28, which stated that based upon an affidavit submitted by Alyon, Badbusinessbureau is restrained and enjoined "from publishing and distributing by way of posting on [its] websites . . . or anywhere whatsoever any derogatory and/or defamatory material about [Alyon]." It also continued the previous orders regarding the asset freeze until further order of the court. In response, Byron had Badbusinessbureau prepare an affidavit of intended compliance with the two orders. The affidavit stated that the forum chosen by Alyon was not proper based on the convenience, expense, availability of witnesses, law governing the transactions, and parties' locations. It also stated that the orders were defective and unenforceable on various grounds. Badbusinessbureau does not know if Byron ever filed the affidavit with the Court.

On April 15, 2003, Badbusinessbureau was held to be in contempt of court for failing to comply with the disclosure requirements of the freeze orders issued pursuant to the February 24 and March 20 orders. Badbusinessbureau sought leave to appeal the contempt of court finding. Leave to appeal was denied.

On May 2, 2003, Alyon filed a complaint in this Court seeking to enforce and domesticate, pursuant to principles of comity, the interim orders issued by the court in St. Christopher.

On July 4, 2003, based on Alyon's Re-Amended Statement of Claim and Badbusinessbureau's default in filing and serving a Defense to the Claim, the High Court of

Justice issued a final judgment, ordering Badbusinessbureau to pay Alyon a sum exceeding ten million dollars and permanently enjoining it from publishing any derogatory or defamatory materials about Alyon on its website(s) or anywhere else. Alyon ultimately seeks enforcement of this final judgment.

Badbusinessbureau has filed a motion to dismiss the complaint on the following grounds: (1) improper service of process; (2) lack of personal jurisdiction; (3) principles of comity; and (4) Communications Decency Act. Alyon responded by filing a cross-motion for summary judgment. Both motions are currently pending before this Court.

On November 12, 2003, Alyon filed the present motion for preliminary injunctive relief, based on an allegedly improper transfer by Badbusinessbureau of its domain names badbusinessbureau.com, ripoffreport.com, and ripoffrevenge.com to a new entity, Xcentric Ventures, LLC ("Xcentric"). Alyon alleges that Badbusinessbureau is dissipating its assets in an effort to render the judgment issued against it in St. Christopher ineffectual. Alyon seeks an order rescinding the transfers and temporarily restraining similar transfers of assets. Alyon also requests that the freeze orders already entered in Saint Christopher be declared enforceable in the United States.[1]

---

[1] Alyon has also filed a motion for Rule 11 sanctions based upon Badbusinessbureau's alleged misrepresentations of fact and law. The Court will defer judgment on this motion and any future motions for sanctions until the culmination of the litigation.

Appx. 000008

## BADBUSINESSBUREAU'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Because Badbusinessbureau argues that this Court lacks personal jurisdiction and is therefore without authority to enter a preliminary injunction, the Court must first address the issue of jurisdiction before proceeding to the merits of Plaintiff's motion.

**A.    Standard of Review**

Once a jurisdictional defense has been raised by a defendant, the burden falls upon the plaintiff to demonstrate by a preponderance of the evidence that the defendant had sufficient contacts with the forum state to support jurisdiction. Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119, 1121 (W.D. Pa. 1997) (citing Mellon Bank (East) PSFS, N.A. v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)). The Third Circuit has stated that when a challenge to personal jurisdiction is raised, "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence," and "at no point may a plaintiff rely on the bare pleadings alone." Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n.9 (3d Cir. 1984); see also Stranahan Gear Co., Inc. v. NL Indus., Inc., 800 F.2d 53, 58 (3d Cir. 1986). The Court must accept the plaintiff's allegations as true and construe all disputed facts in favor of the plaintiff. Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A., 65 Fed.Appx. 844, 849 (3d Cir. 2003) (citing Carteret Sav. Bank v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992), cert. denied, 506 U.S. 817 (1992)).

**B.    Analysis**

Federal Rule of Civil Procedure 4(e) permits district courts to exercise jurisdiction over non-resident defendants only as authorized by the laws of the state where the court resides. Fed.

