GW Equity LLC v. Xcentric Ventures LLC et al                    Doc. 24 Att. 2
Case 3:07-cv-00976    Document 24-3    Filed 06/22/2007    Page 1 of 21
Case 2:03-cv-01992-JCL-MF    Document 29    Filed 01/23/2004    Page 19 of 35

the record shows that Defendant's editor, Ed Magedson, instructed Gregory Strausbaugh, a

volunteer associated with Defendant, in preparing the content of certain postings relating to

Plaintiff. Magedson reviewed drafts, provided edits, and made other suggestions relating to

Strausbaugh's postings. Defendant's involvement in this respect was anything but passive.

Insofar as Defendant allegedly transmitted defamatory statements to New Jersey about a New

Jersey resident corporation, the Fourth Circuit's decision in <u>AKS Scan Inc. v. Digital Serv.</u>

<u>Consultants, Inc.</u>, 293 F.3d 707 (4th Cir. 2002), is instructive.  In adapting the <u>Zippo</u> model, the

Fourth Circuit set forth a three-part test for reconciling contacts through electronic media with

standard due process principles: "the State may . . . exercise judicial power over a person outside

of the State when that person (1) directs electronic activity into the State, (2) with the manifested

intent of engaging in business or other interactions within the State, and (3) that activity creates,

in a person within the State, a potential cause of action cognizable in the State's courts." 293

F.3d at 714.  This standard underscores the requirement that there must be something intentional

about a defendant's conduct vis-a-vis the forum.  To publish allegedly defamatory statements

about a New Jersey resident corporation through the use of an interactive website, the primary

purpose of which is to facilitate class actions and public investigations against companies, and

which is accessible to New Jersey residents, manifests a specifically intended interaction with the

state of New Jersey.  The intentionality of such conduct contributes to the "something more"

required under the <u>Toys "R" Us</u> calculus.

        The deliberateness of Defendant's activity is magnified when considered in light of its

non-Internet contacts.  The record demonstrates that Defendant actively and purposefully

spearheaded an effort to trigger investigations into Plaintiff's activities in New Jersey.  Defendant

-19-

Appx.  000021

Dockets.Justia.com

sought to organize a class action against Plaintiff by having its staff communicate with attorneys located in New Jersey. Defendant's "Chief Investigator/Consumer Advocate" Frank Torelli reported Plaintiff to the FBI and public authorities in New Jersey in order to have it investigated for alleged improper commercial practices. Moreover, Magedson collaborated with Strausbaugh in contacting New Jersey public officials, community leaders and media personnel to raise the public awareness about Plaintiff's allegedly illegal and immoral behavior. Strausbaugh made repeated efforts to contact New Jersey officials–from the Governor of the State of New Jersey to the Catholic Archbishop of Newark. Indeed, the record suggests that Magedson directed Strausbaugh to "try and stir up trouble in NJ. . . " The quality of the non-Internet contacts in this case, therefore, weighs heavily in favor of the assertion of specific jurisdiction.

Defendant argues that Strausbaugh acted on his own behalf, and in furtherance of this argument, submits two sworn declarations from both Magedson and Strausbaugh, stating that Strausbaugh never worked for the Rip-off Report. This argument is unpersuasive. The facts reveal a clear working relationship between Magedson and Strausbaugh, in which Strausbaugh acted under Magedson's supervision in both publishing various statements about Plaintiff and reaching out to New Jersey officials and members of the media. It thus makes no difference that Strausbaugh was never formally employed by Defendant, especially in light of the fact that Defendant attempted to achieve its objectives through the use of volunteer assistance. In any event, Strausbaugh identified himself as a "Consumer Advocate," a title used by Defendant's staff, on more than one occasion and apparently received expense reimbursements for some of his efforts.

Defendant's actions constitute a deliberate undertaking to do or cause an act or thing to be

Appx. 000022

done in New Jersey–the "something more"–which permits the exercise of specific jurisdiction.