R. Civ. P. 4(e);[2] Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28, 31 (3d Cir. 1993); Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 436 (3d Cir. 1987); Dent v. Cunningham, 786 F.2d 176, 175 (3d Cir. 1986). New Jersey permits the exercise of jurisdiction to the fullest extent allowed under the Fourteenth Amendment to the United States Constitution. N.J. Ct. R. 4:4-4(b)(1) (permitting the exercise of jurisdiction "consistent with due process of law"); Charles Gendler & Co., Inc. v. Telecomm. Equip. Corp., 102 N.J. 460, 469 (1986); Avdel Corp. v. Mecure, 58 N.J. 264, 268 (1971); see also Mesalic v. Fiberfloat Corp., 897 F.2d 696, 698 (3d Cir. 1990). Accordingly, this Court's analysis must focus on whether the exercise of jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment.

The constitutional guarantee of due process limits federal jurisdiction to shield "persons from the judgments of a forum with which they have established no substantial ties or relationship." General Elec. Co. v. Deutz Ag, 270 F.3d 144, 150 (3d Cir. 2001). Personal jurisdiction is thus appropriate only when the defendant has "purposefully established 'minimum contacts' in the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (personal jurisdiction rests on conduct and connection with forum State such that defendant "should reasonably anticipate being haled

---

[2] Fed. R. Civ. P. 4(e)(1)(A) states that:
Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed, other than an infant or an incompetent person, may be effected in any judicial district of the United States . . . pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State.

Appx. 000010

into court there"). Minimum contacts describe actions by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State," and thereby invokes "the benefits and protections of its laws." Asahi Metal Indus. Co., Ltd. v. Superior Court of California, 480 U.S. 102, 109 (1987) (quoting Burger King, 471 U.S. at 475); Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001). In addition to adequate minimum contacts, courts must determine whether the exercise of personal jurisdiction sought by the plaintiff offends "traditional notions of fair play and substantial justice." Burger King, 471 U.S. at 476-77; International Shoe, 326 U.S. at 316; Remick, 238 F.3d at 255. The sufficiency of the defendant's minimum contacts with the forum state will therefore vary with the "quality and the nature of the defendant's activity." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

Sufficient minimum contacts will give rise to either specific or general jurisdiction. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984); Remick, 238 F.3d at 255. "Specific personal jurisdiction exists when the defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or related to those activities.'" BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 259 (3d Cir. 2000) (quoting Burger King, 471 U.S. at 472). Alternatively, general jurisdiction exists when a defendant engages in "continuous and systematic" contacts with the forum state, whether or not the contacts are related to the injury giving rise to the cause of action. Remick, 238 F.3d at 255. The greater reach of general jurisdiction requires "significantly more than mere minimum contacts," and the plaintiff seeking to exert general jurisdiction must show that the defendant's contacts with the forum are "continuous and substantial." Provident Nat'l Bank, 819 F.2d at 437 (citations omitted). The threshold for the exercise of general jurisdiction,

then, is significantly higher than for the exercise of specific jurisdiction. Amberson Holdings LLC, Inc. v. Westside Story Newspaper, 110 F.Supp.2d 332, 334 (D.N.J. 2000) (citing Provident Nat'l Bank, 819 F.2d at 437).

The question presented here is whether Defendant's operation of an interactive website, in conjunction with other related non-Internet activities, constitutes sufficient presence in the State of New Jersey to support the assertion of either specific or general jurisdiction. Defendant argues that because it merely operates a website, which is primarily passive and non-commercial, it has no sufficient contacts with New Jersey, thus rendering the exercise of personal jurisdiction improper. Plaintiff responds that Defendant's contacts with New Jersey are enough to support the application of both general and specific jurisdiction. Resolution of this issue, therefore, compels the Court to consider the exercise of personal jurisdiction within the context of the Internet. Although the omnipresence of the Internet–the capacity of website operators to engage in global communications and/or transactions from a single source–requires the Court to be cognizant of the unique nature and quality of Internet-related contacts, traditional due process principles still obtain, thereby preserving the basic structure of personal jurisdiction analysis.