See Toys "R" Us, 318 F.3d at 453-54.  Because it participated in, and indeed organized, a

campaign to impact Plaintiff in New Jersey, Defendant should reasonably have anticipated being

haled into court here.  Id. at 451 (citing World-Wide Volkswagen Corp., 444 U.S. at 297).  In

sum, given the high level of interactivity of Defendant's website, when considered in conjunction

with the nature and quality of Defendant's Internet and non-Internet contacts, the assertion of

specific jurisdiction is consistent with principles of due process.

          (ii)    "Effects" Test

      Specific jurisdiction is also proper under the "effects" test.  Conduct that is specifically

directed at a plaintiff in the forum state, and facilitated by the use of the Internet, may constitute a

sufficient basis for the assertion of personal jurisdiction based on the "effects" test established by

the Supreme Court in Calder v. Jones, 465 U.S. 783 (1984).  In Calder, an editor and writer for

the National Enquirer, both residents of Florida, were sued in California for libel arising out of

an article published in the Enquirer.   The Supreme Court upheld the exercise of personal

jurisdiction over the two defendants because they had "expressly aimed" their conduct towards

California.  465 U.S. at 789.  The allegedly libelous story concerned the California activities of a

California resident; it was drawn from California sources; the brunt of the harm, in terms of

plaintiff's emotional distress and the injury to professional reputation, was suffered in California.

"In sum, California [was] the focal point both of the story and of the harm suffered."  Id.

      The Third Circuit has adopted a three-prong test for determining the applicability of

Calder:

      First, the defendant must have committed an intentional tort.  Second, the plaintiff must

-21-

have felt the brunt of the harm caused by that tort in the forum, such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort. Third, the defendant must have expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

Imo Indus., Inc., 155 F.3d at 256. "[U]nder this test a court may exercise personal jurisdiction over a nonresident defendant who commits an intentional tort by certain acts outside the forum which have a particular type of effect upon the plaintiff within the forum." Id. at 261. The question thus becomes whether the transmission of allegedly defamatory information via the Internet to New Jersey, causing harm there, when considered in conjunction with other non-Internet contacts, subjects Defendant to jurisdiction in New Jersey. Applying the three-prong Imo test, the Court believes that it does.

Plaintiff has asserted that Defendant committed the intentional tort of defamation, thus satisfying the first prong of the Imo test. Plaintiff also "felt the brunt of the harm" in New Jersey where it had its main office. The various postings on Defendant's website all refer to New Jersey as Plaintiff's principal business location. The deliberate contacts with New Jersey public officials, community leaders and media personnel also focus on Plaintiff's activities within the state, where it allegedly hides its illicit business practices. The damage to Plaintiff's reputation, assuming the defamatory nature of the statements, will occur mostly in New Jersey because any public response will be prompted by New Jersey officials and media channels. Moreover, the record indicates that Defendant sought to organize a class action against Plaintiff in New Jersey by contacting New Jersey attorneys. Clearly, then, the focal point of the harm suffered by Plaintiff is New Jersey. Since there is nothing fortuitous about New Jersey's relationship to the alleged harm, and no other location for the alleged harm has been suggested, Plaintiff has met the

-22-

second prong of the <u>Imo</u> analysis. The third prong requires the Court to determine whether Defendant expressly aimed its tortious conduct at the forum. Given the deliberate attempts to contact New Jersey public officials, community leaders, media personnel, and attorneys, prompted by the numerous statements published on Defendant's website, there is no question that Defendant expressly aimed its conduct at New Jersey. Defendant undoubtedly knew that Plaintiff was located in New Jersey and that by causing harm to Plaintiff's reputation, not to mention the potential harm attendant to a civil class action or criminal investigation by New Jersey authorities, the brunt of the injury would be felt within the state. Defendant thus "manifest[ed] behavior intentionally targeted at and focused on" the forum, establishing New Jersey as the focal point of the allegedly tortious conduct. <u>Imo Indust., Inc.</u>, 155 F.3d at 265.