1. **General Jurisdiction**

The Court begins with an analysis of whether Defendant's contacts with New Jersey are sufficient to confer general jurisdiction. Plaintiff argues that this Court may exercise general jurisdiction because Defendant regularly solicits postings from and offers fee-based services to New Jersey residents; solicits fees from New Jersey companies; makes postings about and from New Jersey companies; offers to sell books to New Jersey consumers; solicits donations from New Jersey consumers; and engages in the organization of class actions against New Jersey

-10-

companies. Plaintiff's assertions notwithstanding, the question of general jurisdiction is not a difficult one. Defendant has no physical presence–office, employees or assets– in New Jersey. Moreover, the mere maintenance of an interactive website, without more, does not support the exercise of personal jurisdiction. Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 454 (3d Cir. 2003). And, as set forth below, the additional contacts referred to by Plaintiff are not substantial enough to constitute "continuous and systematic" activity within New Jersey.

Three recent cases from other circuits are instructive. In Revell v. Lidov, 317 F.3d 467, 471 (5th Cir. 2002), the Fifth Circuit confronted the issue of general jurisdiction in the context of a defamation claim arising out of a professor's authorship of an article which he printed on an internet bulletin board hosted by Columbia University. Plaintiff argued that general jurisdiction over Columbia was proper because its website provided internet users the opportunity to subscribe to the *Columbia Journalism Review*, purchase advertising on the website or in the journal, and submit electronic applications for admission. Id. The Fifth Circuit disagreed, noting the stark contrast between Columbia's contacts with the forum and the facts of the Supreme Court's seminal case on general jurisdiction, Perkins v. Benguet Consol. Mining Co., 342 U.S. 437 (1952). Id. In Perkins, the defendant foreign corporation's contacts with the State of Ohio were sufficient to confer general jurisdiction, given that it temporarily relocated to Ohio, its president resided in Ohio, the records of the corporation were in Ohio, accounts were held in Ohio banks, and all key business decisions were made in Ohio. 342 U.S. at 447-48. After noting that Columbia never received more than twenty internet subscriptions per year for the journal from Texas residents, the Fifth Circuit held that Columbia's internet presence in Texas fell short of the general jurisdiction standard. Revell, 317 F.3d at 471.

-11-

In <u>Bird v. Parsons</u>, 289 F.3d 865, 874 (6th Cir. 2002), the Sixth Circuit found general jurisdiction to be lacking over a non-resident business that registered domain names despite the fact that over four thousand Ohio residents had registered domain names with the defendant. The Court held that these registrations were insufficient to establish general jurisdiction because the mere maintenance of a website that is accessible to anyone over the Internet is insufficient to justify general jurisdiction. The Court further noted that the ability of viewers to register domain names on the website did not alter that conclusion because it simply enabled the defendant to do business with Ohio residents, a fact that does not permit general jurisdiction. Finally, the fact that, unlike direct marketing, registrants initiated the contact with defendant also contributed to the Court's holding. <u>Id.</u>

By contrast, in <u>Gator.Com Corp. v. L.L. Bean, Inc.</u>, 341 F.3d 1072, 1078 (9th Cir. 2003), the Ninth Circuit found that a retailer had sufficient contacts with California to permit the exercise of general jurisdiction, given its interactive website and extensive marketing and sales in the state. The critical facts here were that L.L. Bean made substantial sales to state residents, solicited business in the state, and served the state's markets. It targeted its electronic advertising at California and maintained a highly interactive, as opposed to "passive," website from which very large numbers of California consumers regularly made purchases and interacted with L.L. Bean sales representatives. Additionally, L.L. Bean had shipped large quantities of products to California and maintained continuous contacts with California vendors. The Court held that there was nothing "random, fortuitous, or attenuated" about subjecting L.L. Bean to the authority of the court, as it had deliberately and purposefully availed itself of the benefits of doing business within California. <u>Id.</u> at 1079.