Accordingly, through both its Internet and non-Internet activities, the Court concludes that Defendant established minimum contacts with New Jersey.

**b) Relationship of Forum-Related Contacts**

The second requirement for specific personal jurisdiction is that the claim "arise out of or relate to the defendant's contact with the forum." <u>Burger King Corp.</u>, 471 U.S. at 472 n.15 (citations omitted). This requirement protects a defendant from being haled into court in a foreign jurisdiction based on "the unilateral activity of another party or third person," as opposed to the defendant's own deliberate contacts with the forum. <u>Id.</u> at 475 (citations omitted). Plaintiff brings this action to enforce a foreign judgment against Defendant, which was based upon Defendant's allegedly tortious activity in publishing defamatory statements and eliciting a public response against Plaintiff's business practices. As discussed above, New Jersey was the focal point of this activity. Thus, Plaintiff's present claim arises out of Defendant's New Jersey-

-23-

related activities.

### c) Reasonableness of Jurisdiction

Once it is clear that a defendant has minimum contacts with the forum state, the inquiry turns to whether the assertion of jurisdiction comports with traditional notions of fair play and substantial justice. Zippo, 952 F.Supp. at 1123 (citing International Shoe Co., 326 U.S. at 316). The "reasonableness" prong exists to protect defendants against unfairly inconvenient litigation. World-Wide Volkswagen, 444 U.S. at 292. When considering the reasonableness of a particular forum, the court must consider the burden on the defendant in light of other factors including:

> the forum state's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiff's power to choose the forum; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.

Id. (citations omitted).

Defendant argues that the exercise of jurisdiction would be unreasonable in this case. The Court disagrees. New Jersey certainly has a substantial interest in adjudicating disputes arising from allegedly defamatory statements about resident corporations. This is particularly so where a defendant attempts to solicit the support of New Jersey public officials in conducting investigations pertaining to the activities New Jersey corporations. The Court also gives due regard to Plaintiff's choice to seek relief in New Jersey. These concerns outweigh the burden created by forcing Defendant to defend suit in New Jersey, especially where Defendant published allegedly defamatory statements about the activities of a New Jersey resident corporation and also targeted its non-Internet contacts towards New Jersey. Defendant argues that Plaintiff could easily have filed suit in Defendant's home state of Arizona. This may be true, but it does not

-24-

overcome otherwise clear justifications for the exercise of jurisdiction. The Court does not

consider the inconvenience to be so great as to constitute a deprivation of due process. The Due

Process Clause is not a "territorial shield to interstate obligations that have been voluntarily

assumed." Burger King Corp., 471 U.S. at 474.

**C.      Conclusion**

For the foregoing reasons, the assertion of specific personal jurisdiction over Defendant is

appropriate. Defendant's motion to dismiss for lack of personal jurisdiction will therefore be

denied.

As the exercise of personal jurisdiction over Defendant is proper, the Court will now

examine the merits of Plaintiff's motion for a preliminary injunction.

## ALYON'S MOTION FOR A PRELIMINARY INJUNCTION

**A.      Standard**

An injunction is an extraordinary remedy which should be granted only in limited

circumstances. AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir.

1994). An injunction is issued only where the moving party produces sufficient evidence to

establish that the following four factors favor preliminary relief: (1) the likelihood the plaintiff

will prevail on the merits; (2) the extent to which plaintiff is being irreparably harmed by the

conduct at issue; (3) the extent to which the non-moving party will suffer harm if the injunction

is granted; and (4) the public interest implicated. Brian B. ex rel. Lois B. v. Comm'r. of

Pennsylvania Dept. of Educ., 230 F.3d 582, 585 (3d Cir. 2000); Allegheny Energy, Inc. v. DQE,

Inc., 171 F.3d 153, 158 (3d Cir. 1999); Opticians Ass'n v. Independent Opticians, 920 F.2d 187,

191-92 (3d Cir.1990). The Third Circuit, moreover, places particular emphasis on the first two

-25-

Appx.  000027

factors, the likelihood of success and irreparable harm.  <u>Instant Air Freight Co. v. C.F. Air</u>

<u>Freight, Inc.</u>, 882 F.2d 797, 800 & n.5 (3d Cir. 1989).  A "failure to show a likelihood of success

or a failure to demonstrate irreparable injury, must necessarily result in the denial of a

preliminary injunction."  <u>In re Arthur Treacher's Franchisee Litig.</u>, 689 F.2d 1137, 1143 (3d Cir.