Appx. 000014

This case is closer to Revell and Parsons than to L.L. Bean. Applying the "continuous and systematic" contacts test, it is evident that the requisite level of contact is missing. This is particularly true given the economic reality of Defendant's activities in New Jersey. There are two main components to its website. First, visitors to the site can read reports about various businesses. Second, consumers may post their own reports on the site. Both of these services are free. It would nonetheless be wrong to claim that there is no economic aspect to Defendant's website. To establish general jurisdiction, however, there must be more than mere minimum contacts. Provident Nat'l Bank, 819 F.2d at 437. As such, the salient point is that the overall commercial nature of the website does not manifest a deliberate and substantial presence in New Jersey, a fact which distances this case from the Supreme Court's decision in Perkins and the Ninth Circuit's recent decision in L.L. Bean. Indeed, as both Revell and Parsons suggest, the mere fact that an operator of an interactive website has additional commercial contacts with the forum does not compel a finding of general jurisdiction unless those contacts rise to the level of "continuous and systematic" activity.

The record demonstrates that Defendant actually sold and shipped only eight copies of Magedson's book to New Jersey. Compare Revell, 317 F.3d at 471 (holding sale of twenty journal subscriptions not sufficient to confer general jurisdiction). In addition, although the books are advertised on the Rip-off Report website, they are actually purchased through a separate website. Plaintiff's reference to the fact that Defendant offers fee-based services to New Jersey consumers and solicits fees from New Jersey residents is also unavailing. It is true that Defendant has a rebuttal fee policy, which states that if a company files more than four rebuttals, it will be charged a certain fee. The purpose of this policy is to dissuade companies from filing

-13-

numerous form rebuttals without addressing the substance of consumer complaints. More importantly, Defendant has never actually collected any rebuttal fee from any company. And with respect to the other possible fees alluded to by Plaintiff, it has likewise never charged any New Jersey company for any such fee, including promotional and collection fees, notwithstanding the website's statements regarding the existence of these fees. Plaintiff also contends that Defendant offers advertising space for sale on its website. Yet, it has never sold advertising space to any New Jersey resident. Finally, Plaintiff avers that Defendant runs a shakedown of businesses by demanding substantial payments to "resolve" consumer complaints. Again, there is no evidence that Defendant engaged in such behavior with New Jersey companies. It is therefore clear that Defendant's commercial contacts with New Jersey are insufficient to support the exercise of general jurisdiction.

Aside from the commercial nature of Defendant's activities, Plaintiff argues that Defendant has sufficient non-commercial contacts with New Jersey to establish general jurisdiction. Specifically, Plaintiff argues that Defendant (1) actively solicits web postings from New Jersey residents; (2) makes postings about New Jersey companies; and (3) organizes class actions against New Jersey companies. Plaintiff, however, has offered insufficient evidence to support these allegations. There is no evidence in the record that Defendant solicits web postings from New Jersey consumers or otherwise targets New Jersey residents, as it appears to solicit postings from any consumer from any location. Likewise, the record does not support Plaintiff's contention that Defendant regularly makes postings about New Jersey companies; rather, it appears that individual consumers are primarily responsible for the various postings on Defendant's website. And even assuming that Defendant does exercise some measure of

-14-

editorial control over the substance of consumer postings (for which there is some evidence in record, at least as pertains to Plaintiff), such contacts are not of such a continuous and systematic nature that New Jersey may exercise general jurisdiction. Nor does the fact that Defendant sought to organize a class action against Plaintiff in New Jersey support the assertion of general jurisdiction, as the related contacts do not constitute an ongoing, systematic and substantial presence in New Jersey. For these reasons, Defendant is not subject to general jurisdiction in New Jersey. Accordingly, the Court must determine whether the exercise of specific jurisdiction is appropriate.

    2.    **Specific Jurisdiction**

A three-part test has emerged to determine whether the exercise of specific jurisdiction over a non-resident defendant is constitutionally permissible: (1) the defendant must have sufficient "minimum contacts" with the forum state, (2) the claim asserted against the defendant must arise out of those contacts, and (3) the exercise of jurisdiction must be reasonable. Zippo, 952 F.Supp. at 1122-23; Imo Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998).

    a)    **Purposeful Availment and Minimum Contacts**

The "constitutional touchstone" of the minimum contacts analysis is embodied in the first prong – "whether the defendant purposefully established contacts" with the forum state. Zippo, 952 F.Supp. at 1123 (citing Burger King Corp., 471 U.S. at 475). In this case, Defendant's activities demonstrate that it deliberately established minimum contacts with New Jersey and purposefully availed itself of the privilege of conducting activities in this forum under both the "sliding scale" analysis developed for Internet activities and the traditional "effects" doctrine.