1982).

      Alyon seeks an order rescinding the allegedly fraudulent transfer of the domain names

badbusinessbureau.com, ripoffreport.com, and ripoffrevenge.com from Badbusinessbureau to

Xcentric Ventures, LLC and temporarily restraining any similar asset transfers pending final

disposition of this action.  Because this matter solely concerns the enforcement of a foreign

judgment, and not an independent claim for relief, the grant of the preliminary injunctive relief

requested by Alyon depends upon whether enforcement of the foreign judgment is likely.  Put

differently, if there were a foreign judgment deserving of enforcement, then the Court might look

favorably upon enjoining an asset transfer found to be designed to inhibit the successful

execution upon that judgment.  The issue here, then, is whether Alyon has produced sufficient

evidence to establish a likelihood of success on the merits of its claim for enforcement of the

Saint Christopher judgment.  For the reasons set forth below, the Court concludes it has not.[3]

_____

[3] Alyon also requests that this Court declare enforceable the asset freeze order already
entered by the court in Saint Christopher.  However, it does not appear that the asset freeze order
survived the final judgment entered in Saint Christopher, as the freeze order issued on March 28
remained in effect "until further order of the court" and the final judgment, which was
subsequently issued in July, makes no reference to asset transfers.  In any event, without a
foundational final order deserving of enforcement, the Court is unwilling to enforce an interim
order.

Appx.  000028

**B.      Analysis**

**1.      Likelihood of Success on the Merits**

Comity is "the recognition which one nation allows within its territory to the legislative,

executive or judicial acts of another nation, having due regard both to international duty and

convenience, and to the rights of its own citizens or of other persons who are under the protection

of its laws." Hilton v. Guyut, 159 U.S. 113, 163-64 (1895).  Under common law principles of

international comity, a foreign court's judgment on a matter is conclusive in a federal court when

(1) the foreign judgment was rendered by a court of competent jurisdiction, which had

jurisdiction over the cause and the parties, (2) the judgment is supported by due allegations and

proof, (3) the relevant parties had an opportunity to be heard, (4) the foreign court follows

procedural rules, and (5) the foreign proceedings are stated in a clear and formal record. Id. at

__.  "Although more than mere courtesy and accommodation, comity does not achieve the force

of an imperative or obligation." Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d

435, 440 (3d Cir. 1972).  It is, therefore, not a rule of law, but one of practice, convenience, and

expediency. Id.

Where, as here, the jurisdiction of the federal district court is founded upon diversity of

citizenship, the law to be applied is the law of the state where the court is located. Id.

Accordingly, this Court looks to New Jersey law, which provides that recognition of a judgment

of a foreign court under the principles of comity is generally subject to two conditions: (1) that

the foreign court had jurisdiction over the subject matter; and (2) that the foreign judgment will

not offend the public policy of the State. Fantony v. Fantony, 21 N.J. 525, 533 (1956).   In New

Jersey, the rule of comity is "grounded in the policy of avoiding conflicts in jurisdiction, unless

-27-

upon strong grounds, and the general principle that the court which first acquires jurisdiction of an issue has precedence, in the absence of special equities." Id.  In articulating the principles of comity, the court in Fantony acknowledged that the governing standard in New Jersey was in accord with Hilton and other decisions of the United States Supreme Court. Id.