(i)   "Sliding Scale" Test

In Toys "R" Us, the Third Circuit set forth the standard for specific personal jurisdiction based upon a defendant's operation of a commercially interactive website. 318 F.3d at 452. The Court confronted the question as to whether the operation of an interactive website accessible in the forum state is sufficient to support specific jurisdiction, or whether there must be additional evidence that the defendant has "purposefully availed" itself of the privilege of engaging in activity in that state. Id. at 451. After noting that the mere operation of an interactive website should not subject the operator to jurisdiction anywhere in the world, the Court held that there must be evidence that the defendant "'purposefully availed' itself of conducting activity in the forum state, by directly targeting its website to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts." Id. at 454. It follows that there must be "something more" than the mere operation of an interactive website to properly confer personal jurisdiction. Id.

In articulating this standard, the Third Circuit discussed the opinion in Zippo, the "seminal authority regarding personal jurisdiction based upon the operation of an Internet web site." Id. at 452. The court in Zippo grouped the various cases into three separate categories, depending upon the commercial interactivity of the website. "[T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles." Zippo, 952 F.Supp. at 1124. The first category consists of "situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction . . . over the Internet, personal

-16-

jurisdiction is proper." Id. The second category of cases "is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." Id. The third category is "situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction." Id.

In this case, any user of the Internet can post material on Defendant's website, which implies that individuals send information to be posted and receive information that others have posted. Defendant's website is thus interactive and falls into the more amorphous middle category of the Zippo sliding scale. Whereas websites occupying the first and third categories of the sliding scale lend themselves to relatively simple jurisdictional analysis, interactive websites which lack an obvious business purpose present a more difficult question. The Court, consequently, must evaluate the level of interactivity to determine whether the defendant has "purposefully availed" itself of the privilege of engaging in activity in New Jersey. Toys "R" Us, Inc., 318 F.3d at 451-52. What is especially relevant here is that Toys "R" Us permits the Court to consider the Defendant's non-Internet activities as a part of the "purposeful availment" calculus. Id. at 453. In other words, non–Internet contacts may form part of the "something more" needed to establish jurisdiction. The exact mix of Internet and non-Internet contacts required to support an exercise of personal jurisdiction is a determination that "should be made on a case-by-case basis by assessing the 'nature and quality' of the contacts." Id. The

-17-

Appx. 000019

transmission of information to and from New Jersey through Defendant's interactive website must therefore be considered alongside its other contacts with the forum.

Contrary to Defendant's assertions, it does not merely operate a passive website, which facilitates the free transmission of ideas relating to allegedly illicit business practices. There are commercial aspects to the website, i.e. sale of books and advertising space, soliciting of donations, and offering of dispute resolution services. And while this relatively moderate level of commercial activity fails to confer general jurisdiction, it contradicts Defendant's contention that it operates a merely passive website. More importantly, the website is highly interactive. If consumers want to post a report, they select "file a report" on the home page, fill out personal identification information and obtain a password. New Jersey residents have made postings on the website. Defendant thus obtained personal identification information from and provided passwords to residents of the state. Previous reports are searchable by the state in which the company is located and other relevant categories. These consumer reports are available to governmental agencies for prosecuting and investigating allegedly fraudulent cases relating to various companies. Additionally, Defendant responds to emails which contain complaints about companies by inviting the consumer to post a report about their experience. Defendant also coordinates class actions by bringing alleged victims together with attorneys willing to sue the company after reading the relevant postings. The level of interactivity, however, is only one factor in the Court's analysis.

Through these interactive channels, Plaintiff alleges that Defendant published defamatory statements and further organized an effort to elicit a public response against it in New Jersey. Defendant argues that it does not add any content to any report posted by consumers. However,

-18-