In addition, New Jersey has adopted the Foreign Country Money-Judgments Recognition Act ("Act").  See N.J.S.A. 2A:49A-20.  New Jersey's courts must recognize a final foreign country judgment for money damages as "conclusive between the parties," unless one of the specific grounds for non-recognition that are enumerated in the Act is applicable.  Kam-Tech Sys. Ltd. v. Yardeni, 340 N.J.Super. 414, 422-23 (App. Div. 2001).  The pertinent part of the Act reads as follows:

> 2A:49A-20. *Conclusiveness of Foreign Judgment*
>
> a. A foreign country money-judgment is not conclusive if:
> (1) the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;
> (2) the foreign country court did not have personal jurisdiction over the judgment debtor; or
> (3) the foreign country court did not have jurisdiction over the subject matter.
> b. A foreign country money-judgment need not be recognized if:
> (1) the judgment debtor in the proceedings in the foreign country court did not receive notice of the proceedings in sufficient time to enable the judgment debtor to defend;
> (2) the judgment was obtained by fraud;
> (3) the cause of action on which the foreign judgment is based is contrary to the public policy of this State;
> (4) the judgment conflicts with a prior final and conclusive judgment;
> (5) the proceedings in the foreign country court were contrary to an agreement between the parties under which the dispute in question was to be settled, other than by proceedings in that court; or
> (6) in the case of jurisdiction based only on personal service, the foreign country court was a seriously inconvenient forum for the trial of the action.

N.J.S.A. 2A:49A-20.  The Act supplies a statutory basis for enforcing foreign judgments, though

-28-

it expressly limits itself to money judgments.  <u>Kam-Tech Sys. Ltd.</u>, 340 N.J. Super. at 421.

Given that the final judgment rendered by the Saint Christopher court is composed of both money damages and permanent injunctive relief, the Act governs the enforcement of the money damages component while common law principles of comity, as articulated in <u>Hilton</u> and <u>Fantony</u>, govern the injunctive component.  Applying these principles to the present case, the Court has grave reservations as to the propriety of enforcing either aspect–monetary or injunctive–of the foreign judgment.  These reservations focus on two questions: (1) whether the foreign procedures comported with principles of due process and (2) whether enforcing this foreign judgment contravenes the public policy of the State of New Jersey.

First, with respect to the money damages, the Court is not convinced that the foreign procedures were consistent with the requirements of due process.  Under the Act, a foreign money-judgment is not conclusive if that judgment was "rendered under a system which does not provide impartial tribunals or procedures compatible with the requirement of due process of law." N.J.S.A. 2A:49A-20(a)(1).  "The statute simply requires that the foreign procedure be 'compatible with the requirements of due process of law,' namely, that 'the foreign procedures are fundamentally fair and do not offend against basic fairness.'" <u>Kam-Tech Sys. Ltd.</u>, 340 N.J. Super. at 425 (citing <u>Society of Lloyd's v. Ashenden</u>, 233 F.3d 473, 477 (7th Cir. 2000)).  Alyon alleges that Saint Christopher is subject to the oversight of the Judicial Committee of the Privy Council of England, and that it follows English common law and procedure.  Yet, such broad statements as to the design of the Saint Christopher legal system do not address the specific issue before the Court, to wit, whether the foreign procedures employed by the Saint Christopher tribunal in this particular matter comported with basic fairness.

-29-

The Court recognizes that it cannot second-guess every judgment rendered by a foreign tribunal or otherwise engage in a meticulous and exacting review of the relevant foreign procedures. Even so, overarching principles of fundamental fairness require at least a brief glance at those procedures. What this glance has revealed in the present case makes the Court highly doubtful as to the basic fairness of the foreign proceedings; indeed, the money-judgment for ten million dollars appears to have been entered without any competent supporting evidence. Having searched the record for the basis of this calculation, it appears to have been based solely on the filing of a Re-Amended Statement of Claim, certified and submitted by De Lara MacClure Taylor, an attorney of the Eastern Caribbean Supreme Court and solicitor for Alyon.

As a preliminary matter, a statement of claim is not competent evidence. But even assuming it were, the Re-Amended Statement of Claim contains no facts supporting either the damages amount or that the damages were caused by the Defendant's conduct.

The Re-Amended Statement of Claim merely states:

The Claimant has lost revenue from enforceable lawfully incurred charges that the Claimant would otherwise have collected but for the Defendant's conduct. The Defendant's knowing (or at a minimum highly reckless) solicitation and publication and republication of false and defamatory comments for the whole world to see has caused and continues to cause massive and irreparable damage to the Claimant resulting in loss of revenues and business opportunities in an amount difficult to ascertain but not less than US $10,000,000.

Particulars of Special Damage

| | |
|---|---:|
| Decline in payments | $5,597,835.00 |
| Decline in collections | $190,407.00 |
| Burglar alarm | 16,000.00 |
| Public relations – crisis management | 117,464.00 |
| Public relations – alternative trademark | 23,372.00 |
| Legal fees to defend against attacks from the Defendants | 750,000.00 |
| Lost working time (est. @ 20% of payroll) | 129,000.00 |
| Wasted office supplies (extra purchases) | 30,000.00 |

-30-

| Delay in bringing customer service in-house | 150,000.00 |
| Stagnant paper due to loss of collection services | $3,356,632.00 |

(Re-Amended Statement of Claim ¶ 69.).   Although it contains many similar allegations, such

argumentative and conclusory statements in a statement of claim fail to demonstrate any basis for

the amount of the judgment.  And because Alyon has not filed with this Court any additional

evidence that it used to justify this very large damage award, there is an insufficient factual basis

in the record to support the enforcement of this ten million dollar judgment.[4]

Moreover, even assuming that Alyon provided competent evidence as to its loss of

revenues and business opportunities (which it did not), it failed to proffer sufficient evidence as

to causation, which, as in most situations, is a crucial element here.  The economic consequences

of defamatory statements are inherently elusive, thus demanding at least some showing of a

causal relationship between any damage amount and a defendant's actions.  Alyon, however,

assumes a causal connection that is anything but obvious.  For instance, Alyon merely claimed,

without factual support, that Badbusinessbureau's conduct caused consumers to refuse payment,

resulting in losses of 5.5 million dollars in "decline in payments," $190,000 in "decline in

collections," and 3.3 million dollars in "stagnant paper due to loss of collection services."  But in

---

[4] The record shows that Alyon submitted an affidavit from Stephane Touboul in support
of its application for a preliminary injunctive relief in Saint Christopher.  However, it is not clear
whether the Saint Christopher court considered this affidavit in entering the final judgment.
Indeed, Alyon does not contend that this affidavit was ever considered by the court, but rather
argues that the "St. Kitts judgment issued based on the pleaded special damages claim."
Additionally, the final judgment itself states that it was based only on the statement of claim.  In
any event, even assuming the Saint Christopher court did consider the affidavit in calculating the
damages award, it contains the same argumentative and conclusory statements (but without any
itemization of damages); and it therefore does not alter this Court's conclusion that there was
insufficient evidence to support the issuance of a ten million dollar judgment.

-31-

the absence of supporting evidence, there can be no reasonable certainty that Badbusinessbureau is responsible for these losses. These losses may be attributable to many sources, each of which is only partially responsible for the loss in payments and collections. This is especially true where the record contains alternative facts suggesting causation from an entirely different source, i.e., state and federal investigations of Alyon's business practices. Indeed, such a causal nexus is lacking as to all of Alyon's itemized damages.

To render a ten million dollar judgment without the benefit of supporting facts as to the amount of damages and causation transgresses basic norms of fairness, even in a default situation. It is a well-established principle of jurisprudence in this country that even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to damages are not deemed to be true. Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990) (relying on Thomson v. Wooster, 114 U.S. 104, 111 (1885)); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir. 1977); see also Fed. R. Civ. P. 55(b)(2) (providing when granting a default judgment, if "it is necessary to take account or to determine the amount of damages or to establish the truth of any averment by evidence . . . the court may conduct such hearings or order such references as it deems necessary and proper"). Thus, in the default situation, there must be sufficient evidence to support a damages award. See Credit Lyonnais Securities (USA), Inc. v. Alcantara, 183 F.3d 151, 154-55 (2d Cir. 1999) (holding that district court had insufficient evidence upon which to enter amount of judgment where it only had allegations in complaint and affidavit of plaintiff's counsel); Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (holding that district court did not satisfy its obligation to

-32-

ensure that damages were appropriate where it merely accepted at face value plaintiff's

statements in its complaint).

It is, of course, true that our jurisprudence does not require a perfect match between the

procedures of a foreign court and those used by the courts of the United States.  What counts,

however, is "the basic fairness of the foreign procedures."  Kam-Tech Sys. Ltd., 340 N.J. Super.

at 425.  Although Badbusinessbureau cannot ignore a duly-entered default judgment, the absence

of any competent evidence justifying the amount of the judgment entered in Saint Christopher

contradicts any claim that those procedures were compatible with due process of law.  This holds

true notwithstanding the fact that the Saint Christopher legal system purports to follow English

procedures.  Compare CIBC Mellon Trust Co. v. Mora Hotel Corp., N.V., 100 N.Y.2d 215, 220

(2003) (enforcing default judgments of roughly $330 million dollars, which were entered in

England following damages assessment hearings).  As such, pursuant to the standard set forth in

the Foreign Country Money-Judgments Act, principles of basic fairness will likely preclude

enforcement of the money damages part of the foreign judgment.

Second, enforcement of the injunctive relief granted by the Saint Christopher court is

likely to contravene the public policy of the State of New Jersey, as it purports to restrain

Badbusinessbureau from "publishing and distributing by way of posting on [its] websites . . . or

anywhere whatsoever any derogatory and/or defamatory material about [Alyon]."  Such an order

operates as a prior restraint on speech, which, in most relevant situations, triggers constitutional

alarm.  See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1974); see also CBS,

Inc. v. Davis, 510 U.S. 1315, 1317 (1994) ("Subsequent civil or criminal proceedings, rather than

prior restraints, ordinarily are the appropriate sanction for calculated defamation or other

-33-

misdeeds in the First Amendment context.").   Furthermore, insofar as this foreign judgment seeks to suppress derogatory, as well as defamatory speech, it extends to constitutionally-protected speech, which is not actionable in any event.  In this respect, it may further offend New Jersey's public policy.

Alyon argues that it does not seek a prior restraint on expression since it merely seeks enforcement of a final judgment duly entered by the court in Saint Christopher.  This argument misses the point that enforcement of the foreign judgment by this Court will undoubtedly operate as a prior restraint on constitutionally-protected speech.  Alyon also argues that because Badbusinessbureau was incorporated in Nevis, it has waived any constitutional protection.  This argument is also unavailing.  Badbusinessbureau has its principal place of business in Arizona, the Internet Service Provider is in Arizona, the volunteers who assist with the website reside in Arizona, and its founder, Ed Magedson, resides in and operates the website from Arizona.  Perhaps more importantly, the website targets American corporations and exists as an expressive forum for American consumers.  It is therefore somewhat misleading to label Badbusinessbureau as a foreign corporation.  Although true, it obscures the fact that the United States is the focal point of Badbusinessbureau's activities.  The implications of an injunction, moreover, extend beyond Badbusinessbureau to those American consumers who utilize its website as a forum for free expression.  To enjoin Badbusinessbureau from publishing any derogatory statements about Alyon is also to restrain the constitutionally-protected speech of American (including New Jersey) consumers who routinely use the website as a channel of communication.  The Court is extremely hesitant to exercise such powers.

Finally, it bears mentioning that Alyon has been the subject of numerous investigations

-34-

by public authorities in this country, and indeed, is a party to a lawsuit brought against it by the Federal Trade Commission. While not evidence of the impropriety of Alyon's own business practices, this fact surely increases the Court's reluctance to enforce such a broad and sweeping foreign judgment.

In sum, Alyon has failed to carry its burden of demonstrating a likelihood of success on the merits of its enforcement claim. The grant of a preliminary injunction is therefore unwarranted.

### 2.    Remaining Factors

Because Alyon has failed to demonstrate a reasonable likelihood of success on the merits, the Court need not consider the remaining factors for the grant of a preliminary injunction.

### CONCLUSION

Accordingly, **IT IS** on this 23rd of January 2004

**ORDERED** that Defendant Badbusinessbureau.com, LLC's motion to dismiss the complaint as to lack of personal jurisdiction is denied; and it is further

**ORDERED** that Plaintiff Alyon Technologies' motion for a preliminary injunction is denied.


_____    /s/ John C. Lifland, U.S.D.J.

-35-

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GW EQUITY, LLC, | § | |
| | § | |
| PLAINTIFF, | § | CIVIL ACTION |
| | § | |
| v. | § | No. 3-07-CV-0976-K |
| | § | |
| XCENTRIC VENTURES, LLC, | § | |
| WWW.RIPOFFREPORT.COM, | § | |
| WWW.BADBUSINESSBUREAU.COM, | § | |
| and EDWARD MAGEDSON, | § | |
| | § | |
| DEFENDANTS. | § | |

## DECLARATION OF JOHN T. COX III

1.      My name is John T. Cox III.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am, in all ways, capable of making this Declaration. The facts stated in this Declaration are within my personal knowledge and are true and correct.

2.      I am an attorney with the law firm Lynn Tillotson & Pinker, LLP and serve as counsel to Plaintiff GW Equity, LLC ("GW Equity") in the above-referenced action.  I have personal knowledge of the matters set forth in this Declaration through my position as counsel. All of the information contained in this Declaration is submitted in support of GW Equity's Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction.  I make this declaration to place before the Court relevant documents.

3.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the current www.ripoffreport.com webpage offering the "Do-It-Yourself Guide: How to Get Rip-off Revenge."



EXHIBIT
2

DECLARATION OF JOHN T. COX III                                                                PAGE 1

4.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of an archived version of the www.ripoffreport.com webpage offering the "Do-It-Yourself Guide to Rip-off Revenge" that states this material is written by "Ed Magedson, founder of Rip-off Report.com."

5.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of www.ripoffreport.com's webpage offering the "Rip-off Report Corporate Advocacy Business Remediation & Customer Satisfaction Program."

6.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of www.ripoffreport.com's "Donations" webpage.

7.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of an archived version of www.ripoffreport.com's homepage encouraging businesses to advertise in Texas.

8.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of www.ripoffreport.com's homepage offering assistance to consumers in forming class action lawsuits, offering complainants media assistance for the reports that they post, inviting users to engage in communications with the websites via email, and offering complainants the possibility of future compensation for submitting reports on certain companies.

9.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of www.ripoffreport.com's webpage that a new user sees when registering for the website.

10.     Attached hereto as <u>Exhibit H</u> is a true and correct copy of the search results for all reports where Defendant Edward Magedson has personally responded to the posts on the website.

11.     Attached hereto as <u>Exhibit I</u> is a true and correct copy of several posts from www.ripoffreport.com where Defendant Edward Magedson has responded to the individual posts on the website.

12.     Attached hereto as <u>Exhibit J</u> is a true and correct copy of a search result for all reports using the criteria "Texas" from the website www.ripoffreport.com up to June 22, 2007.

13.     Attached hereto as <u>Exhibit K</u> is a true and correct copy of an archived www.ripoffreport.com webpage soliciting consumers to be "Rip-off Reporters."

14.     Based on my review, www.ripoffreport.com organizes its postings under geographic locations, allowing users to search for specific states such as Texas.

---

DECLARATION OF JOHN T. COX III                                                      PAGE 3

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 22, 2007



_____
John T. Cox III

Appx.  000041